1    COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C §§ 1983

2    Name    HONESTO          PETER           J
             (Last)              (First)           (Initial)
3

4    Prisoner Number ___D55459___

5    Institutional Address ___CSATF/SP E2-162;PO Box 5242 Corcoran, CA 93212___

6    ════════════════════════════════════════════

7                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
8
     Peter Honesto; The Honesto Estate
9    (Enter the full name of plaintiff in this action.)     )
                                                            )
10                      vs.                                 )     Case No. _____
                                                            )     (To be provided by the Clerk of Court)
11   J. Tilton, et al. Defendant's                          )
                                                            )     **COMPLAINT UNDER THE**
12   at p. 8, & Doe Defendants                              )     **CIVIL RIGHTS ACT,**
                                                            )     Title 42 U.S.C § 1983
13   1 thru 50                                              )
                                                            )
14   _____                        )
                                                            )
15   (Enter the full name of the defendant(s) in this action)  )

16   *[All questions on this complaint form must be answered in order for your action to proceed..]*

17   I.    Exhaustion of Administrative Remedies.

18         [**Note:** You must exhaust your administrative remedies before your claim can go

19         forward. The court will dismiss any unexhausted claims.]

20         A.    Place of present confinement ___CSATF/SP___

21         B.    Is there a grievance procedure in this institution?

22                   YES (X)      NO ( )

23         C.    Did you present the facts in your complaint for review through the grievance

24               procedure?

25                   YES ( )      NO (X)

26         D.    If your answer is YES, list the appeal number and the date and result of the

27               appeal at each level of review. If you did not pursue a certain level of appeal,

28               explain why.

     COMPLAINT                        - 1 -

1.  Informal appeal _____

_____

_____

2. First formal level_____

_____

_____

3. Second formal level_____

_____

_____

4. Third formal level _____

_____

_____

E.    Is the last level to which you appealed the highest level of appeal available to you?

        YES ( )    NO ( )

F.    If you did not present your claim for review through the grievance procedure, explain why. See Procedural Statement of complaint at p.5; and Liberal Construction/Cognizable Legal Theory at p.29

_____

_____

II.    Parties.

A.    Write your name and your present address.  Do the same for additional plaintiffs, if any.

Peter Honesto, CSATF/SP E2-162;PO Box 5242; Corcoran, CA 93212

The Honesto Estate, 11010 Orleans River Ct., Rancho Cordova, Ca. 95670

_____

B.    Write the full name of each defendant, his or her official position, and his or her place of employment.

James Tilton, Director of California Department of Corrections and Rehabilitation;Sacramento,CA See Additional Defendants at p.8

COMPLAINT               - 2 -

1
2
3
4

5   III.    Statement of Claim.

6          State here as briefly as possible the facts of your case. Be sure to describe how each

7   defendant is involved and to include dates, when possible. Do not give any legal arguments or

8   cite any cases or statutes. If you have more than one claim, each claim should be set forth in a

9   separate numbered paragraph.
          See Statement of Claim at p. 12
10
11
12
13
14
15
16
17
18
19
20
21
22

23  IV.    Relief.

24         Your complaint cannot go forward unless you request specific relief. State briefly exactly

25  what you want the court to do for you. Make no legal arguments; cite no cases or statutes.
          See Relief Requested at p. 22.
26
27
28

COMPLAINT                    - 3 -

1

2

3

4

5      I declare under penalty of perjury that the foregoing is true and correct.

6

7      Signed this _____ day of _____, 20 ___

8

9                          _____

10                              (Plaintiff's signature)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                          - 4 -

## TABLE OF CONTENTS

I.     Procedural Statement of Complaint & Jurisdiction............................5

II.    Plaintiff's and Defendant's................................................8

III.   Statement of Claim.........................................................12

IV.    Requested Relief...........................................................22

V.     Liberal Construction.......................................................29

VI.    Legal Allegations/Cause of Action..........................................31

VII.   Conatitutional Right/Claim.................................................38

VIII.  Memorandum of Points and Authorities.......................................44

VIV.   Unconstitutional Penal Statute 3041(a)(b) and Cal. Code of Regs.2402......44

X.     Cal. Penal Code 3041(b) and Cal.Code of Regs.2402 denies rehabilitation...50

XI.    Unconstitutional Blanket rule/policy that denies/excludes parole..........51

XII.   Application of Penal Statute 3041(a)(b), unconstitutional for uncertainty.52

XIII.  Breached/Violated plea.....................................................54

XIV.   Conclusion.................................................................56

Ex.  A: Plea Contract Stipulated in the Second Degree & Evidentiary Transcripts

Ex.  B: Trial Court & Prosecutors' statement after Plaintiff went to State Prison
        and Probation Report.

Ex.  C: Northern District Stay Granted

Ex.  D: Superior Court Interim Orders & Final Order

Ex.  E: Complaints filed/submitted by the Honesto Estate & documented damages
        Plaintiff suffered.

Ex.  F: Plaintiffs' Affidavit/Declaration

Ex.  G: Stolen Justice Investigation

Ex.  H: Superior Court Final Order documenting/applying the Trial Courts use of the
        probation report and Plaintiffs' statment to the probation officer.

## JURISDICTION

1. This is a Civil Action authorized by U.S.C. Sec.1983 To redress the deprivation, under color of State Law, of the rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. Sec's 2201 and 2202.

I.

### PROCEDURAL STATEMENT OF COMPLAINT

2. This Complaint states a claim of a breached and/or violated plea contract malicious and/or dishonest corrupt intent, bad faith, and discrimination/retaliation after Plaintiff pleaded to a crime (a lesser included offense), for the benefit of less punishment, because of evidence problems with the Peoples case in trial, (Ex.A, Plea Contract 'Stipulated' in the Second Degree & Evidentiary Transcripts); and discrimination/retaliation because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel, due to the plea contract and discrimination/retalatory acts against Plaintiff punishing him by application of the probation report detailing Plaintiffs' induced statement under duress without counsel present, and Ex.B, for and/or after Plaintiff complained about his health, safety/welfare and liberty (14th Amendment right to due process), with actions inflicting Plaintiff with the deliberate indifference of arbitrary or capricious treatment (bad faith), where the facts demonstrate "Defendant's" denied Plaintiff the benefit of less punishment, thereafter "Defendant's", and each of them knowingly aggravated dismissed counts, charges, and facts of the crime that were not found or proven by a jury to violate Plaintiff's Constitutional Rights, and fostered/implemented an unconstitutional blanket rule/policy that denies/excludes parole for individuals who's crime had a particular type of aggravating factor, and applied the blanket rule/policy to discriminate/retaliate against Plaintiff, in violation of Due Process, Equal Protection, the 14th & 6th Amendments, and Jurisdictional Violations of Due Process where the facts demonstrate Plaintiff was not represented by counsel when

5.

interviewed by the probation officer, who induced a statement from Plaintiff under duress without counsel present and without advising Plaintiff of his right to counsel; And when the Trial Court & Prosecutor authored a statement changing the terms of the plea adversely to prejudice Plaintiff after he went to State Prison without counsel present, **Ex.B**, and by application/consideration of the probation report detailing facts that were not found/proven by a jury and Plaintiffs' induced statement under duress without counsel present, and discrimination/retaliation against Plaintiff for and/or after entering into the plea contract for the benefit of less punishment. The above facts demonstrate claims upon which relief can be granted, therein showing any motion by "Defendant's" to dismiss on this ground must be denied and is an act against futility designed to delay the judicial process from applying any standard of review or remedy with regards to the facts, protected by the Due Process Clause of the 14th Amendment to the United States Constitution.

3. Plaintiff further puts forward he has diligently litigated on Habeas Corpus claims of denial/violation to his clearly established Constitutional Rights, as outlined in this Complaint, See United States District Court GRANTED stay as timely, where the claims were NOT "plainly meritless", **Ex.C**; therein supporting other facts that "Defendant's" and each of them, individually and/or in their official capacity, as detailed knew Plaintiff was denied his clearly established Constitutional Rights to Due Process, Equal Protection, 14th & 6th Amendments, Ex Post Facto, and to be free from actions punishing him by application/consideration of the probation report, Plaintiffs' induced statement (prejudice/dicscrimination), under duress without counsel present and without advising Plaintiff of his right to counsel; therein perfecting and applying **Ex.B**, in violation/breach of the plea contract (**Jurisdictional Violation**).

4. See also **Exhibit D**, documenting Plaintiff diligently litigated on Habeas Corpus and that, these claims/facts demonstrate any motion by "Defendant's" to dismiss the claims for failure to prosecute is an act of bad faith and an attempt

6.

by "Defendant's" to delay the process.

5. Plaintiff pro se without an attorney, unskilled and untrained in the law but aware of the fact his claims pending on Habeas Corpus (continued incarceration), damages he is continuously suffering from due to violations of Constitutional Magnitude to his Constitutional Rights, as outlined in this Complaint may allow Plaintiff to submit a Complaint prior to being released from unlawful restraint, due to the fact Plaintiff is seeking declaratory and/or injunctive relief without damages against "Defendant's", and each of them pursuant to 42 U.S.C. 1983, for an action at law, and claims of discrimination/retaliation, incompetence, violations of State Law, and claims of 8th, 14th & 6th Amendment rights protected by the United States Constitution, and where the facts demonstrate acts of acquiescence to unconstitutional acts or culpable conduct as to training, supervision, or control of subordinates, See **Buckley v. Gomez**, 36 F.Supp.2d 1261 (S.D. Cal.9, 1997); **Cunningham v. Gates**, 989 F.Supp.1262 (C.D. Cal.9, 1997), See also **Ex.B**, demonstrating "Defendant's", and each of them knew Plaintiff was not pleading/admitting to First Degree Murder when waiving his right to retrial and the States burden of proof for the benefit of less punishment, demonstrating facts upon which relief can be granted, as outlined in this Complaint.

6. Plaintiff herein respectfully requests this Honorable Court litigate the issues on the 'fast track' and without delay if in light of the facts presented the Court determines the claims against "Defendant's" in their official capacity for declaratory and/or injunctive relief can proceed with or without damages (continued incarceration), and/or without prejudice to Plaintiff submitting an amended Complaint for damages (a suit in equity), against "Defendant's", individually and/or in their official capacity if/when Plaintiff is released from unlawful restraint pursuant to **Heck v. Humphrey**, 114 S.Ct. 2364 (1994).

//

/

7.

## II.

### PARTIES

### PLAINTIFFS

7. Plaintiff Peter Honesto, was at all times mentioned herein a prisoner of the State of California in the custody of the California Department of Corrections.

8. The Estate of Peter Honesto is also a Plaintiff, at all times mentioned herein having a personal interest in Plaintiff Peter Honesto's health, welfare/safety, and liberty. See **Exhibit E**, documenting this fact.

### DEFENDANTS

9. Defendant J. Tilton, was the Director of the California Department of Corrections (herein after CDC), succeeding other Directors of the CDC who were at all times herein responsible for the supervision and management of the employees within the CDC system, and was responsible for Plaintiffs' health, welfare/safety, and liberty. At all time mentioned herein this Defendant was responsible for the health, welfare/safety, and liberty of Plaintiff Peter Honesto and the actions of "Defendant's", and each of them, individually and/or in their official capacity, as detailed and, as outlined in this Complaint. Plaintiff is informed and believe, and thereon allege, that this Defendant individually and/or in his official capacity, and with other Defendant's denied Plaintiff his clearly established Constitutional Rights in breach/violation of Plaintiffs' plea contract and discriminated/retaliated against Plaintiff after he pleaded to a crime for the benefit of less punishment, stipulated in the Second Degree because of evidence problems with the peoples case in trial, therein being responsible for promulgating, enacting and/or maintaining policy, procedures and practices which violate Plaintiffs' Civil Rights, by application of aggravating facts of the crime not found/proven by a jury, dismissed by the Prosecutor, and by application of a blanket rule/policy that

8.

automatically denies/excludes parole/liberty for individuals who's crime had a particular type of aggravating factor including Plaintiff's who was convicted by plea contract to a lesser included offense.

10. At all times mentioned herein defendant Jack Komar was a Superior Court Judge in Santa Clara County.

11. At all times mentioned herein defendant Tom Farris was a Deputy District Attorney in Santa Clara County.

12. At all times mentioned herein defendant Derral Adams was the Warden at Corcoran Substance Abuse Treatment Facility, and was responsible for Plaintiffs' health, welfare/safety and liberty.

13. At all times mentioned herein defendant T. Giaquinto was a Commissioner for the Board of Prison Terms (hereinafter BPT), for the State of California.

14. At all times mentioned herein defendant C. Bentley was a Commissioner for the BPT, State of California.

15. At all times mentioned herein defendant R. Beekman was a Deputy Commissioner for the BPT, State of California.

16. At all times mentioned herein defendant S Lawin was a Commissioner for the BPT, State of California.

17. At all times mentioned herein defendant K. Risen was a Commissioner for the BPT, State of California.

18. At all times mentioned herein defendant F. Vasquez was a Deputy Commissioner for the BPT, State of California.

19. At all times mentioned herein defendant P. Wilson was a Governor for the State of California.

20. At all times mentioned herein defendant G. Davis was a Governor for the State of California.

21. At all times mentioned herein defendant A. Schwartzenegger was a

9.

Governor for the State of California.

22. At all times mentioned herein defendant B. Lockyer was the Attorney General for the State of California, succeeding other Attorney Generals' who were at all times herein responsible for violating Plaintiffs Civil Rights.

23. At all times mentioned herein defendant E. Brown was the Attorney General for the State of California, succeeding other Attorney Generals' who were at all times responsible for violating Plaintiffs' Civil Rights.

24. At all times mentioned herein defendant Jessica Blonien was a Deputy Attorney General for the State of California.

25. At all times mentioned herein defendant Santa Clara County Conflicts was responsible for appointing attorney's in Santa Clara County, including Plaintiffs attorney.

26. At all times mentioned herein defendant Allen Schwartz, attorney at law was appointed to represent Plaintiff on Habeas Corpus.

27. At all times mentioned herein defendant E. Kammelarr, was a probation officer for Santa Clara County who authored/rendered Plaintiffs' probation report and conducted the interview.

28. At all times mentioned herein defendant P. Silva was a Chief Probation Officer for Santa Clara County who authorized Plaintiffs' probation report to be used against Plaintiff.

29. At all times mentioned herein defendant G. Vick was a Supervising Probation Officer for Santa Clara County who authorized Plaintiffs' probation report to be used against Plaintiff.

30. At all times mentioned herein defendant K. Clark was a Warden at Corcoran Substance Abuse Treatment Facility and State Prison, and was responsible for Plaintiffs' health, welfare/safety and liberty.

10.

31. Defendant's; J. Tilton; J. Komar; T. Farris; D. Adams; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasquez; P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; Santa Clara County Conflicts; A. Schwartz; K. Clark; E. Kammelarr; P. Silva; G. Vick; and doe defendant's, are referred collectively throughout this Complaint as "Defenedant's".

///

//

/

11.

III.

## STATEMENT OF CLAIM

32. On 3-26-87, Plaintiffs' jury trial to charges of First Degree Murder and Special Circumstances allegations ended in a deadlocked jury due to evidence problems with the Peoples case, at which time Plaintiff through trial counsel Frances Cavagnaro entered into a binding plea/contract with Defendant's Superior Court Judge Jack Komar, Deputy District Attorney Tom Farris and doe Defendant's who offered to stipulate to fixing the sentence/punishment in the Second Degree, dismissing First Degree Murder and Special Circumstances allegations, aggravating facts of the crime as part of the plea inducement for the benefit of less punishment, due to evidence problems with the Peoples case in trial. See Superior Court documentation at the time of the plea and Evidentiary Transcripts, **Ex.A.** Plaintiff accepted the plea/stipulation at the advise of counsel who advised Plaintiff that he Plaintiff would not suffer any adverse effects of and pertaining to the dismissed counts, charges, and aggravating facts of the crime, in exchange for the significant benefit of less punishment by application of good-time conduct credits, **Ex.A.**

33. Trial Counsel advised Plaintiff the State is bound to the terms of the plea, due to the plea contract.

34. After the plea bargain/contract hearing Defendant Superior Court Judge Jack Komar ordered probation officer Erna G. Kammelarr to interview Plaintiff, counsel was not present and Plaintiff was not advised    of his right to counsel, at which time Plaintiff informed defendant Kammelarr he did not want to go into details of the offense or any other facts without counsel present, and that counsel advised Plaintiff the punishment was fixed in the Second Degree due to the plea contract.    Despite this fact Defendant Kammelarr would not stop interrogating Plaintiff for a long time without counsel present and induced a statement from Plaintiff, ("he advised he is stating he is guilty of the offense to impress the

12.

parole board who will be setting his release date in a few years."); Plaintiffs' statement was under duress without waiving his right to counsel and without being advised of his right to counsel; despite these facts the probation officer rendered/authored a probation report detailing Plaintiffs' induced statement and aggravating facts of the crime that she knew were dismissed due to the term/punishment being fixed/stipulated in the Second Degree as part of the plea contract for the benefit of less punishment, and she knew the aggravating facts of the crime and First Degree Murder were not found/proven by a jury and that, Defendant's Pedro Silva, Chief Probation Officer and Gordon Vick, Supervising Probation Officer, in concert with Defendant Kammelarr and J. Komar knew Plaintiff had the right to counsel but was not advised of the right to counsel; and knowingly rendered/authorized the probation report on order by the Superior Court Defendant J. Komar to be adversely applied to prejudice/discriminate against Plaintiff denying him the benefit of his plea contract and denied Plaintiff the due process protections guaranteed at all stages of the criminal proceedings, and the right to counsel; And when the Trial Court & Prosecutor considered/applied the probation report to render/author Ex.B, detailing the dismissed counts, charges, and facts of the crime, and Plaintiffs' induced statement under duress without counsel present and without advising Plaintiff of his right to counsel, knowing Plaintiff was not represented by effective assistance of counsel when waiving his right to retrial and the States burden of proof for the benefit of less punishment.    These Defendant's perfected the documents and statements to be expressly considered/applied by State and Prison Officials, to knowingly further Defendant's, and each of their actions, (Culpability), despite these violations Plaintiffs' defense counsel advised him he had no grounds to appeal.

35. Plaintiff states/claims as fact after he was incarcerated in State Prison Defendant's J. Komar, T. Farris, E. Kammelarr, P. Silva, and G. Vick; choose to knowingly instruct "Defendant's", James Tilton, T. Giaquinto, C. Bentley, R.

Beekman, S. Lawin, K. Risen, F. Vasquez, P. Wilson, G. Davis, A. Schwartzenegger, B. Lockyer, E. Brown, J. Blonien, Santa Clara County Conflicts, A Schwartz, D. Adams, K. Clark, and Doe Defendant's to deny Plaintiff his clearly established Constitutional Rights and to discriminate/retaliate and/or punish Plaintiff, in violation/breach of Plaintiffs' plea agreement (contract), treating the offense as a First Degree by consideration of the dismissed/stipulated away counts, charges, and aggravating facts of the crime that were not found/proven by a jury and by application of the probation report, Plaintiffs' induced statement to the probation officer under duress without counsel present and Defendant's J. Komar & T. Farris's statement **Ex.B**, knowing Plaintiff did not have counsel present at all stages in the lower proceedings when the documents were authored and after Plaintiff was incarcerated in State Prison for Pleading to a crime for the benefit of less punishment because of evidence problems with the Peoples case in trial, and to discriminate/retaliate by denying Plaintiff the benefit of his plea contract because Plaintiff would not talk about the details of the offense or any other facts at the time of the plea and sentencing, at the advise of counsel and to discriminate/retaliate because Plaintiff did not have effective assistance of counsel when waiving his right to retrial and the States burden of proof for the benefit of less punishment, **Ex.B**; And that these "Defedant's" discriminated and retaliated against Plaintiff punishing him by application/consideration of **Ex.B**, for and/or after complaining about his health, safety/welfare and liberty (due process), See **Ex.E**, and Plaintiffs' affidavit, **Ex.F**, demonstrating State and Prison Officials damaged Plaintiff, as outlined in this Complaint and the facts presented.

36. Plaintiff claims/states as fact Defendant's J. Komar; T. Farris; J. Tilton; D. Adams; K. Clark; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasquez; P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; E. Kammelarr; P. Silva; G. Vick; and doe Defendant's knowingly applied the aggravating facts of the crime that were dismissed/plead away to deny Plaintiff

14.

his clearly established Constitutional Rights, in breach/violation of Plaintiffs' plea agreement (contract) with the State of California and discriminated/retaliated against Plaintiff punishing him by application/consideration of Plaintiffs' induced statement without counsel present and **Ex.B**, after and because he pleaded to a crime for less punishment and discrimination/retaliation denying Plaintiff the benefit of his plea contract because he did not talk about the details of the crime at the time of the plea and sentencing, at the advise of counsel and discrimiantion/retaliation for and/or after Plaintiff complained about his health safety/welfare and liberty, See **Ex.D**, at p.7, **Superior Court Interim Orders** and **Final Order**; demonstrating "for twenty five years it has been held "improper and unfair" to circumvent a plea by using the material the People have bargained away against the defendant." And, P.4, fn.6; in support of violations inflicting Plaintiff to a species of fraud.

37. Plaintiff claims/states as fact on Aug.25,2006, Defendant Deputy Attorney General J. Blonien admitted to the fact Trial Court (Defendant J. Komar), and Deputy District Attorney (Defendant T. Farris), instructed the Parole Board Member's and Prison Officials "Defendant's", to treat the crime "as a First Degree case.", to keep and house Plaintiff in State Prison without counsel present by application of **Ex.B**, and the probation report detailing dismissed counts, charges, and Plaintiffs' induced statement to the probation officer under duress without counsel present and without being advised of his right to counsel, at which time this Defendant knowingly acted under color of State Law in her official capacity, to discriminate/retaliate against Plaintiff punishing him after and because Plaintiff pleaded to a crime for the benefit of less punishment due to evidence problems with the Peoples case in trial and discrimination/retaliation denying Plaintiff the benefit of his plea contract because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel, at which time this Defendant furthered/authorized "Defendant's" actions

15.

therein failing to uphold the law which is specifically prohibited and discriminated/retaliated against Plaintiff punishing him for and/or after he complained about his health, safety/welfare and liberty (due process), See **Ex.D**, at p.7, **Superior Court Interim Orders and Final Order**, demonstrating "Defendant's", and each of them knew the Law/Constitution prohibited "Defendant's" conduct under color of State Law in their official capacity, and they knew Plaintiff had the right to counsel at all stages of the criminal proceedings, and they knew Plaintiff was being discriminated/retaliated against for not having effective assistance of counsel when waiving his right to retrial and that States burden of proof for the benefit of less punishment. The facts and cases history demonstrates Defendant's J. Blonien; B. Lockyer and E. Brown knew about the violations of Constitutional magnitude being inflicted on Plaintiff; and that, these Defendant's had the power and authority to stop the violations of Constitutional magnitude but failed to do so and acted capriciously with "Defendant's", and each of them, as outlined in this Complaint.

38. Plaintiff declares/states as fact "Defendant's", and each of them, knew they were bound to the plea (contract law) and the Prosecutors' Stipulation pursuant to **Cal.Penal Code, 1192.1**, "Petitioner cannot be punished to a higher degree of the crime than the degree specified.", demonstrating when the prosecutor stipulates to a disposition the State/Parole Board Members, "Defendant's", and each of them, are bound to the stipulation/inducement.

39. On Habeas Corpus Nov. 2003, Defendant Santa Clara County Conflicts and doe defendant's appointed Defendant Allen Schwartz, attorney at law, to represent Plaintiff, who after being fully briefed knowingly failed to claim and present facts **Ex.A, B, D, and G**, in support of Petition required on Habeas Corpus, and claims of discrimination/retaliation for and/or after Plaintiff pleaded to a crime for the benefit of less punishment, because of evidence problems with the Peoples case in trial, and because Plaintiff did not talk about the details of the crime at

16.

the time of the plea and sentencing at the advise of counsel, resulting in Plaintiff being denied the benefit of his plea contract on Appeal 6-9-05, in the Sixth Appellate District because appointed counsel failed to present/develop a record of facts; despite this fact Defendant's Santa Clara County Conflicts and doe defendant's knowingly acted with malicious and/or dishonest, corrupt intent, bad faith and discrimination/retaliation against Plaintiff for and/or after pleading to a crime for less punishment by again authorizing/appointing Defendant A. Schwartz to represent Plaintiff on Habeas Corpus June 1,2006; And at oral arguments 8-24-07, A. Schwartz on the record informed the Superior Court of Plaintiffs' complaints to the State Bar about his performance, which included a United States District Court Order (Ex.C), granting Plaintiff a stay on the grounds appointed counsel failed to raise Plaintiffs' claims in the case of In re Honesto, Nov.2003, and on Appeal 6-9-05. Despite these facts Defendant's Santa Clara County Conflicts, doe defendants, and the Superior Court knowingly discriminated/retaliated against Plaintiff denying him the benefit of his plea contract for and/or after he pleaded to a crime for less punishment and for not talking about the details of the crime by failing to remove A. Schwartz from the case, at which time A. Schwartz again knowingly discriminated/retaliated against Plaintiff because Plaintiff filed a complaint against him; at which time Defendant A. Schwartz failed to present the evidence required on Habeas Corpus and failed to present the claim/fact Defendant's J. Komar; T. Farris; E. Kammelarr; P. Silva;

    G. Vick,              Defendant's J. Tilton; D. Adams; K. Clark; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasquez; P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; Santa Clara County Conflicts; and doe Defendant's, and each of them, after Plaintiff went to State Prison and without regard to Plaintiffs' request for counsel, applied the aggravating facts of the crime that were not found/proven by a jury, dismissed as part of the plea contract to breach/violate the binding contract invalidating the plea contract and

17.

to discriminate/retaliate against Plaintiff because he pleaded to a crime for the benefit of less punishment and discrimination/retaliation denying Plaintiff the benefit of his plea contract because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing; and that, "Defendant's", and each of them rendered/authored and applied a report with Plaintiffs' induced statement to the probation officer under duress without counsel present and without being advised of his right to counsel, to prejudice/discriminate against Plaintiff, knowing Plaintiff did not waive his right to counsel, in violation of his clearly established Constitutional Right to counsel at all stages of the criminal proceedings.

40. Plaintiff states/claims as fact "Defendant's", and each of them, inflicted Plaintiff with **Stolen Justice** in Santa Clara County, demonstrating questionable conduct.    Plaintiff submits **Ex.G, Stolen Justice**, a 3 year investigation into the criminal justice system in Santa Clara County, which supports Plaintiffs' claims against "Defendant's", and each of them; See **Ex.G**, at p.2 of 13; "Trial Judges. In more than 150 cases, judges made mistakes or questionable rulings that favored the prosecution.  Violated legal precedents, Trial Judges allowed evidence that unfairly tainted defendants and prohibited evidence that might have supported their defense."; and P.12 of 13, in part; "ruling "completely distorted the process." "Instead of hearing the issues properly argued, they made up what the arguments should have been, and then answered those arguments."

41. Plaintiff declares/states as fact Defendant's J. Komar; T. Farris; J. Tilton; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasques' P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; A. Schwartz; D. Adams; K. Clark; Santa Clara County Conflicts; E. Kammelarr; P.Silva; G. Vick; doe Defendant's; and the Superior Court applied **Stolen Justice, Ex.G**, on Plaintiff to deny him his clearly established Constitutional Rights and the

18.

benefit of his plea contract for less punishment, knowing appointed counsel A. Schwartz failed to present, argue or claim evidence needed on Habeas Corpus Nov.2003 prior to **In re Honesto**, 2005, and knowing Plaintiffs' Petition June 1,2006, would be denied on the same grounds, demonstrating "Defendant's", and each of them, individually and/or in their official capacity, as detailed knowingly denied Plaintiff his clearly established Constitutional Rights for the dismissed aggravating facts of the crime to be found or proven by a jury, as outlined in this Complaint. See **Stolen Justice, Ex.G**, at p.8 of 8; "Often, the Court goes to significant and even surprising lengths to avoid finding fault."

42. Plaintiff alleges on information and belief "Defendant's" and each of them, individually and/or in their official capacity, knowingly  implemented and enforced a Statute **California Penal Code, 3041(a)(b)**, Proposition 7 Briggs Initiative (1978) and **California Code of Regulations 2402**, that authored the intent to keep high profile criminals that are under prior Indeterminate Sentencing Law and Plaintiffs' current ISL Law incarcerated for life without parole by application of aggravating facts of the crime that were not found or proven by a jury, and in Plaintiffs case dismissed/stipulated away as part of the plea inducement for less punishment, because of evidence problems with the Peoples case in trial. These facts demonstrate the law (**Cal.P.C. 3041(a)(b)** and **Cal. Code of Regs.2402**), are uncertain, and remove reformation of the offender (Rehabilitation goals).  The law in this regard (aggravating facts of the crime NOT found or proven by a jury), subjected Plaintiff to Life Without Parole, **California Penal Code 190.1 thru 190.5**, (exceptionally heinous, atrocious, or cruel manifesting exceptional deprivity, and felony murder, i.e. special circumstances), despite Plaintiffs' plea contract for the benefit of less punishment, where the facts demonstrate Plaintiff was convicted of Second Degree Murder NOT First, and that, "Defendant's", and each of them applied the statute/regulation knowingly acting with malicious and/or dishonest, corrupt

19.

intent, bad faith and to discriminate/retaliate committed a species of fraud. against Plaintiff for and/or after pleading to a crime for less punishment.

43. Plaintiff alleges on information and belief "Defendant's", and each of them, individually and/or in their official capacity implemented/adopted and fostered a blanket rule/policy (**Cal.Code of Regs2402**), that denies/excludes parole for individuals who's crime had a particular type of aggravating factor including Plaintiffs' who plead to a lesser included offense because the prosecutor dismissed/plead away the particular type of aggravating factor as part of the plea inducement due to evidence problems with the Peoples case in trial; despite this fact "Defendant's", and each of them, inflicted Plaintiff to the blanket rule/policy, knowingly discriminating/retaliating and/or punishing him by applying the dismissed aggravating facts, counts, charges of the crime that were not found/proven by a jury to deny Plaintiff his clearly established Constitutional Rights, for the benefit of less punishment, pursuant to contract law.

44. Plaintiff alleges on information and belief "Defendant's", and each of them, individually and/or in their official capacity and in concert without jurisdiction knew Plaintiff had the right to counsel at all stages of the criminal proceedings and did not advise him of his right to counsel when interviewing Plaintiff for a Court ordered probation report at which time Plaintiff was not afforded the right to counsel despite his request for counsel at the time of the probation report interview due to the plea contract; and denied Plaintiff counsel when the Trial Court & Prosecutor considered/applied the probation report and Plaintiffs' induced statement to the probation officer under duress without counsel present and without being advised of his right to counsel to change the terms of the plea contract, adversely prejudicing/discriminating against Plaintiff, and that, "Defendant's", and each of them, knowingly denied Plaintiff his clearly established right to counsel mandated at all stages of the criminal proceedings.

45. Subsequent to the above stated facts officials for Santa Clara County and State of California         "Defendant's", and each of them, applied the probation report, Plaintiff's induced statement under duress at the time of the probation report interview without counsel present and without being advised of his right to counsel and application of **Ex.B**, to deny Plaintiff his clearly established Constitutional Rights; See **Ex.H**, at p.3, demonstrating Plaintiffs' Habeas Petition  was denied on Final Order when the Court documented the Trial Courts use of Plaintiffs' statement to the probation officer rendered under duress without counsel present and without being advised of the right to counsel, and where the facts demonstrate Plaintiff did NOT waive his right to counsel at the time of the interview when Plaintiff was ambivalent to answer questions without counsel; despite these facts State and Prison Officials knowingly violated Plaintiffs' Constitutional Rights; And on Habeas Corpus, the Superior Courts Final Order **Ex.H**, demonstrates the culpability of the "Defendant's" acts that continue to damage Plaintiff, violating his clearly established Constitutional Rights, inflicting Plaintiff to a species of fraud by "Defendant's", and each of them, in concert with each other, and in violation of State and Federal Law.

I Peter Honesto, Plaintiff declare under penalty of perjury that the foregoing is correct and true, Executed on _6--17-08_ at CSATF/SP, P.O. Box 5242, Corcoran, Calif. 93212-5242

Peter Honesto, and the Honesto Estate, Plaintiff's

21.

## IV.

## REQUESTED RELIEF

Wherefore, Plaintiff respectfully prays this Court enter judgment granting Plaintiff:

A) A declaratory judgment that declares the rights of Plaintiff who was found guilty of Second Degree Murder and NOT of First; And declare the rights of "Defendant's", and each of them.

B) A declaratory judgment that, "Defendant's", and each of them, subjected/inflicted Plaintiff to malicious and/or dishonest, corrupt intent, bad faith and discrimination/retaliation for and/or after Plaintiff pleaded to a crime for the benefit of less punishment, because of evidence problems with the Peoples case in trial, and discrimination/retaliation denying Plaintiff the benefit of his plea contract for and because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel.

C) A declaratory judgment that, "Defendant's", and each of them, discriminated/retaliated against Plaintiff punishing him by application of the probation report, Plaintiffs' induced statement under duress without counsel present and **Ex.B**, denying Plaintiff the benefit of his plea contract for and/or after complaining about his health, safety/welfare and liberty (due process), in violation of Plaintiffs' clearly established Constitutional Rights to Due Process, Sixth & 8th Amendments, Equal Protection and Ex Post Facto, protected by the Due Process Clause of the 14th Amendment to the United States Constitution; and/or **Injunctive Relief**, prohibiting "Defendant's", and each of them, from continuing to discriminate and retaliate against Plaintiff with violations of Constitutional Magnitude when Plaintiff complains about his health, safety/welfare, liberty, as outlined in this Complaint. See **Ex.E**, demonstrating Complaints and damages Plaintiff suffered. These facts support Plaintiffs' request for relief for protection from "Defendant's", who continue to inflict a species of fraud.

22.

D) A declaratory judgment that "Defendant's", and each of them, individually and/or in their official capacity, as detailed were bound to the prosecutors' stipulation as part of the plea contract for the benefit of less punishment dismissing the aggravating facts of the crime and First Degree Murder; And that, "Defendant's" actions were without jurisdiction, in violation of Plaintiffs' clearly established Constitutional Rights to Due Process, Sixth & 14th Amendments, Equal Protection, Ex Post Facto, protected by the United States Constitution, as outlined in this Complaint. And/or **Injunctive Relief**, prohibiting "Defendant's", and each of them, Parole Board Members, State and Prison Officials from continuing to aggravate and apply dismissed counts, charges, and facts of the crime (i.e. First Degree Murder) to violate Plaintiffs' liberty interest, as outlined in this Complaint.

E) A declaratory judgment that, "Defendant's", and each of their acts and/or policy, procedures and practices alleged herein violated Plaintiffs Civil Rights and violated Plaintiffs' right to counsel under the United States and California Constitutions, as outlined in this Complaint.

F) A declaratory judgment that, "Defendant's", and each of them, individually and/or in their official capacity, as detailed knowingly aggravated facts of Plaintiffs' crime that were NOT found/proven by a jury and dismissed/stipulated away as part of the plea to violate Plaintiffs' clearly established Constitutional Rights with the accompanied acts of malicious, and/or dishonest, corrupt intent, bad faith, discrimination/retaliation, outside their authority to arbitrarily or capriciously violate/breach the plea agreement (contract), treating the offense as a First Degree, punishing Plaintiff by application/consideration of the probation report, Plaintiffs' induced statement under duress without counsel present and **Ex.B**, denying Plaintiff the benefit of his plea contract for and/or after complaining about his health, safety/welfare and liberty (14th Amendment & Equal Protection), and discrimination/retaliation after Plaintiff pleaded to a crime for

23.

less punishment due to evidence problems with the Peoples case in trial and discrimination/retaliation denying Plaintiff the benefit of his plea contract because Plaintiff would not talk about the details of the crime at the time of the plea and sentencing and/or because Plaintiff did not have effective assistance of counsel when waiving his right to retrial and that States burden of proof for the benefit of less punishment, as outlined in this Complaint. **Injunctive Relief**, prohibiting "Defendant's", and each of them, from continuing to apply/consider the probation report, Plaintiffs' induced statement under duress without counsel and **Ex.B**, facts of the crime not found/proven by a jury, when Plaintiff complains about his health, welfare/safety, and liberty, as outlined in this Complaint.

G) A declaratory judgment that "Defendant's", and each of them, individually and/or in their official capacity, knowingly, intentionally breached/violated the binding plea       contract intending or knowing that such a breach/violation would cause severe, unmitigatable harm in the for of mental anguish, personal hardship, or substantial consequential damages when Plaintiff was denied his clearly established Constitutional Rights, as outlined in this Complaint.

H) A declaratory judgment that "Defendant's", and each of them, violated Plaintiffs' clearly established Constitutional Rights under color of authority and in violation of State Law, protected by the 14th Amendment to the United States Constitution, as outlined in this Complaint.

I) A declaratory judgment that "Defendant's", and each of them, individually and/or in their official capacity, as detailed knowingly breached/violated the binding       plea contract with malicious and or dishonest, corrupt intent, acts of bad faith and discrimination/retaliation that arbitrarily or capriciously denied Plaintiff his clearly established Constitutional Rights, where the facts demonstrate Plaintiff did not have effective assistance of counsel when waiving his rights to a retrial and the States burden of proof for the facts to be found/proven by a jury, for the benefit of the plea contract for less punishment.

24.

J) A declaratory judgment that "Defendants, and each of them, individually and/or in their official capacity, as detailed inflicted Plaintiff with violations of Constitutional magnitude, and discrimination/retaliation, **"Stolen Justice"**, **Ex.G**, a 3 year investigation into the criminal justice system in Santa Clara County, calling into question misconduct, as applied to the facts of the case, to violate Plaintiffs' clearly established Constitutional Rights, and/or **Injunctive Relief**, prohibiting "Defendant's", and each of them, from continuing to inflict Plaintiff with **Stolen Justice**, as outlined in this Complaint.

K) A declaratory judgment that "Defendants", and each of them, considered/applied aggravating facts of the crime and facts detailed in the probation report, including Plaintiffs' induced statement to the probation officer when Plaintiff was under duress without counsel present at the interview despite Plaintiffs request for counsel, and without waiving or being advised of his right to counsel, therein considering/submitting and applying a document **Ex.B**, instructing "Defendant's", and each of them, to aggravate facts of the crime and First Degree Murder that were not found/proven by a jury, discriminating/retaliating against Plaintiff, denying Plaintiff the benefit of his plea contract for and/or after pleading to a crime and because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel, due to the plea contract, and denied Plaintiff his right to counsel in the lower proceedings and application of all due process protections afforded to a defendant at all stages of the criminal proceedings, including the right to counsel and to be advised of the right to counsel at the time of the probation report interview and after Plaintiff went to State Prison.

L) A declaratory judgment that "Defendant's", and each of them, committed a Jurisdictional Violation when authorizing/considering a probation report and Plaintiffs' induced statement despite Plaintiffs request for counsel when he did not waive his right to counsel, nor did the probation officer advise him of his

25.

right to counsel, and/or when the statement authored by the Trial Judge & Prosecutor after Plaintiff went to State Prison without counsel present and without advising Plaintiff of his right to counsel, denying Plaintiff his clearly established right to counsel at all stages of the criminal proceedings, in violation of Due Process, the Sixth Amendment, and Equal Protection protected by the 14th Amendment and the Due Process Clause of the United States Constitution.

M) A declaratory judgment that "Defendant'" and each of them, in their official capacity and as individuals, in concert inflicted Plaintiff to a Jurisdictional Violation, denying Plaintiff his Due Process, Sixth Amendment, and Equal Protection right to counsel at all stages of the criminal proceedings, protected by the Due Process Clause of the 14th Amendment to the United States Constitution.

N) A declaratory judgment that "Defendant's", J. Kamar & T. Farris individually and/or in their official capacity committed/inflicted Plaintiff with an unlawful civil conspiracy, knowingly discriminating against Plaintiff after and because he pleaded to a crime; And they knew Plaintiff would be denied the benefit of his plea contract when they Trial Court & Prosecutor instructed State and Prison Officials to disregard the plea negotiation at the time of the plea contract for less punishment        as outlined in this complaint. And/or **Injunctive Relief**, prohibiting "Defendant's", and each of them, from     acting        in concert against Plaintiff with acts of discrimination/retaliation and violations of Constitutional Magnitude, as outlined in this Complaint.

O) A declaratory judgment that the law **Cal.Penal Code, 3041(a)(b)** and/or **Cal Code of Regs.2402**, are unconstitutional        on their face for instructing an administrative agency to aggravate facts of the crime NOT found/proven by a jury or admitted to by Plaintiff to violate Plaintiffs' Due Process, Sixth Amendment, Ex Post Facto and Equal Protection rights protected by the Due Process Clause of the 14th Amendment to the U.S. and Calif. Constitutions, as outlined in this Complaint.

26.

P) A declaratory judgment that the law **Cal.Penal Code, 3041**, and/or **Cal.Code of Regs. 2402**, are unconstitutional on their face for removing rehabilitation goals, and making punishment fit the crime rather than the criminal, in violation of Plaintiff's clearly established Constitutional Rights, as outlined in this Complaint.

Q) A declaratory judgment that the law **Cal.Penal Code, 3041(a)(b)** and/or **Cal.Code of Regs.2402**, are unconstitutional on their face for being uncertain, inflicting Plaintiff with a law and/or regulation in violation of Plaintiffs' clearly established Constitutional Rights, as outlined in this Complaint.

R) A declaratory judgment that "Defendant's", and each of them, in their official capacity implemented a blanket rule/policy (**Cal.Code of Regs.2402**), the unconstitutionally denies/excludes parole for individuals who's crime had a particular type of aggravating factor (especially heinous, atrocious, cruel manner, and felony murder), including Plaintiff and that, "Defendant's", and each of them, punished him with the blanket rule/policy for and/or after he pleaded to a crime for less punishment, because of evidence problems with the Peoples case in trial, and discriminated/retaliated against Plaintiff punishing him with the blanket rule/policy for and/or after complaining about his health, safety/welfare and liberty (due process), by applying the blanket rule/policy to violate Plaintiffs' clearly established Constitutional Rights, therein knowingly breaching and/or violating Plaintiffs' plea bargain/contract for less punishment. **Injunctive Relief**, prohibiting applying the blanket rule/policy.

S) A declaratory judgment that "Defendant'", and each of them, discriminated against Plaintiff for and/or after pleading to a crime, denying him the benefit of his plea contract in violation of the 14th Amendment to the United States Constitution, as outlined in this Complaint.

T) A declaratory judgment that "Defendant's", and each of them were

27.

incompetent when denying Plaintiff the benefit of his plea contract and/or without jurisdiction when the Trial Court & Prosecutor discriminated against Plaintiff inflicting Plaintiff to a species of "Fraud", in violation of the 14th Amendment to the United States Constitution, as outlined in this Complaint.

U) A declaratory judgment that "Defendant's", and each of them, violated the principles consisting of acquiescence and/or culpable conduct, as to training, supervision, and control of subordinates, as outlined in this Complaint.

V) Compensation damages in the sum of Tewnty Million Dollars (20,000,000.00), to Plaintiff, from "Defendant's", and each of them, individually and/or in their official capacity, in concert for violating Plaintiffs' Civil Rights, as outlined in this Complaint.

W) Nominal damages in the sum of Twenty Million Dollars (20,000,000.00), to Plaintiff, from "Defendant's" and each of them, individually and/or in their official capacity, in concert for the intentional deprivation of Plaintiffs' Civil Rights, as outlined in this Complaint.

X) Punitive or Exemplary damages in the sum of Forty Million Dollars (40,000,000.00), to Plaintiff, from "Defendant's", and each of them, individually and/or in their official capacity for willful and gross disregard of Plaintiffs' Civil Rights, as outlined in this Complaint.

Y) Trial on all issues triable.

Z) Plaintiffs' cost of this suit.

Such other and further relief this Court may deem just, proper, and equitable.

///

//

/

**V.**

## LIBERAL CONSTRUCTION

46. Plaintiff propria in a civil rights action is entitled to liberal construction and afforded any benefit of boubt. See **Karim-pana HI v. Los Angeles Police Dept.**, 839 F.2d 621, 623 (9th Cir.1988); **Bretz v. Kelman**, 773 F.3d 750, 756, (9th Cir.1985)(en banc).

47. In giving Plaintiff liberal construction; "vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss." **Ivey v. Bd. Of Regents of the University of Alaska**, 673 F.2d 266, 268 (9th Cir.1982). Plaintiff herein sufficiently alleges facts that support a claim entitling him to relief. **Jackson v. Carey**, 353 F.3d 750, 756 (9th Cir.2003). Claims that , subjected/inflicted Plaintiff to the denial of his liberty, the infliction of discrimination and/or retalatory acts, a species of Fraud, violations of State Law, incompetence, and clearly established Constitutional Rights, protected by the Sixth & Eighth Amendments, Equal Protection, Ex Post Facto, and Due Process Clause of the 14th Amendment to the United States Constitution. Plaintiff contends named Defendant's committed an unlawful civil conspiracy, as demonstrated by the fact they acted in concert and/or under color of State Law and without jurisdiction to deny Plaintiff his clearly established Constitutional Right to counsel, and to be advised of the right to counsel; And violations of Constitutional Magnitude where the facts demonstrate "Defendant's" discriminated/retaliated, knowing Plaintiff did not have effective assistance of counsel when induced to waive his rights attendant to a retrial and the States burden of proof for the facts of the crime to be found/proven by a jury, for the benefit of less punishment.

48. Plaintiff contends he has stated a claim (cognizable legal theory) and facts entitling him to relief. **Conley v. Gibson**, 355 U.S. 41, 45-46, 78 S.Ct.99, 2 L.Ed.2d 80 (1975); **Cahill v. Liberty Mut.Ins. Co.**, 80 F.3d 336, 338 (9th

29.

Cir.1996). These cases establish a motion to dismiss for failure to state a claim as applied to the materials/facts in this case would be without merit. **Schneider v. California Dept. Of Corrections**, 151 F.3d 1194, 1197 n.1 (9th Cir.1998)("The focus of any rule 12(b)(6) dismissal... is the complaint.") Plaintiff provides this rule of law to deter the "Defendants'" from submitting a motion to dismiss for failure to state a claim, due to the fact Plaintiffs' clearly established Constitutional Rights have been violated, See **Plaintiffs' Affidavit Ex.F.**

49. Plaintiff further points out that the State's Attorney General, who must abide by the laws of this State, has effectively challenged inmates pro se who abuse the legal system (bad faith); Plaintiff herein incorporates for reference application of these laws if the "Defendant's" attempt to delay the process with frivolous litigation and acts/motions in bad faith that do not promote judicial economy.

///

//

/

## VI.

### LEGAL ALLEGATION/CAUSE OF ACTION

50. At all times mentioned herein "Defendant's", and each of them were responsible for the health, welfare/safety and liberty of Plaintiff Peter Honesto.

51. At all times alleged herein "Defendant's", and each of them individually and/or in his or her official capacity violated Plaintiff's clearly established Constitutional Rights (due process protected by the 14th Amendment) and the right to counsel, in violation of his Sixth Amendment right; therein aggravating facts of the crime that were **stipulated** away, NOT found/proven by a jury or admitted to by Plaintiff, in breach/violation of the plea contract; subjecting Plaintiff to the deliberate indifference of arbitrary or capricious treatment in bad faith and Ex Post Facto violations that denied Plaintiff his clearly established Constitutional Rights and the right to be free from violations of Constitutional magnitude that were furthered when "Defendant's" denied Plaintiff the benefit of his plea contract  in breach/violation of Plaintiffs' plea agreement, with acts of malicious and/or dishonest, corrupt intent, bad faith, and discrimination/retaliation, punishing Plaintiff by application/consideration of the probation report, Plaintiffs' induced statement under duress at the time of the probation report interview and **Ex.B**, documents perfected without counsel present and without advising Plaintiff of his right to counsel after Plaintiff pleaded to a crime for the benefit of less punishment because of evidence problems with the Peoples case in trial and discrimination/retaliation, denying Plaintiff the benefit of his plea contract because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel due to the plea contract, and discrimination/retaliation, punishing Plaintiff for and/or after complaining about his health, safety/welfare and liberty (due process), therein denying Plaintiff his clearly established Constitutional Rights with actions punishing Plaintiff, despite the facts demonstrating Plaintiff did

31.

not have effective assistance of counsel when he waived his rights attendant to a retrial and the States burden of proof for the benefit of his plea contract for less punishment; And that, "Defendant's", and each of them, individually and/or in their official capacity, knowingly   implemented a blanket rule/policy (**Cal. Code of Regs.2402**), that unconstitutionally denies/excludes parole for individuals who's crime had a particular type of aggravating factor, (especially heinous, atrocious, cruel manner, and felony murder), And that "Defendant's" applied the regulation to Plaintiff with discriminatory and retaliatory acts knowing Plaintiff was convicted of second degree and not First; And knowing the aggravating facts of the crime were not found/proven by a jury or admitted by Plaintiff at the time of the plea and sentencing, as demonstrated by **Exhibit A.**

52. At all times alleged herein, "Defendant's', and each of them, individually and/or in their official capacity, as detailed arbitrarily or capriciously with malicious and/or dishonest, corrupt intent, bad faith, discriminated and/or retaliated against Plaintiff for and/or after Plaintiff pleaded to a crime for less punishment, because of evidence problems with the Peoples case in trial and because Plaintiff would not talk about the details of the crime at the time of the plea and sentencing, and discrimination/retaliation against Plaintiff denying him the right to counsel at all stages of the criminal proceedings, therein punishing him for and/or after complaining about his health, safety/welfare and liberty (due process),            breaching and/or violating Plaintiffs' plea contract.


53. At all times alleged herein, "Defendant's", and each of them, individually and/or in their official capacity, as detailed   knowingly        breached and/or violated Plaintiffs' plea contract with malicious and/or dishonest, corrupt intent, acts of bad faith, therein arbitrarily or capriciously denying Plaintiff his clearly established Constitutional Rights, where the facts demonstrate Plaintiff did not have effective assistance of counsel

32.

when he waived his rights attendant to a retrial, and the States burden of proof when he pleaded/admitted to the crime for the benefit of his plea contract for less punishment, due to the dismissed aggravating facts of the crime.

54. At all times alleged herein "Defendant's", and each of them, individually and/or in their official capacity, in concert intentionally breached and/or violated the contract intending or knowing that such a breach/violation would cause severe, unmitigatable harm in the form of mental anguish, personal hardship, or substantial consequential damages, when Plaintiff was denied his clearly established Constitutional Rights, as outlined in this Complaint.

55. At all times alleged herein, "Defendant's', and each of them, individually and/or in their official capacity, knowingly    breached and/or violated Plaintiffs' contract with acts of discrimination/retaliation, incompetence and actions punishing Plaintiff after pleading to a crime, misrepresentation and deliberate indifference which caused a    liability cause of action to occur, when Plaintiff was denied his clearly established Constitutional Rights, as outlined in this Complaint.

56. At all times alleged herein, "Defendant's", and each of them, individually and/or in their official capacity, in concert violated Federal Law by discriminating/retaliating after Plaintiff pleaded to a crime because of evidence problems with the Peoples case in trial, and to be free from actions punishing Plaintiff; actions that arbitrarily or capriciously denied Plaintiff his clearly established Constitutional Rights, where the facts demonstrate Plaintiff waived his rights attendant to a retrial and the States burden of proof for the benefit of less punishment, due to the dismissed aggravating facts of the crime.

57. Plaintiff is informed and believe, and thereon allege, "Defendant's", and each of them, individually and/or in their official capacity, as detailed knowingly discriminated/retaliated with actions punishing Plaintiff after pleading to a

33.

crime knowingly and intentionally disregarding the plea contract.

58. Plaintiff is informed and believe, and thereon allege, "Defendant's", and each of them, individually and/or in their official capacity, as detailed knew of the discrimination/retaliation to Plaintiffs' health, safety/welfare, liberty and failed to prevent it, and/or promulgated or implemented a policy "so deficient that the policy itself" is a repudiation of clearly established Constitutional Rights and is the moving force of the constitutional violations, demonstrating "Defendant's", and each of them knowingly discriminated/retaliated against Plaintiff.

59. Plaintiff is informed and believe, and thereon allege, that "Defendant's", and each of them, individually and or in their official capacity, as detailed knew denial of Plaintiffs' clearly established Constitutional Rights to be free from actions punishing Plaintiff would result in punishment/treatment without due process of law, and discrimination/retaliation after Plaintiff pleaded to a crime.

60. On information and belief "Defendant's", and each of them, individually and/or in their official capacity, knowingly encouraged their staff, prison officials, and doe defendant's to classify and house Plaintiff with actions discriminating, retaliating and punishing Plaintiff after pleading to a crime, and because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel due to the plea contract, and because Plaintiff did not have effective assistance of counsel when waiving his right to retrial and the States burden of proof for the benefit of less punishment.

61. Defendant J. Tilton, either knew of Defendant's D. Adams and K. Clark's classification policy, procedures, practices and/or acts, or should have known in the proper exercise of their official duties. Although Defendant J. Tilton had the power and legal duty to end these practices and acts, he failed to do so.

62. On information and belief, "Defendant's", and each of them, individually

34.

and/or in their official capacity, in concert arbitrarily or capriciously acted in bad faith with deliberate indifference, knowingly violating Plaintiffs' Civil Rights.

63. On information and belief, the policy, procedures and practices of the Department of Corrections and Board of Prison Terms was to act in bad faith by classifying and housing Plaintiff in institutions/facilities, while knowingly discriminating/retaliating against Plaintiff after pleading to a crime, for less punishment, because of evidence problems with the Peoples case in trial; And that, these Defendant's used and applied their policies to discriminate/retaliate against Plaintiff because he did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel.

64. At all times alleged herein, Defendant's", and each of them, individually and/or in their official capacity, knew they were acting under color of authority State Law, and in violation of the United States Constitution.

65. At all times alleged herein, "Defendant's", and each of them individually and/or in their official capacity, knowingly intended to cause the damages and deprivation of rights and liberties described herein.

66. At all times alleged herein, "Defendant's", and each of them, individually and/or in their official capacity, knew they were the proximate cause of damage and deprivation of rights and liberties described herein. **Leer v. Murphy**, 844 F.2d 628, 634, (9th Cir.1988). Each "Defendant" is sued individually and/or in his or her official capacity.

67. At all times alleged herein, "Defendant's", and each of them, individually and/or in their official capacity, knowingly implemented & enforced an unconstitutional policy, procedure and practice (**Stolen Justice, Ex.G**), inflicting Plaintiff with misconduct, discrimination/retaliation and punishment to a more severe crime after Plaintiff pleaded for less punishment in Santa Clara County, a policy that violated Plaintiffs' clearly established Constitutional

35.

Rights, as outlined in this Complaint.

68. At all times alleged herein, "Defendant's", and each of them, were without jurisdiction when they individually and/or in their official capacity, in concert committed a jurisdictional violation and criminal acts violating Plaintiffs' rights under color of law, and in violation of the United States Constitution.

69. At all times alleged herein the law **Cal.Penal Code, 3041(a)(b)** and/or **Cal.Code of Regs.2402**, were unconstitutional on their face instructing the judiciary and administrative agency to aggravate facts of the crime NOT found/proven by a jury or admitted to by Plaintiff in violation of Due Process, Equal Protection, the Sixth Amendment and the Ex Post Facto Clauses of the United States Constitution, as outlined in this Conplaint.

70. At all times alleged herein the law **Cal.Penal Code, 3041(a)(b)**, and **Cal.Code of Regs.2402**, were uncertain on their face for being uncertain, as outlined in this Complaint.

71. At all times alleged herein, the law **Cal. Penal Code, 3041(b)** and/or **Cal.Code of Regs.2402** were unconstitutional on their face for removing rehabilitation goals, and making punishment fit the crime rather than the criminal, as outlined in this Complaint.

72. At all times alleged herein "Defendant's", and each of them, implemented and enforced a blanket rule/policy (**Cal.Code of Regs.2402**), that unconstitutionally denies/excludes parole for individuals who's crime had a particular type of aggravating factor and applied the rule/policy to Plaintiff with discriminatory and/or retaliatory intent after Plaintiff pleaded to a lesser included offense as part of the plea inducement for less punishment.

73. The true names and capacities of does 1 through 50 are presently unknown to Plaintiff. Plaintiff is informed and believe, and thereon allege, that each of them is responsible in some manner for the injuries alleged herein. Plaintiff

36.

therefore sue each of them by such ficticious names and will seek leave to amend his Complaint to show the true names and capacities of and/or the basis of any allegation of liability against, these defendant's when they have been ascertained.  Plaintiff is informed and believe, and thereon allege, that each of said doe Defendant's are legally and equitably liable to Plaintiff.

74. Plaintiff is informed and believe, and thereon allege, that at all times mentioned herein, "Defendant's", and each of them, individually and in concert were agents of and employees of the remaining "Defendant's", and were at all times herein mentioned acting within the purpose and scope of the remaining Defendant's.

///

//

/

## VII.

### CONSTITUTIONAL RIGHT/CLAIM

Title 42 U.S.C. Section 1983, provides: "Every person who under color of any statute, ordinance, regulation, custom or usage, or any state territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

75. Plaintiff alleges, "Defendant's", and each of them, individually and/or in their official capacity (without jurisdiction), as detailed knew they acted individually and/or in their official capacity,     and      with deliberate indifference denying Plaintiff his Constitutional Rights,  with malicious and/or dishonest, corrupt intent (bad faith), therein arbitrarily or capriciously in bad faith, breaching          and/or violating Plaintiffs' plea agreement and denied Plaintiff the benefit of his plea bargain, that dismissed/stipulated away counts, charges, and aggravating facts of the crime therein denying Plaintiff his clearly established Constitutional Rights  by aggravating facts of the crime NOT found/proven by a jury or admitted to by Plaintiff and that, "Defendant's", and each of them individually and/or in their official capacity, knowingly discriminated/retaliated against Plaintiff punishing him with dismissed counts, facts and charges of a crime after pleading to a lesser included offense  and because Plaintiff did not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel, furthering  the violations

 after and when Plaintiff was denied his clearly established Constitutional Rights and the right to counsel at all stages of the criminal proceedings, where the facts demonstrate Plaintiff entered into a binding contract for the benefit of his bargain for less punishment due to the dismissed aggravating facts of the crime; And that, "Defendant's", and  each  of  them  in  their  official  capacity

38.

fostered/implemented a blanket rule/policy (**Cal.Code of Regs.2402**), that unconstitutionally denies/excludes parole for individuals who's crime had a particular type of aggravating factor, and applied the rule/policy to Plaintiff with discriminatory and/or retaliatory intent after Plaintiff pleaded to a lesser included offense as part of the plea inducement.

76. Plaintiff alleges, Defendant's J. Komar and T. Farris knew they acted in the **"clear absence of all jurisdiction"**, and outside the scope of their authority, therein performing an act that **is not "judicial"** in nature, where the controversy centered around Plaintiffs' breached and/or violated contract   and that, the events at issue arose directly and immediately out of a confrontation with Defendant's J. Komar and T. Farris, who were without jurisdiction after Plaintiff was in State Prison committing an act in breach /violation of the plea contract that is **NOT** "a function performed by a judge", or to the expectations of Plaintiff's; And where the acts complained of were taken without Plaintiffs' knowledge or presence and clearly without Plaintiff being advised of his rights or of the right to counsel; and that, these Defendant's discriminated/retaliated in concert with each other directing Defendant's J. Tilton; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasquez; P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; D. Adams; K. Clark; and doe defendant's, individually and/or in their official capacity, as detailed to maliciously and/or dishonesty, with corrupt intent (bad faith), arbitrarily or capriciously violate Plaintiffs' clearly established Constitutional Rights, and to discriminate/retaliate after Plaintiff pleaded to a crime for less punishment and because Plaintiff would not talk about the details of the crime at the time of the plea and sentencing at the advise of counsel due to the plea contract, in violation of Due Process, the Sixth Amendment, Equal Protection, and Ex Post Facto Clauses, protected by the due process clause and the 14th Amendment of the United States Constitution.

77. Plaintiff alleges Defendant's J. Komar; T. Farris; E. Kammelarr; P. Silva; and G. Vick, knew their acts did not encompass independent judgment and disinterested judicial and prosecutorial decision-making, where these Defendant's were without authority and in excess of jurisdiction after Plaintiff pleaded to a lesser included offense and went to State Prison; and that, Defendant J. Komar, T. Farris, E. Kammelarr, P. Silva and G. Vick were without jurisdiction where Plaintiff was NOT advised of his rights or allowed to withdraw the plea and/or given the right to counsel at all stages of the criminal proceedings, and after Plaintiff went to State Prison. **People v. Superior Court (Gifford)**, Cal.App.3d (1997) at p.143, 62 Cal.Rptr.2d 220; "In essence, plea agreement is contract between defendant and prosecutor to which court consents to be bound and should consider plea bargain to be unacceptable it's remedy is to reject it, not to violate it, directly or indirectly." Despite these facts Plaintiff was handed over to Defendant's, State Prison Officials and Parole Board Member's, "Defendant's", and each of them, who were thereafter instructed by Defendant's J. Komar, T. Farris, E. Kammelarr, P. Silva and G. Vick to directly and/or indirectly breach/violate Plaintiffs' plea agreement/contract, without jurisdiction.

78. Plaintiff alleges, Defendant's E. Kammelarr, P. Silva, and G. Vick knew they committed a jurisdictional violation when interviewing Plaintiff to render/author a probation report as part of the judicial process without counsel present, and without advising Plaintiff of his right to counsel and where Plaintiff did not waive his right to counsel when interviewed, and that, these Defendant's knew the aggravating facts of the crime were dismissed as part of the plea knowingly prejudicing/discriminating against Plaintiff by submitting a probation report detailing Plaintiffs' induced statement under duress when Plaintiff was ambivalent to answer any questions after requesting counsel during the probation report interview and prejudiced/discriminated against Plaintiff when detailing the dismissed aggravating facts of the crime and Plaintiffs' statement

40.

in violation of Plaintiffs' Constitutional Right to counsel at all stages of the criminal proceedings, acting in concert to inflict Plaintiff with a jurisdictional violation.

79. A judge who acts in clear and complete absence of personal jurisdiction loses immunity. **Dykes v. Horseman**, (Cal.1984) 743 F.2d 1488). "Color of state law component of **Sec.1983** may be satisfied by showing that official act of defendant judge was product of corrupt conspiracy involving judge and other private parties." **(Dykes)**. Even if a judge is held immune from damages, private persons who conspire with judge act under color of State law for **Sec.1983** purposes **(Dykes)**, however, immunity for judicial acts in clear absence of jurisdiction is lost if judge knows that he lacked jurisdiction, or acts in face of clearly established statues or case law expressly depriving him of jurisdiction **(Dykes)**. See **Cal.Penal Code, 1192.1**, "Petitioner cannot be punished to a higher degree of the crime than the degree specified." Plaintiff claims/states as fact at the time of the plea defendant's J. Komar, T. Farris, E. Kammelarr, P. Silva, and G. Vick knew the punishment was fixed in the second degree, and that they knew they lacked jurisdiction before and after Plaintiff went to State Prison recharacterizing the punishment to a higher degree than the degree specified;  And they knew they lacked jurisdiction where Plaintiff was not provided with counsel upon request or advised of his right to counsel at the time of the probation report interview with E. Kammelarr authorized by P. Silva and G. Vick and/or  after Plaintiff was in the custody of the California Department of Corrections; And they knew their actions would breach/violate the terms of the plea where the punishment was fixed/stipulated in the second degree at the time of the plea, because of evidence problems with the Peoples case in trial, and discriminated/retaliated against Plaintiff punishing him for and/or after complaining about his health, safety/welfare and liberty (due process); See **Ex.D**, at p.7; Superior Court Interim Orders and Final Order, demonstrating "for twenty five years it has been held

41

"improper and unfair" to circumvent a plea by using the material the people have bargained away against defendant." These facts demonstrate "Defendant's", and each of them, knew they were without jurisdiction when they violated Plaintiffs' clearly established Constitutional Rights, and the right to counsel. See Herman v. Claudy, 350 U.S. 116, 100 L.Ed.126(U.S. Pa.1956). Plaintiff has the right to Counsel at all stages of the proceedings.

80. Plaintiff submits Exhibits A thru H demonstrating the States Attorney Generals Office has failed to uphold the law and furthered the violations which the law specifically prohibits, therein connecting "Defendant's", and each of them to this action. Papasan v. Allain, (1986) 478 U.S. 265, at p.276, 277.

81. Law Enforcement by AG Cal.Const., Art.5 Sec.13, Attorney General Key 6. NOTE1, ..."The A.G. is the highest non judicial officer of California, and is particularly charged with the duty of supervising administration of criminal laws"... Pyle v. Duffy, (1945) 68 S.Ct. 1131, 334 U.S. 431, 92 L.Ed.11494, rehearing denied 68 ns.Ct.1526.

82. "A private person who acts "under color of " State Law when engaged in a conspiracy.    Glover alleges that Petitioner's conspired with state officials and his complaint, therefore, includes an adequate allegation of conduct "under color of" State Law." Tower v. Glover (S.Or. 1984), 104 S.Ct.2820, at p.2824, 467 U.S. 914.

83. Plaintiff alleges, "Defendant's", and each of them, in their official capacity, as detailed, knew they acted in their official capacity, to violate Plaintiff's clearly established Constitutional Rights by application of a penal statute Cal.Penal Code, 3041(a)(b) and/or    Cal Code of Regs.2402, that are unconstitutional on their face                for uncertainty after Plaintiff served the mandatory minimum term, which further removes the theory of a shortened sentence upon a showing of rehabilitation where the statute allows the punishment to fit the crime rather than the criminal, and that "Defendant's", and each of

42.

them, unconstitutionally fostered/implemented a blanket rule/policy that denies/excludes parole for individuals who's crime had a particular type of aggravating factor, therein demonstrating, "Defendant's", and each of them, in their official capacity, knowingly aggravated Plaintiffs' crime/offense for a greater punishment (First Degree/LWOP), by application of facts/evidence not found/proven by a jury or admitted to by Plaintiff, in violation of Due Process, the Sixth Amendment of the United States Constitution. **Himes v. Thompson**, 336 F.3d 848 (9th Cir.2003); "application of a parole regulation that postdated the petitioner's offense and created a "significant risk of a more onerous sentence" violates the Ex Post Facto Clause."

84. Plaintiff alleges, "Defendant's", and each of them, in their official capacity, as detailed knew they acted individually, and                with deliberate indifference and/or discrimination/retaliation to violate Plaintiffs' Civil Rights    with malicious and/or dishonest, corrupt intent (bad faith), therein arbitrarily or capriciously discriminating/retaliating against him with punishment after pleading to a crime; where the facts demonstrate Plaintiff          pleaded to a lesser included offense for the benefit of less punishment, in violation of the Due Process Clause and the 14th Amendment of the United States Constitution.

///

//

/

43

VIII

POINTS AND AUTHORITIES

VIV

CALIFORNIA P.C. 3041(a)(b) AND CAL.CODE OF REGS.2402 ARE CALLED INTO

QUESTION          FOR INSTRUCTING THE PAROLE BOARD TO PUNISH

PRISONER'S WITH THE MAXIMUM TERM OF LIFE BY AGGRAVATING FACTS

OF THE CRIME NOT FOUND/PROVEN BY A JURY AND DISMISSED AS PART OF

PLEA; AND FOR EXPOSING PRISONER'S TO A SIGNIFICANT RISK OF

INCREASED INCARCERATION TO A PUNISHMENT OF LWOP, PURSUANT TO

CAL.P.C.'S 190.1 THRU 190.5.

85. Plaintiff expresses the U.S. Supreme Court in several cases **Apprendi v. New Jersey**, 530 U.S. 466, 147

L.Ed.2d 435, 120 S.Ct.2348 (U.S.N.J.2000); **Blakely v. Washington**, 124 S.Ct.2531(2004); and more recently

**Cunningham v. California**, 549 U.S. 2007; expresses legal ramifications to the sentencing law in California

where punishments are aggravated with facts and evidence not found/proven or admitted to by defendant. This

summary of law is necessary as it directly and indirectly applies to the claims presented within this Complaint.

86. See **Winston v. Board of Prison Terms**, C.A.9 (Cal.2005), 123 Fed.Appx.802, 2005 WL 428831,

unreported on remand 2005 WL 1983891, "Habeas petitioner's claim that California state regulations governing

parole suitability determinations, containing guiding language such as "especially heinous, atrocious, or cruel

manner," were unconstitutionally vague was not so obviously frivolous or false as to permit summary dismissal."

See **Cal.Code of Regs.2402.**

87. Plaintiff submits the above facts of law due to his challenge that the above determinations apply

aggravating facts contained in **California Penal Code's, 190.1 thru 190.5**, for a punishment of Life Without

Parole or Death, to be found or proven by a jury.

88. The California Legislature intended **Cal.P.C. 3041(a)** to apply unconstitutionally individually, and as

applied to **Cal. P.C.3041(b)** and **Cal.Code of Regs.2402**, in violation of the 6th amendment, and the due process

and ex post facto clauses of the 14th amendment to the U.S. and Cal. Constitutions; therein striking down **Cal.P.C.**

**3041(a)(b)**, and **Cal.Code of Regs. 2402**, on their face; And that, the states plea agreement with Plaintiff was

breached as to illusory concessions of promises & inducements that resulted in a species of fraud, in violation of

44.

Plaintiff's clearly established Constitutional Rights.

89. Cal. P.C.'S, 1170(b), 3041(a)(b) and Cal. Code of Regs. 2402 express consideration of some additional facts of the crime that shall apply in a mandatory manner. **Cunningham v. California**, 2007, supra.

90. Plaintiff puts forward the Court in **Cunningham** was looking to the mandatory application of punishments where the Trial Court went beyond a specified uniform proportionate term with some additional facts of the crime not found or proven by a jury, therein holding the 6th amendment right is not toothless. In this regard Plaintiff is entitled to Equal Protection of laws established in **Cunningham; Cal.P.C. 3041(a)(b)** and **Cal.Code of Regs. 2402**, which can **NOT** withstand a due process, 6th amendment or ex post facto challenge, nor can it avoid the dilemmas horns on several grounds where sentencing goals can not apply constitutionally, (i.e.Rehabilitation/Uniform Terms).

91. Plaintiffs' dilemma is further demonstrated by the fact the Authority (Parole Board) can only go above the proportionate term/punishment for the crime based on facts found or proven by a jury, but in California for the Parole Board to go beyond the proportionate term to life or LWOP it must be a fact not found or proven by a jury; **Cunningham v. California**, 2007, supra, therein demonstrating the law can **NOT** apply constitutionally because a challenge to the statute on it's face is the maximum term prescribed by law life as to facts not found or proven by a jury, **Apprendi v. New Jersey**, 2000, supra; This application of law aggravates facts of the crime that exposed Plaintiff to a significant risk of increased incarceration, (**Cal.P.C. 190.1 thru 190.5**, especially heinous, atrocious, cruel manner, felony murder, special circumstances), for a punishment of Life Without the Possibility of Parole/First Degree Murder), an aggravated punishment requiring the facts to be found or proven by a jury. See **Rosenkrantz v. Marshall**, (C.D. Cal.2006) WL 2327085 at p.19, "a special circumstances which, if found to be true by a jury, requires a sentence of life without the possibility of parole..." See also **In re Leslie Van Houten**, (2004) 116 Cal.App.4th 339, 10 Cal.Rptr.3d 406, "Prisoners offense was characterized by the presence of special circumstances under current law that justified punishment by death or life without the possibility of parole including multiple murder convictions, felony murder by commission of robbery during the murder, and racial motivation for the murders."

92. Plaintiff further expresses application of unchanging facts/characterization of the offense pursuant to **Cal.P.C. 3041(a)(b)** and **Cal Code of Regs.2402**, converts Petitioner sentence of 17 years to life to a term/punishment of life without the possibility of parole. As one court has put it: "The court asks retorically -

45.

what is it about the circumstances of Petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crime will always be what they were, and petitioner's motivation for committing them will always be trivial. Petitioner has no hope for ever obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were not that serious or the motive was more than trivial. Given that no one seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary remote possibility. **Irons v. Warden of California State Prison – Solano**, 358 F.Supp.2d 939, 947 (E.D. Cal.2005).

93. As demonstrated California's **P.C. 3041(a)(b)** and relevant Parole Board rules **Cal Code of Regs.2402**, are unconstitutional to the extent they authorize the imposition of a sentence/punishment to first degree murder/Life Without Parole, without a jury findings or proof beyond a reasonable doubt. Plaintiff points out in this regard any fact that increases the penalty for a crime beyond that prescribed for the convicted offense of second degree murder must be submitted to a jury, and proved beyond a reasonable doubt. See **Cal. P.C.'s 190.1** thru **190.5**, demonstrating **Cal.Code of Regs.2402**, requires/mandates re-characterization of the punishment to First Degree/LWOP by application of aggravating facts of the crime not found/proven by a jury, (especially heinous, atrocious, or cruel manner, and felony murder, **In re Leslie Van Houten**, (2004), Supra.)

94. Under California's Indeterminate Sentencing Law **Cal.P.C. 3041(a)(b)**, and **Cal.Code of Regs.2402**, aggravating factors of the crime expose Plaintiff to punishment First Degree/LWOP a greater punishment than the one Plaintiff stipulated to in a plea for a lesser included offense, and that this increase **Cal.P.C. 3041(a)(b)** and **Cal.Code of Regs.2402** are the functional equivalent of an element of a greater offense than the one covered by a jury's verdict, or Plaintiff's plea to a lesser included offense.

95. As noted any "fact that exposes a defendant to a punishment greater than that otherwise legally prescribed [are] by definition 'elements' of a separate legal offense" or "the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict"; See **Apprendi v. New Jersey**, (2000), supra, 530 at pp.483 fn.10 494 fn.19 "A fact that increases the maximum permissible punishment of a crime is the functional equivalent of an element of the crime, regardless whether that fact is defined by state law as an element of the crime or as a sentencing factor." **People v. Betts**, (2005) 34 Cal.4th 1039, 1054; After **Apprendi, Blakely**, and **Cunningham**, therefore, "Circumstances in aggravation" are equivalent to elements of a crime. They no

46.

longer qualify as matters that the legislature can delegate to the judiciary or Authority (Parole Board), to define as it could before these rulings under the Constitution of the United States. Legislature cannot delegate to the judiciary or parole board power to manufacture such elements and submit them to a jury. **People v. Figueroa,** (1999) 68 Cal.App.4th 1409, 1414, "Although the legislature may delegate rule-making power to an administrative body, it may not allow the agency to declare the violation of it's rules a crime. Only the legislature, not an administrative body, may determine what conduct is lawful and the penalty for the unlawful conduct." [citations ommitted].

96. . In holding that a court may not increase the defendant's sentence based on facts not found or proven by a jury, **Blakely** and **Cunningham** prohibited judicial and administrative body fact finding, therein demonstrating the Parole Board is bound by the constitution which prohibits an administrative body (parole board) from increasing the sentence/punishment based on facts not presented or proven to a jury, or admitted by Plaintiff, who stipulated to a plea bargain for a lesser included offense of second degree, wherein the aggravating facts, counts, charges, and special circumstances were plead/stipulated away by the State of California by and through a binding contract where these dismissed facts could **NOT** deny Petitioner his clearly established Constitutional Rights.

97. . As stated in **Apprendi, Blakely,** and now **Cunningham** such a penalty provision **Cal.P.C. 1170(b), 3041(a)(b)** and **Cal. Code of Regs.2402,** constitutes an element of an offense. **People v. Steel,** (2004) 34 Cal.4th 535, at pp.545-549; In **Steel,** this meant that even though California law had not defined a crime of premeditated attempted murder - since attempted murder was a crime and premeditated allegation merely a penalty provision - nonetheless for federal double jeopardy purposes, premeditation had to be deemed an element of a greater crime than attempted murder.

98. . In light of **Cunningham,** which applied **Blakely** and **Apprendi's** bright - line constitutional application of law to California upper-term sentencing, the same is necessarily true of a California upper-term aggravating factor. It too is a "penalty provision" that must be deemed an element of an offense greater than the offense of conviction to which it attaches. Given the holding of **Cunningham,** and it's application of **Blakely** and **Apprendi** the difference between - for example - attempted murder, and attempted murder with a premeditation penalty provision, is the same as the difference between attempted murder and attempted murder with vulnerable victim penalty aggravating factors, or second degree murder compared to first degree murder with wilfull, deliberate and premeditation with malice aforethought (**Cal.P.C.190**). For **Blakely** and **Apprendi,** purposes there

47

is no difference at all.

99. . The records, facts and constitutional issues presented in this case demonstrates **Cal.P.C. 3041(a)(b)** and **Cal.Code of Regs.2420** are in violation of the 6th Amendment, Ex Post Facto, and Due Process, protected by the 14th Amendment to the U.S. and Cal. Constitutions; wherein facts of the crime **NOT** found or proven by a jury are aggravated exposing Plaintiff to a more severe punishment.

> **Thomas v. Brown**, (N.D. Cal.2006), WL 378355, n.7 at p.6, "The Governor's determination
> that the manner of the killing demonstrated "an extreme level of anger and lack of control,
> and a degree of premeditation" was well-supported by the record." "Although there was
> evidence of premeditation as the Governor mentioned, the jury had convicted Thomas of
> second degree murder and not first degree murder."
> See also **Tollover v. Carey**, (E.D. Cal.2006) WL 3497670 at p.9, "First degree murder
> requires a wilful, deliberate and premeditated killing with express malice aforethought.
> **CALJIC 820**. However, petitioner was convicted of second degree murder. Second
> second degree murder can be found either through 1) an intentional killing with malice
> aforethought but **without** deliberation and premeditation, i.e. express malice (**CALJIC**
> **8.30**), or 2) an unintentional killing which resulted from an intentional act whose natural
> consequences were dangerous to human life, with knowledge and conscious disregard of
> the danger, i.e. implied malice (**CALJIC No.8.31**)."

100. As applied to Plaintiff's sentencing scheme **Cal.P.C. 3041(a)(b)** and **Cal.Code of Regs.2402**, the Parole Board was directed to apply the sentencing rules of the judicial counsel (**Cal.P.C.1170, subd.(a)(3)**), therein the legislature delegated authority to the judicial counsel to adopt such rules (**Cal.P.C.1170.3**), including the definitions of aggravating factors. (**Rule 4.421**). This sentencing scheme was **Struck Down** by **Cunningham**, and such factors are equivalent to elements of the crime, and the legislature cannot delegate the power to define elements. **Keeler v. Superior Court**, (1970) 2 Cal.3d 619, at p.632; **People v. Figueroa**, (1999) 68 Cal.App.4th 1409, at pp.1414.) As demonstrated Legislature authored a statute wherein the Authority (Parole Board) adopted a rule/regulation **Cal.Code of Regs.2402**, defining aggravating factors equivalent to elements of a greater crime **Cal.P.C. 190.1** thru **190.5**, requiring a punishment of First Degree/LWOP to be found/proven by a jury; Like

**Cunningham**, these facts require this sentencing scheme to be **Struck Down.**

///

//

/

49.

**X.**

APPLICATION OF CAL.PENAL CODE 3041(a)(b) AND CAL.CODE OF REGS. 2402, **VIOLATES**    THE SENTENCING GOAL OF INDIVIDUALIZING THE REHABILITATION PROCESS FOR THE SHORTENING OF SENTENCES (to mitigate the punishment that would otherwise be imposed), WHERE THE POWER TO SHORTEN SENTENCES MAKE PUNISHMENT FIT THE CRIME RATHER THAN THE CRIMINAL, REMOVING A PRISONER'S INCENTIVE TO WELL-DOING AND STRENGTH FOR THE HABIT OF WELL-DOING, THEREIN

DENYING PETITIONER THE BENEFIT OF HIS PLEA BARGAIN.

101. Under the Indeterminate Sentencing System legislature not only prescribes the minimum and maximum terms for the offense upon which a conviction of such an offense but also establishes the operating features the authority (Parole Board), determines within limits the length of the term the inmate will actually be required to serve, (Cal.P.C. 3041(a)). In this regard as applied in theory the indeterminate sentencing law in California permits the shortening of a defendant's sentence upon a showing of rehabilitation.

> The Goal of indeterminate sentence system is to individualize the rehabilitation process
> and to use power to shorten sentences as an incentive to reformation. **In re Lee**, (1918)
> 177 Cal.690, 171 P.698, ("to mitigate the punishment which would otherwise be imposed
> upon the offender. These laws place emphasis upon the reformation of the offender. They
> seek to make punishment fit the criminal rather than the crime. They endevor to put
> before the prisoner great incentive to well-doing in order that his will to do well should be
> strengthened and confirmed by the habit of well-doing.")

102. The relevance of this theory in challenging the statute on it's face is to mitigate the punishment which would otherwise be imposed the greater punishment must itself be one which it is within the power of the legislature to decree. Accordingly, it is the maximum term prescribed by the statute–not a lesser period thereafter fixed as an incentive to well-doing which must survive constitutional scrutiny. Plaintiff demonstrates this fact of law does **NOT** survive constitutional scrutiny, where the legislature has authored a statute **Cal.P.C. 3041(a)(b)**, instructing the Parole Board to aggravate unchanging facts/evidence of a crime not found or proven by a jury, or

admitted to by Plaintiff, pursuant to **Cal.Code of Regs.2402**, therein making punishment fit the crime rather than the criminal denying Plaintiff the benefit of his plea bargain for less punishment.

103. Plaintiff supports a conclusion that invalidates/strikes down the law, **Cal.P.C.3041(a)(b)** and **Cal.Code of Regs.2402**, on their face by demonstrating the Court **In re Foss**, 112 Cal.Rptr.649, 10 Cal.3d 910, (Cal.1974), found the statutory minimum of 10 years for a non-violent offender to serve before being considered for parole by consideration of rehabilitation of the offender (mitigating factors), unconstitutional on it's face. Applying the reasoning established in **Foss**, Plaintiff puts forward the fact his crime violent in nature, required a mandatory minimum period of incarceration, after which the Parole Board applied **Cal.P.C. 3041(a)(b)** and **Cal.Code of Regs.2402**, unchanging facts/evidence of a crime not found or proven by a jury, dismissed as part of the plea for less punishment, to deny Plaintiff his clearly established Constitutional Rights; **Cal.P.C.'S 190.1 thru 190.5**, especially heinous, atrocious, or cruel manner, and felony murder, special circumstances, requires/mandates a punishment of LWOP as there will always be some evidence to deny parole, **In re Leslie Van Houten**, (2004), supra. In this regard the challenge is clear as Plaintiff was unconstitutionally denied this benefit of his bargain (rehabilitation goals/mitigating factors), where punishment was mandated by the indeterminate sentencing system to fit the criminal rather than the crime.

## XI.

## THE PAROLE BOARD AND STATE GOVERNORS HAVE ADOPTED AN UNCONSTITUTIONAL BLANKET RULE/POLICY THAT DENYS/EXCLUDES PAROLE FOR INDIVIDUALS WHO'S CRIME HAVE A PARTICULAR TYPE OF AGGRAVATING FACTOR. (NO PAROLE POLICY/RULE FOR AN AGGRAVATING FACTOR), IN VIOLATION/BREACH OF THE PLEA.

104. Application of **Cal.P.C. 3041(a)(b)** and **Cal. Code of Regs.2402**, unchanging facts/characterization of aggravating facts, **Cal.P.C. 190.1 thru 190.5**, especially heinous, atrocious, cruel manner and felony murder, special circumstances, converts Plaintiffs' sentence of second degree murder to life without parole, by aggravating facts of the crime not found/proven by a jury, dismissed/pled away as part of the plea inducement by the prosecutor, therein inflicting Plaintiff with a blanket rule/policy that excludes parole for individuals who the Parole Board and/or State Governor's apply one of the above aggravating factors, despite Plaintiffs' plea for less punishment. See **In re Leslie Van Houten**, (2004), supra, demonstrating special circumstances will always be

51.

some evidence to deny parole as the law/regulation allowed the authority (Parole Board and State Governor's) to adopt a blanket rule/policy that automatically excludes parole for individuals who's crime have a particular type of aggravating factor, and/or who plead to a lesser included offense because the prosecutor dismissed/pled away the particular type of aggravating factor as part of the plea inducement.

## XII.

## APPLICATION OF Cal.P.C. 3041(a)(b) IS UNCONSTITUTIONAL    FOR UNCERTAINTY AS TO A UNIFORM PROPORTIONATE TERM FOR THE PUNISHMENT OF LIFE.

105. ; Plaintiff demonstrates the Statute **Cal.P.C. 3041(a)(b)** is void for uncertainty after Plaintiff served the mandatory minimum term, where Petitioner may never receive a uniform proportionate term required under **Cal.P.C.3041(a)** as the Parole Board is required to aggravate unchanging facts and evidence of the crime to deny a fixed term, despite the plea dismissing the aggravating facts of the crime. See **In re Dannenberg**, (2005) 34 Cal.4th 1061. As demonstrated application of **Cal.P.C. 3041(a)(b)** and **Cal.Code of Regs.2402**, subjects Plaintiff to a period of time (Uniform Proportionate Term as to Life), that cannot be calculated except with hindsight after death, and hence is void for uncertainty. In this regard the maximum (Life), must in the first instance be constitutionally valid. In the case of **People v. Sama**, (1922) 189 Cal.153, 207 P.893, the defendant was convicted of robbery and punished to a sentence of five years to life. The punishment for an attempt to commit any crime was imprisonment for up to one-half of the maximum term provided for the completed offense. **Sama** contended that an indeterminate sentence is a sentence for the maximum term and that the sentence in his case must therefore be deemed to be for a term of one-half of his life, a period of time that obviously cannot be calculated except with hind sight after his death, and hence is void for uncertainty. The Court in **Sama** explained the Boards function in determining what term of years appellant must serve is no part of the actual fixing of the sentence itself; and if it were so regarded it would be the exercise of a judicial function by an executive board, and void under section 1 article III, of the Constitution. The Legislature has no authority to vest this judicial power in the state board of prison directors, and in so far as section **1168** of the Penal Code purports to do so it is in violation of that section. Hence, in determining whether or not this sentence is valid, the test, is the term of imprisonment by the judgement–one-half, of appellant's life–and NOT the term of years which would be fixed by the state board of prison directors at the expiration of the minimum term. The maximum term was thereafter void

for uncertainty.

106.   Plaintiff demonstrates the maximum sentence of life as to a uniform proportionate term is a period of time that obviously cannot be calculated except with hind sight after his death, and hence is void for uncertainty, as to a punishment challenge to the statute when the Authority (Parole Board) fails or declines to fix a shorter term.  See **In re Lynch**, 8 Cal.3d 410, 105 Cal.Rptr.217, (1972); and **In re Rodriguez**, 14 Cal.3d 639, 122 Cal.Rptr.552, (1975).

107.   Plaintiff further supports the **Sama** application of law **In re Dannenberg**, 23 Cal.Rptr.3d 417(2005), at p.445, in part: "the majority accordingly holds, in effect that "normally" can mean almost never' and that, "the majority advances the position that the Board is governed by Section **3041(b)** to exclusion of **3041(a)**." This reasoning of law flies in the face of the Constitution where in California Plaintiff can be punished with aggravating facts of the crime, **Cal.P.C.190.1** thru **190.5**, requiring a punishment of Life Without the Possibility of Parole, with facts, that were NOT found or proven by a jury, therein invalidating **Cal.P.C. 3041(a)(b)**, as uncertain for a uniform proportionate term on a challenge to a life sentence or for an increased punishment of life without the possibility of parole, **Cal.Code of Regs.2402**.  Plaintiff further points out, **In re Dannenberg**, supra, at p.449, the decentstated: "In other words, no one is challenging the validity of the Boards regulation."

XIII

'VIOLATED/BREACHED PLEA

109. Plaintiff was originally charged in this case with First Degree Murder, after a month long trial which included about forty witnesses, the jury trial deadlocked at seven to five and a mistrial was declared. The prosecutor after having evidence problems with the Peoples case offered Plaintiff a plea bargain stipulating that the crime would be fixed in the second degree, and that all other counts, charges, and aggravating factors of the crime would be dismissed as part of the plea for less punishment.

110. Plaintiffs understanding of the plea was that the Parole Board Members (State and Prison Officials), would examine his crime as Second Degree and would not recharacterize the conviction as one requiring First Degree treatment, and would Not aggravate facts of the crime dismissed/stiulated away by the prosecutor as part of the plea contract.

111. In the context of a plea, certain statutory provisions set out what must occur and govern how the crime is ultimately to be treated. For example Cal.P.C. Sec.1192 provides "[u]pon a plea of guilty,... the court must before passing sentence determine the degree" of the offense in question. Upon doing so, the law is very specific about the effect that the determination of degree has, stating that thereafter"... the defendant cannot be punished to a higher degree of the crime." Cal.P.C. Sec.1192.5, specifies that once "the plea is accepted by the prosecutor... and approved by the court... the court may not proceed as to the plea other than as specified in the plea." The present case specifically involved this type of determination of "degree" of the crime;  Plaintiff "cannot be sentenced on the plea to a punishment more severe than that specified in the plea and the court may not proceed as to the plea other than as specified in the plea."

112. Plaintiff herein alleges the facts are after Plaintiff was incarcerated in State Prison the Trial Court and Prosecutor instructed Parole Board Member's

54.

State and Prison Officials  to treat the offense as a First Degree by consideration/application of the dismissed counts, charges, aggravating factors that were plead away as part of the plea contract, without Plaintiff's knowledge or presence and failed to advise Plaintiff of his rights, and denied Plaintiff the right to counsel as demonstrated by the fact Defendant's E. Kammelarr; P. Silva and G. Vick, on order by the Court Defendant J. Komar rendered/authored a probation report after interviewing Plaintiff without counsel present and without advising Plaintiff of his right to counsel, in violation of Plaintiffs' Constitutional Rights and the right to counsel at all stages of the criminal proceedings, despite these facts defense counsel advised Plaintiff he had no grounds to appeal.

113.   Plaintiff respectfully points out basic logic demands that Plaintiff would NOT enter a voluntary and knowing plea to a term of 25 years to life, First Degree Murder or Life Without Parole at the change of the plea with no promise of release/less punishment, where the aggravating facts of the crime were dismissed/stipulated away by the Prosecutor as part of the plea inducement for less punishment, when Plaintiff had just been the recipient of a deadlocked jury due to evidence problems with the Peoples case. It is implausible that Plaintiff would enter the plea to Second Degree only to have his punishment fixed at that contemplated by First Degree and /or to deny release/parole. See **Brown v. Poole,** 337 F.3d 1155 (2003); citing **INS v. St. Cyr,** (2001) 533 U.S. 289, 322, 323, 325, ("inferring based on general analysis of what would motivate defendant to accept plea agreements that particular defendant "almost certainly" relied on available of particular relief.")

114.   The alleged facts in this Complaint demonstrates Plaintiff was unconstitutionally denied his clearly established Constitutional Rights which further demonstrates Plaintiffs' plea contract was violated/breached with illusory concessions by the state which constituted a species of fraud. (**In re Ibarra,**

55.

(1983) 34 Cal.3d 277, 289.) "Simply put, a contract is not a license allowing one party to cheat or defraud the other." **Gryberg v. Citation Oil & Gas Corp.**, (S.D. 1997) 573 N.W.2d 493, 501.)

115. Plaintiff entered into a plea bargain/contract with Defendant's J. Komar; T. Farris; J. Tilton; Doe Defendant's; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasquez; P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; D. Adams; and K. Clark, for the significant benefit of less punishment by application of good-time credits, due to the dismissed/stipulated away counts, charges and aggravating facts of the crime. Plaintiff honored the terms of the plea, waiving his right to a retrial and the States burden of proof for the dismissed counts, charges and facts of the crime to be found/proven by a jury, nevertheless "Defendant's", and each of them, individually and/or in their official capacity denied Plaintiff his clearly established Constitutional Rights, therein arbitrarily or capriciously acting in bad faith, where the facts demonstrate Plaintiff entered into the plea contract for the benefit of less punishment; And that, "Defendant's", and each of them, were bound to the Prosecutors' plea contract/stipulation as part of the plea inducement, and were without jurisdiction, as outlined in this Complaint.

116. The afore demonstrated facts, Constitutional and Statutory rules show that the policy of law is to require that the offense be treated as being no greater than was agreed by the parties to the plea contract, by doing otherwise, Plaintiff has lost the benefit of less punishment under the contract.

117. The facts clearly demonstrate/show the dismissed counts induced Plaintiff's plea with the promise of less punishment, release/parole, by and through the lesser included offense of Second Degree, which was fixed/stipulated as a consequence of the plea for less punishment.

///

//

XIV

## CONCLUSION

118. Plaintiff puts forward these facts to demonstrate he has been damaged by "Defendant's", and each of them, who not only violated his clearly established Constitutional Rights with promises and inducements to plead away his due pocess and Sixth Amendment right to jury trial and subjected him to violations of Ex Post Facto principles of law, but also "Defendant's", individually and/or in their official capacity, implemented a blanket rule/policy where the records and facts show/demonstrate "Defendant's" applied the rule . to arbitrarily or capriciously deny Plaintiff his contract and subjected him to the deliberate indifference of discrimination/retaliation, in violation of State and U.S. Constitutions aggravating facts of the crime not found/proven by a jury.

119. The Constitutional Rights infringed by "Defendant's", were clearly established at the time of their challenged conduct, "Defendant's", knew their conduct violated the constitutional norms.

120. "Defendant's", and each of them, acted with malice intent to discriminate/retaliate and deprive Plaintiff of his Constitutional Rights or cause him other injury.


I Peter Honesto, Plaintiff have read the foregoing Complaint and hereby verify the matters herein are true, except as to matters alleged on information and belief, and as to those I believe them to be true. I certify under penalty of perjury that the foregoing is correct and true.

Peter Honesto, The Honesto Estate, Pro Se Plaintiff's

Dated: 6-17-08

57.

EXHIBIT

A

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA

Case No.: 98079    Case Name: People of the State of California vs

Date: 26 MARCH 1987  Time: _____  PEDRO JOSE HONESTO

HONORABLE    JACK KOMAR

Deputy Clerk    RALPH B. ULATE

Court Reporter   D. ROGINA

Deputy Sheriff   P. O'DONOVAN


___T. FARRIS___                    ___F. CAVAGNARO___
Deputy District Attorney           Counsel for Defendant

MATTER HEREIN REGULARLY BEFORE the Court for continued criminal jury trial
(5th day). Sixth day jury deliberations.
thereupon, at 9:30 am the members of the jury retire to the juryroom to
retinue with jury deliberations.
Attys, defendant, all jurors not present pursuant to stipulation.
thereafter, at 10:47 am the members of the jury are returned to the courtroom
persuant to order of court.
Attys, DEFENDANT, jurors each present. the members of the jury, through a NOTE
of the FOREPERSON requesting that the jury Instructions RE: circumstantial
evidence, direct evidence, and also instructions on determining creditability of a
witness including eyewitness testimony
the court then proceeds to read back the jury instructions as requested by
members of the jury. the members of the jury then being satisfied, them once
to retire to the juryroom to continue with jury deliberations.
thereafter, at 11:54 am the members of jury are returned to the courtroom pursuant
order of court. Attys, DEFENDANT, jurors each present.
the FOREPERSON of the jury then informs the court through a written message that the
members of the jury are at an impass-deadlocked.
the FOREPERSON of the jury is asked by the court if the members of the jury are at a
hopeless deadlock. Answer: Yes  How many ballots have the jury TAKEN: ANSWER (05
court asks for a number break down on their last ballot TAKEN: ANSWER: 7 to 5
the members of the jury are then polled individually, to see if they each agree that
each agree that they are at a hopeless deadlock. Each jurer responded Yes (deadlocked
the members of the jury are then excused for the noon hour, and ordered to return at
; to the jury deliberation room.
the members of the jury at 1:58 pm retire to juryroom once again. the members of
jury are then excused to the juryroom to await further orders of the court.

7717 REV 2/77                  CRIMINAL MINUTES                        1238

98079     26 MARCH 1987     PEOPLE OF THE STATE OF CALIFORNIA     02
Case Number     Date     Plaintiff     Page

-vs-

PEDRO JOSE HONESTO
Defendant

=================================================================

Thereafter, at 4:05 PM IN OPEN Court:

Attys present, DEFENDANT present, Jurors Not present.

The defendant states through his Atty that he will enter a "No Contest" PLEA to count 01 a Viol. Pc 187 stipulated to be in the 2nd degree, Allegation Viol. Pc 12022.5/ 1203.06 admitted. (TERM OF SENTENCE 17 yrs to LIFE STATE Prison)

The defendant is then advised by his Atty as to his PLEA OF NO contest, and as to his constitional Rights.

The court then examines the defendant as to his PLEA of "No Contest" and as to his constitional Rights. the defendant then enters a PLEA of "No Contest" to ct. 01 a Viol. Pc 187 2nd degree (stipulated), and admits the Armed Allegation a Viol. Pc Section 12022.5/1203.06. (DEFT. STATED that he UNDERSTOOD and WAIVED his Rights as Explained)

The deputy district Atty makes a motion to dismiss the special circumstances, and remaining charges.

The deputy district Atty states on the record his basis for Not Contesting the No contest PLEA of the defendant.

Whereupon, the court finds the defendant "guilty" and accepts the "No Contest" PLEA of the defendant to ct. 01 Pc 187 stipulated to be 2nd degree, and the Armed Allegation Viol. Pc 12022.5/1203.06 admitted.

Matter is set for receipt of Probation Report and Sentencing on Mon: 04 May 1987 at 9 AM.

DEFT. REMANDED to custody of Sheriff.

ALL Exhibits are ordered returned to Party Submitting Same

DIST. Attys Motion to dismiss special circumstances, remaining CHARGES will stand Submitted to date of hearing (Receipt of Probation Report/ Sentencing).

IN OPEN Court:

at 4:20 PM the members of the jury return to open court.

Attys, Jurors, each present. DEFT. Not present (Presence WAIVED)

The court then informs the members of the jury that there has been a disposition in the case.

The members of the jury are then each thanked for their jury service and are discharged at this time, and the Admonishment Not to discuss the case is lifted.

All of the Jurors, as well as the Alt. Jurors who were contacted by Phone by the Clerk requested that their names each be dislodged from the jury Panel. at this time they be, having SELECTED through a jury trial.

court adjourned : 4:35 PM ————o————

1239

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA   CRIMINAL MIN: ::ES, CHANGE OF PLEA

Case No. _98079_   PEOPLE v. _PEDRO JOSE HONESTO_

Date: _03/26/87_

Honorable _JACK KOMAR_   Clerk _RALPH B ULLATE_

Reporter _D. Rodriga Rogina_   Sheriff _P. C'DONOVAN, DEPUTY_

[ ] Conditional Plea _NOTE: ON 3/26/87 the Jury INFORMED the court that they were deadlocked at 7 to 5, BEFORE the Jury was discharged the defendant entered a "No Contest Plea"_

_T. FARRIS_   _F. CAVAGNARO (PD)_
Deputy District Attorney   Counsel for Defendant

CHARGES: _CT. 01 Pc 187 / Pc 12022.5/12203.06 / SPECIAL CIRCUMSTANCE Pc 211/ SPECIAL CIRCUMSTANCE Pc 207/209_
_CT. 02 Pc 664-211/ Pc 12022.5 / 1203.06_
_CT. 03 Pc 207(a) /Pc 12022.5 /1203.06_
_Ct. 04 Pc 209 (b)/ Pc 12022.5 /1203.06_

Matter regularly before the Court this date, counsel and defendant being present.

_Jury Trial: Feb 9,10,11,13,17,18,19,20,23,24, March 2,3,4,4,12,13,17,18,19,20, 23,24,25,26 1987 (CHANGE OF PLEA 3/26/87 - 6th day Jury deliberation)_
_Trial by Jury - defendant enters change of plea before Jury to discharged_

After examination and permission by the Court, defendant's plea of ~~Not Guilty~~ is withdrawn and defendant enters a plea of ~~Guilty~~ _COP (NO Contest) PLEA (17yrs to LIFE SENTENCE)_
_CT. 01 Pc 187 stipulated 2nd degree_
_Pc 12022.5/1203.06 admitted_
_Peo's Motion to dismiss special circumstances allegation_
_Cts Two Pc 664/211, Ct. 03 Pc 207(a)/Pc 12022.5/1203.06, Ct. 04 Pc 209(b)/Pc 12022.5/ 1203.06_

WHEREUPON, the matter is referred to the Adult Probation Officer for investigation and is set for hearing on _Mon 04 May 1987_____, in [ ] Master Sentencing Calendar, OR [✓] Submitted to date of

Courtroom _04_, at _9:00_ A.m. [✓] Time waived for sentencing sentencing.
_Criminal Court: Annex (Judge Komar)_

ARMED ALLEGATION [XX] Admitted _CT. 01_   [ ] Denied _STIPULATED_   [ ] Dismissed

DEGREE   [ ] First   [YY] Second   [ ] Not Fixed   [ ] Hearing

PRIORS   _-0-_   [ ] Admitted   [ ] Denied   [ ] Mute   [ ] Stricken

[ ] Hearing pending

Dates of priors _____

AGENCY _SJPD_   CUSTODY STATUS _IN_

CO-DEFENDANTS (Including dispositions) _NONE_

_DEFT. WAIVES his rights as explained._
_NOTE: Court to state Factual basis for PLEA at each / Sent hrg date -_
_DEFT. REMANDED to custody of sheriff_

Ⓢ 3519 REV 8/77

**1240**

Defendant _WAS NOT_ adjudged a habitual criminal within the meaning of Sub-division _a or b_ of
(was) or (was not)                                                                          (a) or (b)
Section 644 of the Penal Code; and the defendant _IS NOT_ a habitual criminal in accordance with Sub-division (c)
of that Section.                            (is) or (is not)

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprison-
ment in the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff
of the _____ County of _SANTA CLARA_ and by him delivered to the Director of Corrections of the
State of California at the place hereinafter designated. _CALIFORNIA MEDICAL FACILITY VACAVILLE_

It is ordered that sentences shall be served in respect to one another as follows: _CONSECUTIVE_
_COUNT ONE, VIOLATION PENAL CODE SECTION 187 (MURDER SECOND DEGREE) DEFT, SENTENCED_   (Note whether concurrent or consecutive as in each count):
_TO STATE PRISON FOR THE TERM OF 15 YEARS TO LIFE. FOR A VIOLATION OF PENAL CODE SECTION_
_12022.5 THE DEFT, IS SENTENCED TO STATE PRISON FOR THE TERM OF 02 YEARS WITH SAID_
_TERM TO RUN CONSECUTIVE WITH THE 15 YEARS TO LIFE SENTENCE_

and in respect to any prior incomplete sentence (s) as follows: _N/A_
                                                                (NOTE whether concurrent or consecutive as to all incomplete sentences from other jurisdictions.)
_COUNT TWO, VIOL PC SEC. 664/211 WITH PC 12022.5/1203.06; CT. 04 PC SEC. 12022.5/1203.06; CT. 03 PC SEC. 207(a)_
_CIRCUMSTANCES, AS CONTAINED IN COUNT ONE ARE EACH ORDERED DISMISSED UPON MOTION_
_OF THE DISTRICT ATTORNEY IN THE INTEREST OF JUSTICE._
_DEFT, PAY RESTITUTION FINE PURSUANT TO GOVERNMENT CODE SECTION 13967 IN THE AMOUNT_
_OF $2,500.00._
To the Sheriff of the _____ County of _SANTA CLARA_ and to the Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at _CALIFORNIA MEDICAL FACILITY VACAVILLE_
at your earliest convenience.

_DEFT, ADVISED OF HIS_
_EAL RIGHTS:_              Witness my hand and seal of said court

_CREDIT FOR TIME SERVED:_   this _04th_ day of _MAY_ 1987

_4 ACTUAL DAYS_            _GRACE K. YAMAKAWA_
_2 LOCAL CONDUCT CREDITS_  by _Ralph B. Ulate_ ........................ Clerk
_6 TOTAL DAYS_        SEAL        (Ralph B. Ulate)          ........................ Deputy

                          State of California,
                          _____ County of _SANTA CLARA_  } ss.
                          I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made
                          and entered on the minutes of the Superior Court in the above entitled action as provided by Penal
                          Code Section 1213.
                          Attest my hand and seal of the said Superior Court this _04th_ day of _MAY_ 19 _87_
                          _GRACE K. YAMAKAWA, COUNTY CLERK_
                          by _Ralph B. Ulate_          (Ralph B. Ulate)
                          County Clerk and Ex-officio Clerk of the Superior Court of the State of California in and for the
                          _____ County of _SANTA CLARA_
                          The Honorable: _JACK KOMAR_
                          Judge of the Superior Court of the State of California, in and for the _____ County of
                          _SANTA CLARA_

Note: If probation was granted in any sentence of which abstract of judgment is certified, attach a
minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

7956 REV 8/76

1376

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

THE PEOPLE OF THE STATE OF CALIFORNIA,

Plaintiff,

Against

(ENDORSED)

F I L E D

FEB 11 1985

County Clerk
Santa Clara County

DEPUTY

PEDRO JOSE HONESTO

Defendant

The __11th__ day of __February__ , A.D., 19 __85__

Cen: _____

Cen: _____

Cen: _____

Cen: __8493830__

**INFORMATION NO.** __98079__

**COUNT ONE**

The District Attorney of the County of Santa Clara, State of California, hereby accuses _____

_____ **PEDRO JOSE HONESTO** — *Nolo to 187PC 2nd*

of a felony, to-wit: a viol. of Calif. __PENAL CODE SECTION 187__

**( MURDER )** __ in that, on or about the __12th__

day of __August__ , A.D., 19 __84__ , in the County of Santa Clara, State of California, the said defendant(s) did

unlawfully and with malice aforethought, kill JOHN RE, a human being.

It is further alleged that at the time of and in the commission and attempted commission of the foregoing offense, the said defendant, PEDRO JOSE HONESTO, personally used a firearm, to wit: a 12 GAUGE SHOTGUN, within the meaning of Sections 12022.5 and 1203.06 of the Penal Code.                                               *admitted*

**FIRST SPECIAL CIRCUMSTANCE** *Sub*

It is further alleged that the murder of JOHN RE was committed while the defendant, PEDRO JOSE HONESTO was engaged in and was an accomplice in the commission, the attempted commission, and the immediate flight after the commission and attempted commission, of a felony, to wit: ROBBERY IN VIOLATION OF PENAL CODE SECTION 211.

**SECOND SPECIAL CIRCUMSTANCE** *Sub*

It is further alleged that the murder of JOHN RE was committed while the defendant, PEDRO JOSE HONESTO was engaged in and was an accomplice in the commission, the attempted commission, and the immediate flight after the commission and attempted commission, of a felony, to wit: KIDNAPPING IN VIOLATION OF PENAL CODE SECTIONS 207 and 209.

COUNT TWO *Sub*

The District Attorney of the County of Santa Clara, State of California,
hereby accuses PEDRO JOSE HONESTO of a FELONY, to wit: a violation of
CALIFORNIA PENAL CODE SECTION 664-211 (ATTEMPTED ROBBERY) in that, on
or about the 12th day of August, 1984, in the County of Santa Clara,
State of California, the said defendant(s) did attempt to commit the
crime of ROBBERY, in violation of Section 211 of the Penal Code of the
State of California.

It is further alleged that at the time of and in the commission and
attempted commission of the foregoing offense, the said defendant, *Sub*
PEDRO JOSE HONESTO, personally used a firearm, to wit:  a 12 GAUGE
SHOTGUN, within the meaning of Sections 12022.5 and 1203.06 of the
Penal Code.

COUNT THREE *Sub*

The District Attorney of the County of Santa Clara, State of California,
hereby accuses PEDRO JOSE HONESTO of a FELONY, to wit:  a violation of
CALIFORNIA PENAL CODE SECTION 207(a) (KIDNAPPING) in that, on or about
the 12th day of August, 1984, in the County of Santa Clara, State of
California, the said defendant(s) did forcibly steal and take JOHN RE
in this County and did carry and take said person into another part of
the same County.

It is further alleged that at the time of and in the commission and
attempted commission of the foregoing offense, the said defendant,
PEDRO JOSE HONESTO, personally used a firearm, to wit:  a 12 GAUGE   *Sub*
SHOTGUN, within the meaning of Sections 12022.5 and 1203.06 of the
Penal Code.

COUNT FOUR *Sub*

The District Attorney of the County of Santa Clara, State of California,
hereby accuses PEDRO JOSE HONESTO of a FELONY, to wit:  a violation of
CALIFORNIA PENAL CODE SECTION 209(b) (KIDNAPPING FOR ROBBERY) in that,
on or about the 12th day of August, 1984, in the County of Santa Clara,
State of California, the said defendant(s) did kidnap and carry away
JOHN RE, to commit robbery.

It is further alleged that at the time of and in the commission and
attempted commission of the foregoing offense, the said defendant,   *Sub*
PEDRO JOSE HONESTO, personally used a firearm, to wit:  a 12 GAUGE
SHOTGUN, within the meaning of Sections 12022.5 and 1203.06 of the
Penal Code.

64932  gg   SJ/SJ
C8473441

Leo Himmelsbach
District Attorney

By ...........................................................
THOMAS O. FARRIS/D125
.............Deputy............................................ District Attorney

A5-2 REV 1/83

Defendant _WAS NOT_ adjudged a habitual criminal within the meaning of Sub-division _a or b_ of
(was or was not)                                                                              (a) or (b)
Section 644 of the Penal Code; and the defendant _IS NOT_ a habitual criminal in accordance with Sub-division (c)
                                              (is or is not)
of that Section.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the said defendant be punished by imprison-
ment in the State Prison of the State of California for the term provided by law, and that he be remanded to the Sheriff
of the _____ County of _SANTA CLARA_ and by him delivered to the Director of Corrections of the
State of California at the place hereinafter designated. _CALIFORNIA MEDICAL FACILITY VACAVILLE_

It is ordered that sentences shall be served in respect to one another as follows _CONSECUTIVE_

_COUNT ONE, Violation PENAL CODE SECTION 187 (MURDER SECOND DEGREE) DEFT, SENTENCED
TO STATE PRISON FOR THE TERM OF 15 YEARS TO LIFE. FOR A Violation OF PENAL CODE SECTION
12022.5 THE DEFT, IS SENTENCED TO STATE PRISON FOR THE TERM OF O2 YEARS WITH SAID
TERM TO RUN CONSECUTIVE WITH THE 15 YEARS TO LIFE SENTENCE_

and in respect to any prior incomplete sentence (s) as follows: _N/A_
(NOTE whether concurrent or consecutive as to all incomplete sentences from other jurisdictions)
_COUNT TWO, Viol PC SEC. 664/211 WITH PC 12022.5/1203.06; CT. 03 PC SEC. 207(a)
WITH PC 12022.5/1203.06; CT. 04 PC SEC. 209(b) WITH PC 12022.5/1203.06; AND TWO SPECIAL
CIRCUMSTANCES, AS CONTAINED IN COUNT ONE ARE Each ORDERED dismissed UPON Motion
OF the District Attorney IN the INTEREST OF JUSTICE.
DEFT, PAY RESTITUTION FINE PURSUANT to GOVERNMENT CODE SECTION 13967 IN the AMOUNT
OF $2,500.00._
To the Sheriff of the _____ County of _SANTA CLARA_ and to the Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above-named defendant into the
custody of the Director of Corrections at _CALIFORNIA MEDICAL FACILITY VACAVILLE_
at your earliest convenience.

_DEFT, ADVISED OF HIS
PEAL Rights:_          Witness my hand and seal of said court

_CREDIT FOR TIME SERVED:_     this _04th_ day of _MAY_ _1987_

_04 Actual Days_        _GRACE K. YAMAKAWA_ ................................................... Clerk
_12 LOCAL CONDUCT CREDITS_   by _Ralph B. Ulate_          _(Ralph B. ULATE)_ .......... Deputy
        SEAL
_16 TOTAL Days_         State of California,
                        _____ County of _SANTA CLARA_ } ss.

                        I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made
                        and entered on the minutes of the Superior Court in the above entitled action as provided by Penal
                        Code Section 1213.
                        Attest my hand and seal of the said Superior Court this _04th_ day of _MAY_ ......... 19 _87_
                        _GRACE K. YAMAKAWA, COUNTY CLERK_
                        _By Ralph B. Ulate_       _CRalph B. ULATE)_
                        County Clerk and Ex-officio Clerk of the Superior Court of the State of California in and for the
                        ................................County of _SANTA CLARA_
                        The Honorable: .................................................................
                            _JACK KOMAR_
                        Judge of the Superior Court of the State of California, in and for the.................County of
                        _SANTA CLARA_

Note: If probation was granted in any sentence of which abstract of judgment is certified, attach a
minute order reciting the fact and imposing sentence or ordering a suspended sentence into effect.

7956 REV 6/76

**1376**

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA

DATE: 04 MAY 1987

Court convenes at SAN JOSE

Criminal
Courtroom ___04___

PRESENT: HON ___JACK KOMAR___ , JUDGE

RALPH B. ULATE ___ DEPUTY CLERK

___NOT REPORTED___ , REPORTER

P. O"DONOVAN ___ BAILIFF

TITLE: THE PEOPLE OF THE STATE OF
CALIFORNIA,
          VS.        PLAINTIFF,
PEDRO JOSE HONESTO,
                     DEFENDANT.

COUNSEL PRESENT:

NATURE OF PROCEEDINGS:

## MINUTE ORDER

DEFENDANT (PEDRO JOSE HONESTO) RECEIVE CREDIT FOR TIME SERVED AS

FOLLOWS:

ACTUAL LOCAL TIME      904 DAYS
LOCAL CONDUCT CREDITS  452 DAYS

TOTAL DAYS            1356 DAYS

cc: PEDRO JOSE HONESTO
    MAIN JAIL
    SAN JOSE, CA.

    DEPARTMENT OF CORRECTIONS

☐ LAW AND MOTION MINUTES
XXX Criminal Sentencing
☐ TRIAL MINUTES

BOOK _____ ACTION NO. ___98079___

PAGE _____ DATE: 04 MAY 1987

12826

**1378**

COPY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SANTA CLARA

BEFORE THE HONORABLE LINDA R. CONDRON, JUDGE

---o0o---

In re the matter of

    PEDRO JOSE HONESTO,              No.  98079

On habeas corpus,

         Petitioner.

_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Held on June 22, 2007

A P P E A R A N C E S:

FOR THE PEOPLE:           JESSICA BLONIEN
                       DEPUTY ATTORNEY GENERAL

FOR THE PETITIONER:      ALLEN SCHWARTZ
                       ATTORNEY AT LAW

REPORTED BY:            CINDI M. JOHNSON, CSR
                       CERTIFICATE NO. 10125

2

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Petitioner: | | | | |
| Pedro Jose Honesto | 5 | 11 | | |
| Grace Honesto | 13 | | | |

1  San Jose, California                           June 22, 2007

2

3                        P R O C E E D I N G S

4          THE COURT:  Call the matter of in re Peter Honesto

5  on habeas corpus.

6          Counsel, your appearances, please.

7          MR. SCHWARTZ:  Good morning, Your Honor.  Allen

8  Schwartz on behalf of Peter Honesto.  He is personally

9  present.

10         MS. BLONIEN:  Jessica Blonien for respondent.

11         THE COURT:  Counsel, this matters has been set for

12 evidentiary hearing so the Court may undertake certain

13 factual determinations with respect to the understanding and

14 agreement upon which the defendant entered his plea in this

15 matter.

16         Are both sides ready to proceed?

17         MR. SCHWARTZ:  Ready, Your Honor.

18         MS. BLONIEN:  We are ready, Your Honor.  We have a

19 few initial objections, if we could put them on the record.

20         THE COURT:  All right.

21         MS. BLONIEN:  First, Your Honor, I would just like

22 to preserve all the procedural defenses raised in our brief.

23 And those would be the claims in the petition are

24 repetitious, successive --

25         THE COURT:  Let me stop you there, counsel.  They

26 are in your brief.  They are in the record.

27         MS. BLONIEN:  I'm just preserving them, Your

28 Honor.

4

1    THE COURT:  Well, I'm going to deem that the
2    pleadings filed in this matter are sufficient to preserve
3    the record for purposes of this hearing.  And all of your
4    objections noted in the response are noted for purposes of
5    this hearing.

6        MS. BLONIEN:  Thank you.

7        I have one additional objection to the hearing
8    itself.  And it's our contention that at issue here is a
9    question of law, not a question of fact.  And so under the
10   Rules of Court and the Penal Code, an evidentiary hearing is
11   inappropriate.

12       THE COURT:  All right.  Mr. Schwartz.

13       MR. SCHWARTZ:  I do object, Your Honor.  I think
14   this evidentiary hearing --

15       THE COURT:  What are you objecting to?

16       MR. SCHWARTZ:  The objection that respondent is
17   making that this is not an appropriate forum or appropriate
18   hearing.  There are issue of facts that need to be decided,
19   particularly what the plea bargain entailed, what the
20   reasonable expectations of the parties were and so on.  And
21   I think that can only be determined by a factual
22   determination at an evidentiary hearing, and I think we are
23   in the right place for the right purpose.

24       THE COURT:  All right.

25       Anything further?

26       MS. BLONIEN:  Nothing, Your Honor.

27       THE COURT:  You may call your first witness.

28       MR. SCHWARTZ:  Thank you very much.

```
 1              Call the petitioner, Peter Honesto.
 2                   PEDRO JOSE HONESTO,
 3    the petitioner, is called as a witness on his behalf, being
 4    first duly sworn, was examined and testified as follows:
 5              THE COURT:  Would you please state your name and
 6    spell it for the record.
 7              THE WITNESS:  Pedro Jose Honesto.
 8              THE COURT:  Please proceed.
 9              MR. SCHWARTZ:  Thank you, Your Honor.
10                   DIRECT EXAMINATION
11    Q.    MR. SCHWARTZ:  Mr. Honesto, you are the petitioner in
12    this case, is that correct?
13    A.    Yes, sir.
14    Q.    Do you recall the trial in this case?
15    A.    Yes, sir.
16    Q.    Do you remember what you were charged with when you
17    were at trial?
18    A.    Hmm, first degree murder, special circumstances.
19    Q.    Do you remember who the judge was?
20    A.    Jack Komar.
21    Q.    Do you recall the district attorney who tried the
22    case?
23    A.    Tom Farris.
24    Q.    And do you remember who your attorney was?
25    A.    Francis Cavagnaro.
26    Q.    Was he a private attorney or a public defender?
27    A.    Public defender.
28    Q.    Mr. Honesto, what was your understanding of what the
```

1    punishment would be in your case if you were convicted of

2    the charges?

3    A.    I could face life without the possibility of parole or

4    25 to life.

5    Q.    And after the trial, was there a verdict?

6    A.    The jury was hung up.  They didn't convict me.  They

7    were nearly even split, my attorney had told me.

8    Q.    I want to focus on what happened after the jury came

9    back without a verdict.  Do you recall having a conversation

10   with your lawyer after the jury came back with no verdict?

11   A.    Yes.

12   Q.    Was that in the courtroom or someplace else?

13   A.    That was -- the first time was someplace else.

14   Q.    Was that immediately after the jury was discharged?

15   A.    No.  He came and told me that they were deadlocked and

16   that the judge was going to declare a mistrial or something

17   to that effect, because they had already sent the jury back

18   one time because they wanted a hearing on further evidence.

19   Q.    Well, once the mistrial was declared, did you and your

20   attorney have a conversation about what was going to happen

21   next?

22   A.    Yes.

23   Q.    Tell us about that conversation?

24   A.    He said the prosecutor, Mr. Farris, was offering a

25   plea bargain to second degree, and dismiss the special

26   circumstances and first degree charges.

27   Q.    And did your attorney, Mr. Cavagnaro, tell you what

28   the terms of the bargain would be?

1    A.    He said if J served and programmed, that I would get

2    out at my minimum term.

3    Q.    What did you understand that to mean?

4    A.    At that time that was in the back of the courtroom.

5    We didn't discuss time yet.  He said this is a win for the

6    Public Defender's Office and for us, you know, for me.

7    Q.    Mr. Honesto, during that conversation, was anybody

8    else present besides you and Mr. Honesto?

9    A.    Not at that time, no.

10    Q.    Did anybody join the conversation afterward?

11    A.    Yes.

12    Q.    Who?

13    A.    My mother.

14    Q.    And what's her name?

15    A.    Grace Honesto.

16    Q.    Were you given an opportunity to reflect and consider

17    whether this was a good deal for you?

18    A.    No.  He brought me out to the courtroom to sit with my

19    mother because I told him I needed to talk to her before I

20    accepted the deal.

21    Q.    And did you have an opportunity to talk with your

22    mother at that time?

23    A.    Yes.

24    Q.    And was it just one-on-one with you and your mom or

25    was Mr. Cavagnaro part of the conversation?

26    A.    Mr. Cavagnaro was part of the conversation.

27    Q.    Did your attorney recommend that you take the deal?

28    A.    Yes, he did.

8

1    Q.    What did he tell you?

2    A.    Hmm, well, my mom said don't take the deal.  And

3    that's when he said well, look, this is how much time he'll

4    do, and he wrote down on paper -- he actually calculated the

5    time that I would do, the minimum term that I would do if I

6    performed a program, because I had good time credit from

7    being in the county jail for three years, nine months.

8    Q.    Tell us about this calculation that he did.

9    A.    He calculated the good time credit for being in

10   prison, that if I perform a program and stay out of trouble,

11   I would go to the parole board sooner and get out sooner

12   than if I didn't.  Then I would do the maximum of 15 and two

13   years for the gun.

14   Q.    And did he put any number on how much time you would

15   do if you programmed well and stayed out of trouble?

16   A.    When I -- let's see.  I went to my first parole

17   hearing in '94 -- so '87...  Seven years, seven and a half

18   years, something like that.  Along with the county jail

19   credit, add up to about 10.

20   Q.    Did Mr. Cavagnaro tell you anything else to convince

21   you to plead guilty to second degree murder?

22   A.    No.  He was -- he was -- when I was having second

23   thoughts about it; talking with my mother, he had said that

24   he had another case to try and he didn't have the time to

25   keep -- for my case.

26   Q.    So he wanted you to plead right away?

27   A.    Yes.

28   Q.    That day?

1    A.    Yes.  I remember that.

2    Q.    And did you plead guilty that day?

3    A.    Yes.

4    Q.    Did Mr. Cavagnaro ever tell you what your maximum time

5    in prison could be?

6    A.    He never said I would be in prison for life.

7    Q.    Did he tell you what the maximum would be?  He told

8    you the minimum.  Did he tell you the maximum?

9    A.    15 and two for the gun, 17 would be the maximum

10   that -- for the parole board, and earlier if I performed and

11   programmed.

12   Q.    And what did your attorney tell you you would have to

13   do to insure being paroled at the first hearing?

14   A.    To behave and program and not cause the Department of

15   Corrections any problems.

16   Q.    How has your institutional behavior been?  Have you

17   been in trouble since you have been in prison?

18   A.    Nothing else.  I have done everything I could to stay

19   out of gang activity.  I have even filed petitions to the

20   Court, grievances.

21   Q.    Any 128s?

22   A.    I think I have one 128.

23   Q.    How about any 115s?

24   A.    I have one, but they -- they lessened it because of

25   the circumstances.  I probably could have filed an appeal

26   and got it dismissed.  Because I was talking to the

27   investigators after the crime and when I went to prison, on

28   the phone an inmate overheard me telling the private

```
 1   homicide investigators about my crime partners and who they
 2   were.  This was in like '87, '88 when I was in the -- at New
 3   Fulton prison (phonetic).  And I got -- that inmate jumped
 4   me from behind in the classroom and that's all on the
 5   disciplinary.  The teacher testified that I was the passive
 6   one.
 7   Q.    How about programming?  Have you taken classes since
 8   you have been in prison?
 9   A.    Nine years of AA, NA, different kinds of group
10   therapy, self-esteem and assertiveness, college degree, GED,
11   computer programming certificate.  I was in an x-ray
12   technician course.  I worked my way from a level four
13   maximum security all the way down to level one and zero
14   points.  They have me on two yard because of my sentence.
15   Q.    Well, Mr. Honesto, what was your understanding of what
16   benefit you would receive if you took this deal and pled
17   guilty to a second degree murder?
18   A.    That if I did everything that I just mentioned,
19   programmed, that I would be paroled, released.
20   Q.    And at the time of your plea, were you ever told that
21   by pleading guilty you could still be treated as a first
22   degree murderer?
23   A.    No.  When the judge said 15 years to life at the time
24   of the plea, my attorney said, don't worry about that, if
25   you perform a program, you are going to get out of prison,
26   you are not going to be in prison for life.
27   Q.    Thank you, Mr. Honesto.
28           MR. SCHWARTZ:  No more questions, Your Honor.
```

1           THE COURT: One moment, please.

2           (Pause in proceedings.)

3           THE COURT: Cross examination.

4                 CROSS EXAMINATION

5   Q.   MS. BLONIEN: Mr. Honesto, at the time of your plea,

6 were you told who would decide when and if you would be

7 released?

8   A.   Yes.

9   Q.   And who were you told would make that decision?

10   A.   The parole board.

11   Q.   And were you told what factors they would take into

12 consideration?

13   A.   My performance and program in prison, my

14 rehabilitation.

15   Q.   And who told ~~you this~~?

16   A.   My attorney, and I recall the judge saying it at

17 sentencing after the plea.

18   Q.   And did you discuss your plea with the district

19 attorney?

20   A.   He never spoke to me.

21           MS. BLONIEN: I have no further questions.

22           THE COURT: Any redirect?

23           MR. SCHWARTZ: No, thank you, Your Honor.

24           THE COURT: Thank you, sir. You may step down.

25           Call your next witness.

26           MR. SCHWARTZ: Thank you, Your Honor.

27           Call Grace Honesto.

28                GRACE MARY HONESTO,

1  called as a witness on behalf of the petitioner, being first

2  duly sworn, was examined and testified as follows:

3        THE COURT:  Would you please state your name and

4  spell it for the record.

5        THE WITNESS:  Grace Mary Honesto.  G-R-A-C-E.

6  M-A-R-Y.  H-O-N-E-S-T-O.

7        MS. BLONIEN:  Your Honor, if I may.  Before the

8  witness starts testifying, I would like to object to

9  Ms. Honesto testifying as the Court's inquiry was as to the

10  petitioner's state of mind at the time of his plea, and

11  therefore I would contend her testimony is irrelevant.

12        THE COURT:  All right.

13        Do you wish to respond, Mr. Schwartz?

14        MR. SCHWARTZ:  Your Honor, as an offer of proof,

15  Ms. Honesto was privy to the conversation --

16        THE COURT:  Sir, I don't need an offer of proof.

17  I need to know what your response is in terms of generally

18  counsel is alleging there is no relevance to what her --

19  what is the relevance of her testimony going to be.  I can

20  guess the content.

21        MR. SCHWARTZ:  Ms. Honesto was a percipient

22  witness to the conversation regarding the plea and she can

23  testify to her son's state of mind when the terms of the

24  offer were being discussed.

25        THE COURT:  Well, as to her ability to testify to

26  her son's state of mind, I would have to sustain the

27  objection.

28        Is there any other relevance to her proffered

13

1  testimony?

2          MR. SCHWARTZ:  Yes.  Ms. Honesto could also

3  testify to what her son was told by the public defender.

4          THE COURT:  All right.  Very well.  Then the

5  objection will be overruled.  And you may proceed.

6                    DIRECT EXAMINATION

7  Q.    MR. SCHWARTZ:  Ms. Honesto, how are you employed?

8  A.    I'm self-employed.

9  Q.    What do you do?

10 A.    I cater.

11 Q.    Have you ever worked in government?

12 A.    No.

13 Q.    Do you have any law enforcement connections?

14 A.    I worked for the Department of Corrections for one

15 time for a while as extra help.  I worked for the director

16 of the Department of Corrections, executive administrator

17 assistant.

18 Q.    The young man seated next to me is related to you in

19 what way?

20 A.    He's my son.

21 Q.    And were you at his trial?

22 A.    Yes, I was.

23 Q.    Were you there on the last day of jury deliberation?

24 A.    Yes, I was.

25 Q.    Do you recall if there was a verdict in the case?

26 A.    It was a hung jury.

27 Q.    Were you present in court when the judge discharged

28 the jury?

1    A.    Yes, I was.

2    Q.    What happened after that?

3    A.    Mr. Cavagnaro came and told me that Pete had decided

4    to take a deal, and he wanted me to go in the courtroom and

5    sit with Pete, and Pete wanted to discuss it with me.

6    Q.    And did you have an opportunity to talk with your son

7    that day in the courtroom?

8    A.    Yes.    We sat in the courtroom and I told Pete that I

9    didn't want him to take that deal, that I knew he didn't do

10   this, and I didn't understand why he was doing this.

11   Q.    Was anybody else present during this conversation?

12   A.    Not at that moment.    Later.    We were alone.

13   Q.    Did you have a conversation where Francis Cavagnaro

14   joined you and your son?

15   A.    Yes.    He left us alone for about five minutes and then

16   he came in.

17   Q.    What did Francis Cavagnaro tell your son the terms of

18   the plea bargain were?

19   A.    He said you have -- you are going to have time served

20   for the time you have been in jail.    There will be no gun

21   enhancement.    There will be no special circumstances.    If

22   you behave, you will be paroled -- you could be paroled at

23   your first hearing.    If you behave, you will be paroled --

24   you could be paroled at your first parole hearing.

25   Q.    Did Mr. Cavagnaro tell your son what he would have to

26   do to insure being paroled at the first parole hearing?

27   A.    He had to behave.    Those were the words that I heard.

28   You have to behave and be good.

1    Q.    Did you hear Mr. Cavagnaro say anything about a

2    certain minimum time or maximum time that your son would

3    serve?

4    A.    He just told him that at his first parole hearing he

5    could be released if he behaved.  He didn't -- I didn't

6    hear -- I didn't hear no years.  I didn't hear no years.

7    Q.    Did Mr. Cavagnaro say anything about any urgency to

8    plead that day?

9    A.    After we walked out of the courtroom, I approached him

10   and said why are you letting my son take a deal.  And he

11   said, I have no time for Pedro, I have another hearing --

12   another trial.

13          That was out in the hallway.  He said it quite

14   loud.

15   Q.    Again, did Mr. Cavagnaro say anything about how much

16   time your son would do if he took the deal?

17   A.    Just that at his first parole hearing he would be

18   released if he was good, if he behaved.

19          MR. SCHWARTZ:  I have no more questions at this

20   time, Your Honor.

21          THE COURT:  Cross examination.

22          MS. BLONIEN:  No questions.

23          THE COURT:  Thank you, ma'am.  You may step down.

24   You are excused.

25          Call your next witness.

26          MR. SCHWARTZ:  Thank you, Your Honor.

27          Call Andrew Lucero.

28                    ANDREW JOSE LUCERO,

```
1    called as a witness on behalf of the petitioner, being first
2    duly sworn, was examined and testified as follows:
3              THE COURT:  Would you please state your name and
4    spell it for the record.
5              THE WITNESS:  Andrew Jose Lucero.  L-U-C-E-R-O.
6              MS. BLONIEN:  Again, I would like to object to
7    this witness testifying as what is at issue here is the
8    petitioner's state of mind at the time he accepted the plea.
9              THE COURT:  Counsel, approach, please.
10             (A sidebar conference was held out of the hearing
11             of anyone else present in the courtroom as
12             follows:)
13             THE COURT:  I want an offer of proof as to the
14   testimony of this witness and how it's relevant to these
15   proceedings.
16             MR. SCHWARTZ:  This witness was privy to a
17   conversation with the public defender at the time of the
18   plea or right after the plea.  He was a juror in the case.
19   And the attorney talked to him after the jury was
20   discharged.
21             MS. BLONIEN:  Was the petitioner present?
22             MR. SCHWARTZ:  Pardon?
23             MS. BLONIEN:  Was the petitioner present?
24             MR. SCHWARTZ:  No.
25             THE COURT:  So what's the relevance?
26             MR. SCHWARTZ:  He can say what the public defender
27   told him the terms of the deal were, what the expectation --
28             THE COURT:  What's the relevance of what the
```

1    public defender might have told a juror?

2         MR. SCHWARTZ:  Well, it just goes to corroborate

3    what the petitioner had been told and what his expectation

4    of the terms of the deal or what benefit that he would

5    derive from accepting the deal.

6         THE COURT:  How does it corroborate what the

7    petitioner was told?

8         MR. SCHWARTZ:  Well, it's like a prior consistent

9    statement.  I mean, the petitioner is told something --

10        THE COURT:  Wait, wait.  Let me get this straight.

11        You are offering this witness to testify to a

12   prior consistent statement of a hearsay declarant whose

13   statements were not offered for a hearsay purpose but were

14   in fact only offered to show their effect on the listener?

15        MR. SCHWARTZ:  Right.

16        THE COURT:  The objection is sustained.

17        MS. BLONIEN:  Thank you.

18        (End of sidebar conference.)

19        THE COURT:  Anything else, counsel, on this

20   subject?

21        MR. SCHWARTZ:  No, Your Honor.  You are sustaining

22   the objection?

23        THE COURT:  Yes.  It's on the record.  Our

24   conversations at bench are on the record.

25        Thank you very much.  You are excused.

26        THE WITNESS:  Got up early for nothing.

27        THE COURT:  You may call your next witness,

28   counsel.

1    MR. SCHWARTZ: Can we approach the bench, Your

2  Honor?

3        THE COURT: Sure.

4        (A sidebar conference was held out of the hearing

5        of anyone else present in the courtroom as

6        follows:)

7        THE COURT: You are being picked up. It makes it

8  a lot easier.

9        MR. SCHWARTZ: Just to avoid repetition. The next

10  witness I was going to call was another witness who was

11  privy to the conversation between Francis Cavagnaro -- in

12  the hallway between Francis and the jurors where Francis is

13  explaining to the jurors why they took the deal. I mean,

14  this goes back to the same thing.

15        MS. BLONIEN: I would make the same objection.

16  It's irrelevant to the petitioner's state of mind and the

17  legitimacy of the plea based on his understanding and

18  representations made at the time.

19        THE COURT: Yeah. I would sustain the objection

20  as well.

21        MR. SCHWARTZ: That's why I asked to approach

22  without going through --

23        THE COURT: Did you have any other witnesses?

24        MR. SCHWARTZ: No.

25        THE COURT: Do the People have witnesses?

26        MS. BLONIEN: We have none, Your Honor.

27        THE COURT: All right.

28        MR. SCHWARTZ: Shall we step back?

19

1    THE COURT:  Might as well.

2    (End of sidebar conference.)

3    THE COURT:  No further evidence on behalf of the

4    petitioner?

5    MR. SCHWARTZ:  No.  Thank you, Your Honor.

6    THE COURT:  Any further evidence to be offered to

7    behalf of respondent?

8    MS. BLONIEN:  No, Your Honor.

9    THE COURT:  Just a moment, counsel.

10    Let me simply inquire as to whether or not counsel

11    wish to file supplemental briefs in this matter based on and

12    directed at the evidence presented in this hearing?

13    MR. SCHWARTZ:  I would, Your Honor.

14    I would like to file written argument.

15    THE COURT:  I'm going --

16    MS. BLONIEN:  Yes, Your Honor.

17    THE COURT:  I'm going to defer argument.  I'm

18    going to allow you to file supplemental briefs and set the

19    matter where I will hear your oral arguments, any additional

20    arguments you want to make.  I will allow petitioner to file

21    a supplemental brief as well as respondent.  No reply

22    briefs, handle that orally in open court.

23    That will be scheduled as follows:  Petitioner's

24    post-hearing brief is to be filed on or before July 20;

25    respondent's brief to be filed on or before August 10.

26    Hearing to take place August 24, 9:00 a.m., this department.

27    MS. BLONIEN:  Your Honor, what day is the 24th?

28    THE COURT:  A Friday.

1          MS. BLONIEN:  Great.

2          MR. SCHWARTZ:  Petitioner's brief July 20,

3     resorbent's brief, August 10.  Argument, August 24.

4          THE COURT:  That will give me time to review in

5     case you throw any new additional authorities at me.  That

6     will give me plenty of opportunity to review those as well

7     as any other that might tend to lead me towards.

8          MR. SCHWARTZ:  I would also like an opportunity to

9     review the transcript of today's hearing, and ask that that

10    be prepared in a manner so that it would be available.

11         THE COURT:  Sure.  You need to make that request

12    formally with the court reporter, and I think I have given

13    you enough time to be able to do that based on the brevity

14    of today's proceeding.

15         MR. SCHWARTZ:  Thank you very much.

16         THE COURT:  You are very welcome.

17         The defendant is ordered returned to the

18    custody --

19         MR. SCHWARTZ:  I would like to speak to the

20    custody status, Your Honor.  I would like to have

21    Mr. Honesto present in the county so that he can make his

22    appearance when he argues the case on the 24th.

23         THE COURT:  That's two months away, counsel.  We

24    can bring him back for that purpose.  If that's the request,

25    I have no problem doing that.

26         MR. SCHWARTZ:  Is there any way to keep him here

27    any longer between now and say July 10 when we are filing

28    our argument?

21

1        THE COURT:  What would be the purpose behind that,

2  counsel?

3        MR. SCHWARTZ:  Just so that I can confer with my

4  client and insure that I'm getting all the points that I

5  need to.  Mr. Honesto is very well versed on the law in this

6  case as well, and I would like to have him more readily

7  accessible than if he went back to Corcoran.

8        THE COURT:  Counsel, I don't find any good cause

9  to keep him here during the intervening period.  The

10  transcript will be provided to you.  Obviously it is that

11  evidence that is going to be determinative here.  I think

12  the state of the law on this issue is fairly clear.

13        It is the import of the evidence that's been

14  received.  I think that is most significant.  And I have no

15  doubt that you are able to do that.  You can also of course

16  visit your client, if you choose to do so.

17        The order will be that the defendant be returned

18  forthwith to the custody of the state Department of

19  Corrections and Rehabilitation.

20        I'll make a further order that he be returned, and

21  we'll have an order prepared for that purpose for the

22  hearing on August 24.

23        We are in recess.

24        (Whereupon, court was adjourned on this matter.)

25             ---o0o---

26

27

28

22

STATE OF CALIFORNIA      )
                         )  ss.
COUNTY OF SANTA CLARA     )


     I, CINDI M. JOHNSON, hereby certify:  That I was appointed by the Court to act as the Court Reporter in the above-entitled action; that I reported the same in stenotype and thereafter transcribed the same into typewriting as appears by the foregoing transcript; that said transcript is a full, true and correct statement of this proceeding.

     In said capacity, I have adhered to Civil Code of Procedure Section 237(a)(2), Sixth Appellate District Miscellaneous Order 96-2, by sealing through redaction all references to juror identifying information, including but not limited to names, addresses and telephone numbers.

     Executed June 26, 2007, at San Jose, California.


                         CINDI M. JOHNSON, CSR
                         CERTIFICATE No. 10125

EXHIBIT

# B

# Statement By Judge And District Attorney

## 1203.01 (PENAL CODE)

### SUPERIOR COURT OF THE STATE OF CALIFORNIA
### IN AND FOR THE COUNTY OF ...... SANTA CLARA

FILED

MAY 1 3 1987

County Clerk
Santa Clara County
BY _____ DEPUTY

The People of the State of California,

Plaintiff,

vs

...PEDRO...JOSE...HONESTO...............................
Defendant,

Co. Clerk No. ....9.8.0.7.9...................DEPUTY...

Prison No. ..................................................................

The following is furnished for the assistance of the Department of Corrections.

The crimes for which the defendant was convicted are as follows:

    Penal Code Section 187 (Murder-Second Degree), with Penal Code
    Section 12022.5 (Personal Use of a Firearm-admitted within
    meaning of Section 1203.06 of the Penal Code).

I hereby incorporate by reference the Information and Proceedings had at sentence and direct the court reporter to transcribe and attach a copy of each to this statement. Additionally, my views with respect to the person convicted and/or sentenced and the crime committed are as follows:
In this case, a totally innocent victim was brutally murdered by parties intent on committing a robbery of the victim's employer. The facts are this was a first degree murder, but difficulties with the evidence resulted in a plea of no contest to second degree murder. For parole purposes, the facts warrant treating this as a first degree case.

The defendant has acknowledged informally his responsibility but contends he did not "pull the trigger". If he did not, he clearly knows who did but has thus far refused to disclose that information. He should reveal the identities of his co-participants if he ever intends to demonstrate "rehabilitation" and "remorse" for purposes of parole.

This defendant demonstrated a callous disregard for life at the time of the murder and that attitude seems to continue even after his plea in this case.

Trial Judge
**JACK KOMAR**

My views with respect to the person convicted and/or sentenced and the crime committed are as follows:    The defendant kidnapped the victim from the victim's home intending to effect an eventual robbery at the victim's workplace. The defendant and victim did not know each other.  Clearly the defendant intended to kill, should the need arise, in order to advance the purpose of his scheme.  The defendant killed the victim with a single blast from a sawed-off twelve-gauge shotgun fired at close range into the victim's chest.  The defendant has shown no real remorse or true sorrow for this cold, callous, unprovoked and senseless murder of a person who posed no threat of harm to the defendant.  The defendant has expressed remorse only where he deems it advantageous to himself in order to favorably impress prison authorities He should suffer the maximum allowable period of imprisonment. _____
DEPUTY    District Attorney

CDC-173 (Rev. 5/68)

**1379**

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079
                                              May 4, 1987

DAYS IN CUSTODY:  889 actual days; 444 days - 4019 PC; 1,333 total
days; ordered to serve 20 CJ (14 days with GTWT)
on 11/6/85 on Complaint Number C8585630; ordered
to serve 14 days CJ in lieu of fine payment on
2/24/86 on Complaint Number C8472952; presently
in custody.

AGE & DATE OF BIRTH:  24; August 29, 1962; San Jose, California.

CODEFENDANTS & STATUS:  None

SUMMARY OF OFFENSE:

The Court, having heard the Jury trial in this matter, is aware
of the facts surrounding the instant offense.  The following
information was obtained from the testimony provided at the
Preliminary Examination and the data contained in San Jose Police
Department Report number 84-225-1353 and California Highway
Patrol Report number 8-194.  It should be noted that the
testimony at the Preliminary Examination was often evasive and
contradictory.  When contradictions occurred, the taped
statements made by the witnesses to police right after the
offense were taken as the truth of the matter.

At about 9:50 p.m. on August 12, 1984, officers of the San Jose
Police Department and the California Highway Patrol responded to
Northbound Freeway 101, just North of the Alum Rock
over-crossing, to investigate a three car accident which occurred
as a result of a shooting.  Upon arrival, officers viewed victim
John Angelo Re, Sr., age 54, in the reclined driver's seat of a
1983 Oldsmobile, which had come to rest in the slow lane of the
freeway.  The victim was suffering from a large, open gunshot
wound to his right side.  Although conscious, the victim was in
great pain, and he asked to be killed as he knew he was dying.

While waiting for the ambulance, the victim indicated his
passenger had shot him with a shotgun and had run away.  He
indicated his assailant had acted crazy, as if he were on drugs,
and had robbed him.  The victim also stated he was a clerk, and
he was going to a store.  He described his assailant as a Mexican
male, with straight, medium-length brown hair and a bruise or
welt under his eye.  Thereafter, the victim was transported to
San Jose Hospital, where he died at 3:05 the next morning,
despite extensive surgery to save his life.  A subsequent autopsy
revealed the victim had died of a close-range gunshot wound to
the right chest, which had caused extensive injuries, including
perferation of the heart, diaphragm, stomach, small and large
bowels, and pancreas and massive destruction of the liver.  In
all, sixty nine gunshot pellets were recovered from the victim's

-2-

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079

May 4, 1987

body.  During treatment, medical personnel found the victim's
wallet intact.

On examining the scene of the collision, officers interviewed
several witnesses.  According to the witnesses, the victim was
traveling in his 1983 Oldsmobile northbound in the slow lane of
Freeway 101, just at the Alum Rock over-crossing, when the
Oldsmobile suddenly swerved into the fast lane and hit victim
Alfredo Remonida's 1979 Chevrolet in the rear, causing the
Chevrolet to collide into the center guard rail.  Following the
collision, the Oldsmobile returned to the slow lane, where it was
rear-ended by victim Gregory Goncharoff's 1976 Oldsmobile.
Victim Re's vehicle then came to rest in the slow lane of the
Highway.  Although only victim Re was injured, all three cars in
the collision sustained major damage.

Witness Russell Russell, who had viewed the entire accident,
related after victim Re's Oldsmobile came to a stop, he observed
a tall, thin Mexican male exit Re's car by crawling head-first
over the victim and through the driver's side window, which
apparently had been open.  The Mexican male ran into the bushes
along side of the Freeway and was lost from view.  Officers
subsequently searched for the suspect with negative results.
During the Preliminary Examination, witness Russell positively
identified the defendant as the individual who exited victim Re's
car on the evening in question.

An examination of Re's car revealed the front passenger door had
been locked, with the window up.  Between the driver's seat and
door, officers located a gray athletic bag with a two-to-three-
inch hole in one end, as if a shot had been fired through it, and
a second, six-inch hole at the top of the bag near the zipper.
The second hole was large enough for a hand to go through it.
Inside the bag, officers found a sawed-off, twelve guage shotgun,
with an expended shell still in the chamber.  Also in the bag was
a black, medium-sized "members only" jacket.

In re-tracing victim Re's movements, officers interviewed
Robert Beltran, a clerk at the Food Bowl Market on McKee Road in
San Jose, where the victim had been employed as head clerk.  As
head clerk, the victim had keys to the office containing the
safe, where $30,00 to $40,000 in currency was kept for
check-cashing purposes.  According to Robert Beltran, the victim
had closed and locked up the Store at 9:15 p.m., and departed
alone in his car, Westbound on McKee Road to Freeway 101.  The
victim then drove home, a trip which would take about seven to
seven-and-one-half minutes in moderate traffic.  The victim
shared his residence with his son, John Re, Jr., who was not at
home when the victim returned.  However, when the son returned

-3-

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079                                    May 4, 1987

home that night, he discovered through some physical evidence, that his father had come home after work, but upon departing again had varied his normal routine by leaving the garage door open and failing to dead-bolt the front door.

On August 13, 1984, the San Jose Crime Stoppers Program received a tip from an anonymous individual that his brother had heard someone brag about the offense.  While police followed the leads provided in the tip, the brother, identified as Doug Grossman, came forward and provided a statement.  Grossman related he encountered the defendant on the bus on the day after the offense.  Grossman knew the defendant casually as a person who often visited Grossman's neighbor, Frank Mendoza.

En route from the bus stop to Mendoza's house, the defendant admitted to Grossman that he shot the victim on Freeway #101 the previous evening.  He said the victim and the defendant's brother had previously argued, and the victim threatened the brother. The defendant then offered to kill the victim before he could make good his threat.  The defendant confronted the victim at home at gun-point, and made him get in his car and drive.  Out on Freeway 101, they got into a crash, and he shot the victim, before running from the scene.  Grossman could not recall whether the defendant specified which came first, the shooting or the collision.  Members of Mendoza's family later made statements, in Grossman's presence, indicating Frank Mendoza had loaned the defendant the murder weapon.  When questioned, the Mendoza family denied this.

During their investigation, officers contacted Guadalupe Honesto, the defendant's younger sister, who advised she had given a gray athletic bag, similar to the one recovered from the victim's vehicle, to the defendant.  Further, some of the defendant's family members identified the jacket in the gray bag as just like one of two owned by the defendant.  Based upon the above evidence, officers arrested the defendant and transported him to Police Headquarters for questioning.  At that time, the defendant refused to provide a statement, and the interview was terminated.

VICTIM'S STATEMENT:  (Appearance Unknown)

Due to the victim's death, Mr. John Angelo Re, Jr., the victim's son and next of kin, was contacted.  Mr. Re advised he was very disappointed in the jury verdict, and the fact the defendant will only serve about eight-and-one-half to nine years in Prison is enough to make him turn against the Criminal Justice System.  He stated his father was only fifty-four years old when he was murdered, and but for the instant matter, he would have had many

-4-

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079                                          May 4, 1987

more years of life.  Equally upsetting to his family was the
manner of the victim's death.  Mr. Re explained that his father,
who was a completely innocent victim in this matter, suffered
untold agony while waiting medical treatment.

In addition to the emotional trauma surrounding the victim's
death, Mr. Re noted he had to deal with his father's medical and
funeral expenses.  His father's medical bills totalled about
$19,000 and the funeral expenses totalled about $3,700.  Mr. Re
had to hire an attorney, and the bills were subsequently paid
through a combination of Workman's Compensation and Medical
Insurance.  In addition, Mr. Re received a $25,000 settlement
through the victim's Workman's Compensation, while his sister
received a $65,000 settlement.  Mr. Re was advised of the date
and time of sentencing and his right to be heard at the
proceedings.  Mr. John Re, Jr., indicated he would appear.
Further, he would like to be advised of the date of the
defendant's parole hearing and his release.

Attempts were made to contact victim Alfredo Ramonida, 718
Santa Susana Street, Sunnyvale, and victim Gregory Goncharoff,
1510 Merferd Avenue, San Mateo, by telephone.  As neither of
these victims could be reached, claim letters were sent to them,
and any subsequent information will be submitted to the Court.
In these claim letters, the victims were apprised of their rights
pursuant to Section 1191.1 of the Penal Code.  It should be noted
that victim Remonida has moved, but the relative answering the
phone indicated she would relay the message to him.

Father Angelo Re, brother to victim Re, 1576 Curtner Avenue,
San Jose, California 95125, was also contacted.  Father Re
advised he was there throughout the trial, and will appear at
time of sentencing.  Further, he will submit a letter to the
Court through the Probation Department and this will be forwarded
once received.  Father Angelo advised that although he is not a
death penalty advocate, he felt the defendant was a very
dangerous individual, who had no regard for human life.  He felt
the defendant was guilty of the offense, and was very lucky to
have gotten off as lightly as he did, especially since he used
one of the most destructive weapons possible, a sawed-off
shotgun.


DEFENDANT'S STATEMENT:  (Attached)

In a verbal statement during the Pre-Sentence Interview, the
defendant advised he was "taking full responsibility for the
death of John Re, Sr.," and he was "very sorry for John Re and
his family."  Upon advice of his attorney, the defendant

-5-

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079

May 4, 1987

indicated he did not wish to go into the details of the offense.
When asked if the above meant he was guilty of the crime, the
defendant became very ambivalent, and following a long
discussion, he advised he is stating he is guilty of the offense
in order to impress the parole board, who will be setting his
release date in a few years.

Regarding his alcohol and narcotic consumption habits, the
defendant advised he began consuming alcohol at age seventeen,
and prior to his incarceration, he was imbibing on the average of
twice per week on weekends, with mild intoxication.  Between the
ages of fifteen and nineteen, the defendant advised he
experimented with marijuana on three or four occasions.  At
nineteen, the defendant inadvertenly smoked phencyclidine on one
occasion, on the erroneous assumption it was marijuana.  For
about six months, in 1977, the defendant sniffed gasoline on the
average of five times per week.  As a juvenile, the defendant
participated in drug counseling on the average of once a month
for about one year through a private Saratoga psychiatrist,
Doctor Pena.  The defendant denied all contact with other
controlled substances, and an examination of his arms revealed no
indications of intravenous drug usage.


INTERESTED PARTIES:

Attached for the Court's review are sixteen inmate infraction
reports, which run the gamut of offenses from possession of a
zip-gun in his cell, to "mooning" a deputy, to agitating other
inmates, to making a cuff key, and to possession of "pruno" in
his cell.  Further, the Sheriff's Department considered the
defendant an escape risk, not only because he made "cuff keys,"
but he was double jointed and could slip restraints with minor
effort.


DISCUSSION:

Judicial Council Rules 414, 421 & 423:   (Attached)

Enhancements:

As the defendant admitted a violation of Section 12022.5 of the
Penal Code (Did Use A Firearm), any term of imprisonment may be
enhanced by two years.

-6-

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079                                    May 4, 1987

Case Evaluation:

Appearing before the Court is a twenty-four-year-old defendant
who has pled Nolo Contendere to Second Degree Murder, with
Personal Use of a Firearm.  The defendant's prior record consists
of twenty-one convictions for Misdemeanor matters.

During the Pre-Sentence Interview, the defendant stated he was
"responsible" for the offense, but he was very ambivalent about
admitting guilt.  Basically, he indicated he was only admitting
guilt to impress the Parole Board.  Despite this, the defendant
expressed remorse for his behavior, indicating he sympathized
with both the victim and the victim's family.  Further, the
defendant denied any problem with alcohol or drugs, although
collateral information indicated the defendant may have had a
sporadic problem with phencyclidine since a juvenile.

With respect to Social Data, the defendant has an eleventh grade
education, and a prior employment history as a warehouseman and
machine operator.  On April 8, 1987, the defendant married the
former Jacquelyne DeBoer, age eighteen.

The defendant impressed the undersigned officer as a very
immature, irresponsible, and unstable individual who has a high
potential for violence.  The defendant has a tendency to act
without thought of the consequences, and often, he has a
hair-trigger temper.

In addition, the offense is extremely serious, as it resulted in
the death of a fellow human being.  As pointed out by the
victim's son, the victim died a horrible death, leaving a family
to try to pick up the pieces even though they had to re-live the
trauma over and over again during the lengthy prosecution in this
matter.  In addition, the shooting incident occurred on the
freeway, and by only the sheerest luck, no one else died or was
seriously injured.  Based upon these facts, a State Prison term,
as mandated by law, is certainly warranted, and as the victim's
brother pointed out, the defendant is very lucky the term was not
longer.  As noted in the Victim's Statement of this report,
Mr. John Re, Jr., would like to be apprised of the defendant's
parole hearings and his release date.

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079                                        May 4, 1987

RECOMMENDATION:

1.  Probation be denied.

2.  The defendant be committed to the California Department of
    Corrections for seventeen years to life.

3.  The defendant be advised of a Parole period of from five (5)
    years to Life.

4.  Restitution as determined by the Court.

5.  A Restitution Fine of not more than $10,000 be imposed
    pursuant to Section 13967 of the Government Code.

                          Respectfully submitted,

                          PEDRO R. SILVA, Chief
                          Probation Officer

                          *Erna G. Kammelaar*

                          Erna G. Kammelaar, Deputy
                          Probation Officer

EGK:cjp
Attachments

Reviewed by:

*Gordon C. Vick*

Gordon C. Vick
Supervising Probation
Officer - 2741

The above report has been read and considered by the Court.


                          JACK KOMAR
                          Judge of the Superior Court
                          Santa Clara County, California

In the Case of:  PEDRO HONESTO
Charge:  187 & 12022.5 PC
Info. No.: 98079

May 4, 1987

<u>SUGGESTED TERM</u>:

| <u>CRIME</u> | <u>MIT</u> | <u>AGG</u> | <u>RANGE</u> | <u>ENHANCEMENT</u> | <u>TOTAL TERM</u> |
|---|---|---|---|---|---|
| Ct. 1<br>187 PC<br>2nd Degree | 15 Years | To | Life | 2 Years<br>(12022.5 PC) | 17 Years<br>To Life |
| | | | | TOTAL TERM | 17 Years<br>To Life |

EXHIBIT

C

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

efiled 6/12/07

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PETER HONESTO,

       Petitioner,

  vs.

DERRAL G. ADAMS, Warden,

       Respondent.

No. C 06-308 JF (PR)

ORDER GRANTING
PETITIONER'S RENEWED
MOTION TO STAY;
INSTRUCTIONS TO CLERK

(Docket No. 7)

Petitioner, a state prisoner proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court initially dismissed the instant petition because Petitioner's claims did not allege any federal constitutional violation and were not cognizable pursuant to § 2254. The Court granted Petitioner leave to file an amended petition to correct this deficiency within thirty days. On October 25, 2006, Petitioner filed a motion to stay the petition and hold the remainder of the petition in abeyance while he exhausts his claims in state court. Petitioner attached a copy of a June 1, 2006 Santa Clara Superior Court Order to Show Cause in his pending state habeas action. On May 21, 2007, the Court denied Petitioner's motion to stay the instant petition without prejudice because it was unclear whether any of Petitioner's claims were exhausted.

Order Granting Petitioner's Renewed Motion to Stay; Instructions to Clerk
P:\pro-se\sj.jf\hc.06\Honesto308stay        1

1  The Court notified that Petitioner he could file a renewed motion to stay without
2  prejudice in order for Petitioner to address the factors set forth below in Rhines v.
3  Webber, 544 U.S. 269, 277-78 (2005). Petitioner has filed a renewed motion to stay and
4  an amended petition. The Court will GRANT Petitioner's renewed motion to stay the
5  amended petition (docket no. 7).

## BACKGROUND

7  A Santa Clara Superior Court jury convicted Petitioner of second degree murder.
8  Petitioner was sentenced to fifteen years-to-life in state prison. Petitioner challenges the
9  California Board of Prison Terms' decision denying him parole. According to the
10 petition, Petitioner filed a state habeas petition in the state superior court, which was
11 granted in 2004. The state appellate court reversed the superior court's decision in 2005.
12 The state supreme court denied petitioner's habeas petition in 2005. The instant federal
13 petition was filed on January 17, 2006. Petitioner then filed a habeas petition in the state
14 superior court, which is currently pending. On December 4, 2006, Petitioner filed a
15 habeas petition in the state supreme court, which was denied on May 16, 2007.

## DISCUSSION

17 Petitioner filed a renewed motion to stay the petition in order to raise his
18 unexhausted claims in state court. District courts have the authority to issue stays and
19 AEDPA does not deprive them of that authority. Rhines v. Webber, 544 U.S. 269, 277-
20 78 (2005). The district court's discretion to stay a mixed petition is circumscribed by
21 AEDPA's stated purposes of reducing delay in the execution of criminal sentences and
22 encouraging petitioners to seek relief in the state courts before filing their claims in
23 federal court. Id. Because the use of a stay and abeyance procedure has the potential to
24 undermine these dual purposes of AEDPA, its use is only appropriate where the district
25 court has first determined that there was good cause for the petitioner's failure to exhaust
26 the claims in state court and that the claims are potentially meritorious. Id. Moreover,
27 where granting a stay, the district court must effectuate the timeliness concerns in
28 AEDPA by placing "reasonable limits on a petitioner's trip to state court and back."

1   Id. at 278. Prisoners who may run the risk of having the federal statute of limitations
2   expire while they are exhausting their state remedies may avoid this predicament "by
3   filing a 'protective' petition in federal court and asking the federal court to stay and abey
4   the federal habeas proceedings until state remedies are exhausted." Pace v. DiGuglielmo,
5   544 U.S. 408, 416 (2005) (citing Rhines, 544 U.S. at 277-78).

6       Here, Petitioner's proposed claims are cognizable under § 2254 and are not
7   "plainly meritless." Petitioner appears to show good cause for his failure to exhaust his
8   additional claims in state court based upon his allegation of ineffective assistance of
9   counsel and his appointed counsel's failure to raise these claims in his state habeas
10  proceedings. Additionally, the Court notes that Respondent has yet to file an answer to
11  the petition and Petitioner has already exhausted several of his claims in the state supreme
12  court. Petitioner's state habeas petition is now pending in the state superior court. Thus,
13  Petitioner does not appear to be intentionally delaying this action. Accordingly,
14  Petitioner's renewed motion to stay the instant petition (docket no. 7) is GRANTED.
15  This action is hereby STAYED until thirty days after the California Supreme Court's
16  final decision on Petitioner's claims, as set forth below.

17                          **CONCLUSION**

18      1.    Petitioner's renewed motion to stay the amended petition (docket no. 7) is
19  GRANTED, and the above-titled action is hereby STAYED until thirty days after the
20  state court's final decision on Petitioner's additional claims.

21      2.    Once the state superior court and the state supreme court have issued a
22  decision on Petitioner's additional claims, and if he has not obtained relief in state court,
23  Petitioner shall promptly notify this Court within thirty days of the state courts' decisions.

24      3.    The Clerk shall ADMINISTRATIVELY CLOSE the file pending the stay
25  of this action. This has no legal effect; it is purely a statistical procedure. When
26  Petitioner informs the Court that he has exhausted his additional claims, the case will be
27  administratively re-opened.

28  \\\

4.    It is Petitioner's responsibility to prosecute this case.  Petitioner must keep the Court informed of any change of address by filing a separate paper with the clerk headed "Notice of Change of Address."  He must comply with the Court's orders in a timely fashion or ask for an extension of time to do so.  Failure to comply may result in the dismissal of this action pursuant to Federal Rule of Civil Procedure 41(b).

IT IS SO ORDERED.

DATED:    6/7/07

JEREMY FOGEL
United States District Judge

Order Granting Petitioner's Renewed Motion to Stay; Instructions to Clerk
P:\pro-se\sj.jf\hc.06\Honesto308stay
4

THE STATE BAR OF CALIFORNIA

## COMPLAINT FORM
### Read instructions before filling in this form.

Date  8-8-07

(1)    Your name and address  Peter Honesto, CSATF/SP, A3-171L, P.O. Box 5248,

Corcoran, Calif. 93212-5248

(2)    Telephone number:   Residence ____N/A_____Work ___N/A____

(3)    The name, address and telephone number of the attorney being complained about. (See note below.)

Allen H. Schwartz, 111 W. St. John Street, Suite 555, San Jose, Calif. 95113

(4)    Have you or a member of your family complained about this attorney previously?
       Yes _X_ No _____ If yes, please state to whom the previous complaint was made, its approximate date and disposition.
In the Superior Court of Santa Clara County and the United States District Court

for the Northern District, See Orders Attached and Motion.

(5)    Did you employ the attorney? Answer yes or no and, if "yes," give the approximate date you employed him or them and the amount, if any, paid to him.
Mr. Schwartz was appointed by the Superior Court upon an Order to Show Cause in

the Case of In re Honesto, 130 Cal.App.4th 81 (2005), and the case now before the
Superior Court.

(6)    If your answer to 5 above is "no," what is your connection with the attorney? Explain briefly.
As Explained above my attorney was appointed by the Superior Court (I did not

want him to represent me).

(7)    Write out on a separate piece of paper and send with this form a statement of what the attorney did or did not do that you
       are complaining about. Please state the facts as you understand them. Do not include opinions or arguments. If you
       employed the attorney, state what you employed him to do. Sign and date such separate piece of paper. Further
       information may be requested. (Attach copies of pertaining documents.)

(8)    If your complaint is about a law suit, answer the following, if known:
       a.   Name of court (For example, Superior Court or Municipal - in what county)
            N/A

       b.   Title of the suit (For example, Smith against Jones)
            N/A

       c.   Number of the suit ___N/A___

       d.   Approximate date the suit was filed ___N/A___

       e.   If you are not a party to this suit, what is your connection with it? Explain briefly.
            N/A

(9)    Size of law firm complained about (*)  1 Attorney ____  2 - 10 Attorneys ____  11 + Attorneys ____  Don't know __XX__

NOTE: If you are complaining about more than one attorney, write out the information about each in answer to questions 3
      through 8 above on separate sheets if necessary.

Mail to:
Office of the Chief Trial Counsel/Intake
State Bar of California
1149 South Hill Street
Los Angeles, California 90015-2299

(*)   Section 6095.1 of the Business and Professions Code mandates that the State Bar
      compile statistics concerning the size of the attorney's law firm – solo practitioner,
      small law firm (2-10 attorneys) and large law firm (11+ attorneys).

      Signature _____

Statement of Facts as I understand them.

In the case of In re Honesto, 130 Cal.App.4th 81, (2005), the Superior Court appointed Allen Schwartz to represent me, at which time I specifically told him to stop arguing parole and to focus on the Invalid/Breached Plea issue.    Mr. Schwartz continued to argue parole despite my and my families objections.    The Published case of In re Honesto, supra, Solidifies this fact.

I then filed another Petition in the Superior Court that again issued an order to show cause pertaining to the Invalid plea; The Santa Clara County Superior Court again appointed Mr. Schwartz to represent me.    It should be noted I complained about him in the Petition for being ineffective In re Honesto, Supra.

While the case regarding the invalid plea was pending pleading regarding the Order to Show Cause Mr. Schwartz and I had disagreements as to what the issues were and how to proceed so I submitted a complaint to the Superior Court requesting that I be allowed to proceed pro se. My pleading was denied and the Court explained Specific Performance (parole) is not at issue before the court; The Invalid Plea is at issue.

I now find myself filing another motion to the court and this complaint to the state Bar; a complaint that I did not want to file, which the record of attached documents show I could have filed years ago, nevertheless I must submit the attached documents demonstrating Mr. Schwartz has put himself in this position by arguing for Specific Performance (parole), a notion the Santa Clara County Superior Court rejected as to the issue (Invalid Plea) now pending in the Santa Clara County Superior Court.

I have respectfully attached pertinent documents of the cases history and respectfully request this State Bar apply their rules in a fair and just manner as to the facts of the issue now before them.

Respectfully Submitted
Peter Honesto
Dated: 8-8-07

EXHIBIT

D

ORIGINAL

FILED

DEC 29 2003

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of County of Santa Clara

BY _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

|  |  |
|---|---|
| In re | No.: 98079 |
| PETER HONESTO, | |
| On Habeas Corpus | INTERIM ORDER |

PETER HONESTO, hereinafter Petitioner, submitted a habeas corpus petition challenging the Parole Board's decision to deny him parole. In his Petition, one of his three central claims is his assertion that there has been a "Violation of His Plea Agreement." Petitioner asserts that his plea bargain was a contract with the state and he "had a reasonable right to anticipate that the State of California would also comply with those terms." (Petition at p. 76.) Petitioner argues that he has "met and exceeded the legislative criteria for release on parole" yet the Governor and the Board have adopted such "extremist" positions, and routinely abuse

1

1 their discretion, such that he has not received fair consideration
2 of his application, or an unbiased application of the suitability
3 criteria.  Although calling the situation an Ex Post Facto Clause
4 violation, Petitioner has in fact made a Due Process argument.
5 Petitioner argues that the Parole Board abandoned all integrity and
6 did not honestly weigh or balance his suitability as was anticipated
7 at the time of his plea.  Petitioner argues, and the evidence
8 suggests, that the reason for this new and unprincipled approach is
9 political pressure.  Petitioner has never claimed that he was
10 entitled to a parole date because he entered a plea, but rather, he
11 claims that all parties to the plea agreed that his crime was second
12 degree murder, (see *In re Ramirez* (2001) 94 Cal.App.4th 549, 569, fn.
13 8,) and it was understood that if he performed and programmed well
14 in prison the Board would set his term as indicated by its matrix.
15 In addition to his argument in the body of his Petition, Petitioner
16 supports his position with a declaration in which he explains:
17 "Trial Counsel also advised me that, if I maintained a good prison
18 record, participated in self-help programs for my alcohol addiction,
19 improved my education level, and stayed out of trouble, I would be
20 released on parole at my first application."
21     Petitioner has made a prima facie case equivalent to that which
22 required a parole release by the Court in *Brown v. Poole* (2003) 337
23 F.3d 1155.  In this Court's Order to Show Cause, the plea bargain
24 claim was mentioned on pages one and three, and, in an order
25 attached and incorporated into the Order to Show Cause there was a
26 quote from *INS v. St. Cyr* (2001) 533 U.S. 289, 150 L.Ed.2d 347, a
27 case acknowledging the sanctity of a plea bargain.  Respondent has
28

2

1 | either misunderstood or mischaracterized Petitioner's claim and
2 | presented non-responsive arguments in the Return.  Given that the
3 | return serves as the principal pleading (*People v. Romero* (1994) 8
4 | Cal.4th 728, 738-739,) this failure disadvantaged appointed counsel
5 | and the issue did not receive the attention this Court feels it
6 | deserves.

7 |     Accordingly, both parties are invited to present additional
8 | argument and evidence on this matter.  (E.g. declarations from the
9 | trial attorneys and other attorneys (either defense or prosecution)
10 | who were involved in similar plea negotiations, and statistics on
11 | Board parole grants at the time.)

12 |     Further pleadings, if any, shall be filed by February 6, 2004.

15 | DATED:    Dec                        James C. Emerson
16 |                              JAMES C. EMERSON
   |                              JUDGE OF THE SUPERIOR COURT

18 | cc:  Petitioner (at State Prison Corcoran)
19 |      Petitioner's Attorney (Allen H. Schwartz)
   |      Attorney General (Jessica Blonien)

3

1
2
3
4
5
6
7
8

**FILED**

FEB 1 0 2004

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY _____ DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

In re                                    )      No.: 98079
                                         )
    PETER HONESTO,                       )
                                         )      INTERIM ORDER AND
On Habeas Corpus                         )      EXTENSION OF TIME
                                         )
_____)

    In order to give the parties more guidance on what this Court sees as a central issue in this case, this Court is attaching two recent final orders on the significance of plea bargains in parole suitability decisions.  (See DeLuna, #101994, at pages 4-7, and Chaudhary, #108084, at page 6.)

    In this case Petitioner was originally charged with first degree murder.  After a month long trial, which included about forty witnesses, the jury deadlocked at seven to five and a mistrial was declared.  The prosecution then entered into a plea bargain with

1

Petitioner that stipulated the crime was second degree murder.  The
trial judge, in a PC § 1203.01 statement, explained that
"difficulties with the evidence resulted in a plea of no contest to
second degree murder."  The benefit to the prosecution in making this
plea bargain contract was that another long and costly trial was
avoided and a murder conviction was guaranteed as opposed to
speculative.  The benefit of the bargain to Petitioner was that the
conviction was fixed as being no more than second degree murder.  It
appears the Board has circumvented and nullified the state's contract
with Petitioner by basing Petitioner's parole denial "first and
foremost [on] the commitment offense itself."  With his credits,
Petitioner has already served more time than any matrix designation
for second degree murder.  Since another arm of the executive branch
has bound the state to second degree murder in this case it would
appear to be a violation of due process for the Board to now
recharacterize the case in contravention of the earlier agreement of
the parties.  (See *In re Ramirez* (2001) 94 Cal.App.4th 549, 569, fn.
8.)

The Board appears to have unilaterally decided the crime can and
should be punished as first degree murder--the conviction the state
could not, and did not, obtain.  Notwithstanding the fact that there
is 'some evidence' Petitioner's crime was first degree murder the
Board might be precluded, by the Due Process Clause, from adopting
this view given that the Board's jurisdiction over Petitioner is
based on the state's plea bargain.

2

1  |  Legal analysis on these points should be presented in addition
2  | to the factual material outlined in this Court's earlier interim
3  | order.

4  |

5  |  The request for an extension of time is granted (good cause
6  | appearing due to the excessive number of these types of petitions)
7  | and time is further extended to March 19, 2004 so that the parties
8  | can respond as outlined above.

9  |

10 |

11 |

12 | DATED: _Feb 18_ , 2004    *James C. Emerson*
13 |                          JAMES C. EMERSON
   |                          JUDGE OF THE SUPERIOR COURT

14 |

15 | cc:  Petitioner (at CSATF/SP Corcoran)
   |      Petitioner's Attorney (Allen H. Schwartz)
16 |      Attorney General (Anya Binsacca)

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

2

3

4

5

6

7

F I L E D

APR 13 2004

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
DEPUTY

8

## SUPERIOR COURT OF CALIFORNIA

9

### COUNTY OF SANTA CLARA

10

11

12

In re

13

    PETER HONESTO,

14

On Habeas Corpus

15

No.: 98079

FINAL ORDER

16

17

18    In *People v. Avila* (1994) 24 Cal.App.4th 1455 the Defendant was

19    originally charged with first degree murder but entered a plea to

20    murder of the second degree.  In denying his motion to withdraw his

21    plea the Sixth District of the Court of Appeal relied in part on the

22    fact that "his negotiated sentence of 16 years to life was [] a

23    favorable one." (*Avila* at p. 1460.)  A plea reducing the crime to

24    second degree murder would not, however, be favorable if the Parole

25    Board had the power to nullify the plea, recharacterize the crime as

26    first degree murder, and then deny parole principally for this

27    reason.  Although there would always be "some evidence" supporting

28

1

C-6

1  such a recharacterization, the Due Process Clause would be violated
2  by such Board action.  Because that is precisely what happened in
3  this case the Board's decision is hereby reversed.

4

5      The Legislative Branch has decreed a different and less severe
6  punishment for second degree murder as opposed to first degree murder.
7  Furthermore, the legislature has set forth a matrix in the California
8  Code of Regulations meant to assure discrete and proportional terms of
9  punishment.  When the Executive Branch enters into a plea bargain with
10 a defendant it binds itself, as when entering a contract, to the terms
11 of that plea.  If the principal term of a plea is that the murder be
12 designated as being of the second degree then, plainly, it would be a
13 violation of that plea for a different division of the Executive
14 Branch to unilaterally recharacterize the appropriate punishment.
15 The Judicial Branch, by accepting a plea reducing a first degree
16 murder to a second degree, places a Constitutional imprimatur upon the
17 arrangement and is available to either party seeking redress.[1]
18 Sometimes it is the defendant who breaches the plea.[2]  But usually all
19 that is required of the defendant is that he waive all his
20 constitutional rights and accept immediate punishment.[3]  After a

21

22 [1] See People v. Cunningham (1996) 49 Cal.App.4th 1044, 1047; "A plea agreement is, in
   essence, a contract between the defendant and the prosecutor to which the court
   consents to be bound."

23
24 [2]  See People v. Collins (1996) 45 Cal.App.4th 849, 863, in which the defendant
   breached his part of the bargain to testify truthfully against a co-defendant and
   the court ruled: "The reciprocal nature of a plea bargain agreement mandates that
25 either party to the agreement be entitled to enforce the agreement in a situation
   where the party is deprived of the benefit of the bargain."

26 [3] "When the State enters a plea bargain with a criminal defendant, it receives
   immediate and tangible benefits, such as promptly imposed punishment without the
   expenditure of prosecutorial resources."   (Newton v. Rumery (1987) 480 U.S. 386,
27 394.)

28

1  defendant has fully performed his part of the bargain the remedy of
2  specific performance of the state's obligation exists.[4]

3      The government assures a defendant that his punishment will be
4  imposed as contemplated at the time of the plea.  Although remedying
5  the Board's breach of a plea agreement, as in this case, vindicates
6  the rights of one of the most reprehensible classes of persons in our
7  society, it also focuses this Court's attention on the honor of the
8  government and public confidence in the fair administration of
9  justice.  We would violate foundational precepts of due process when,
10 in order to extract additional punishment from an agreement entered
11 by a defendant, we increase the punishment from the second degree
12 matrix level.

13     Respondent may argue that it was never an explicit term of the
14 plea that the Parole Board would be bound by the District Attorney's
15 concession that the crime must be designated as second degree murder.
16 What then was the purpose of the plea bargain?  Petitioner, who had
17 insisted on a trial once and had obtained a mistrial after the jury
18 deadlocked in a nearly even split, never intended to freely give the
19 state everything he had thus far successfully fought against.  It is
20 implausible that when a defendant enters a plea to second degree
21 murder he does so in order to have his punishment fixed at that
22 contemplated by first degree murder.[5]

23     Conversely, it surely *can* be said that it was not a term of the
24

25 [4] See e.g. *People v. Lercy* (1984) 155 Cal.App.3d 602, 606: "Plea Bargain Must Be
   Specifically Enforced."  And see *People v. Mancheno* (1982) 32 Cal.3d 855, 860.

26 [5] See *Brown v. Poole* (2003) 337 F.3d 1155 citing *INS v. St.Cyr* (2001) 533 U.S. 289,
   322-323, 325: "inferring based on general analysis of what would motivate
27 defendants to accept plea agreements that particular defendant 'almost certainly'
   relied on availability of particular relief."

28

3

C-8

1  plea that the Parole Board *would* have a power of nullification. No
2  defendant would enter such a plea. And, if this were indeed the
3  situation, defense counsel would be derelict in their duties if they
4  did not warn their clients of the completely illusory nature of such
5  plea 'deals.' Nor was it anticipated by either party that the Board
6  would abuse its power in this way. There can be no argument that the
7  District Attorney secretly left this possibility open and gave away
8  nothing in exchange for the plea. This would betray the ethical duty
9  of a District Attorney, as a representative of the state, to conduct
10 the government's business fairly and honestly.[6]

11    Respondent may argue that even if the crime must be designated as
12 second degree murder, the Board must still be able to decide that it
13 was a particularly egregious example of second degree murder and for
14 that reason deny parole. This argument is nothing more than recasting
15 the original argument that the Board has unfettered discretion
16 regardless of the plea bargain. When there is a plea bargain, the
17 Board's discretionary use of the crime is limited to the statutory
18 matrix. All other factors are fully available for the Board's
19 discretionary interpretation. For example, an inmate who continues to
20 engage in serious misconduct in prison may properly never be given a
21 parole date notwithstanding the plea. Similarly, an inmate who
22 refuses programming, and has no prospects should he be released, may
23 never receive a parole date regardless of his plea. A plea only
24 impacts the state's ability to rely on the judgment as one factor
25

26 [6] See *In re Ibarra*, (1983) 34 Cal.3d 277, 289, in which the court stated that
   invalid or illusory "'concessions'" offered by the state "constitutes a species of
   fraud." See also *Santabello v. New York* (1971) 404 U.S. 257, 261: plea bargain
27 contracts "presuppose fairness in securing agreement between an accused and a
   prosecutor."
28

4

C-9

1  justifying an exception to the rule that a parole date shall normally
2  be set.[7]

3  Respondent may argue that Petitioner *has* received a benefit from
4  his plea and that benefit was the availability of parole hearings ten
5  years earlier. However, it defies common sense and logic to suggest
6  that Petitioner made such a bargain which lacks any substantive
7  benefit. To suggest that Petitioner entered his plea for an empty
8  procedural benefit of having his first parole hearing ten years
9  earlier would be unreasonable. Without any substantive concessions
10 by the state, the plea would be devoid of benefit to a Petitioner and
11 not "favorable," (*Avila* at p. 1460,). (See also *Brown v. Poole,*
12 *supra.*) That Petitioner's parole decisions would be based on the
13 crime being second degree murder was the ONLY benefit Petitioner
14 received from the plea. It was never contemplated that the Parole
15 Board would believe it had the power to examine the facts in the
16 abstract and without regard to the degree of murder fixed by the
17 District Attorney.

18 In large part Respondent tries to avoid the import of the above
19 points by asserting that Petitioner has no vested right to parole.
20 While this is true, focusing on this point avoids the question of what
21 rights Petitioner does have in the process by which parole is
22 determined. The California Supreme Court has stated "prisoners
23 possess a protected liberty interest in connection with parole
24 decisions rendered by the Board." (*Rosenkrantz* at p. 661.) This
25 liberty interest is grounded in the due process clause. (*Id.* at pp.

26
27 [7] The Board retains its full discretion on all but this one point. So if, for
   example, the Board disagreed with Petitioner's assertion that matrix category "B,"
   "contributing victim," applied, there would appear to be some evidence to support
28

C-10

1  660-661.  See also *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895.)

2  When, as in this case, the only basis for the Board's jurisdiction

3  over the inmate is his plea bargain, the inmate's liberty interest/due

4  process rights translate into a vested right that the facts of the

5  crime can not be reexamined and recharacterized as calling for more

6  punishment than the second degree matrix.

7      In Respondent's final pleading they argue that the applicable

8  laws and regulations expressly allow, and even require, the Board to

9  consider any evidence regarding the crime as it sees fit.  Such a

10  position begs the question of whether this action is constitutional

11  when there has been a plea bargain.  This Court finds that the Board's

12  procedures and methods, which amount to nullification of pleas,

13  violate the constitutional right to due process.  It is not a viable

14  answer for Respondent to suggest that their procedures and methods

15  allow such an action.

16      Respondent cites several older federal cases and suggests that it

17  is "analogous" that in those cases the parole authority was allowed to

18  consider separate counts that were dismissed.  Counts dismissed, even

19  pursuant to a plea bargain, must not be confused with a plea bargain

20  to a single count of a crime which is divided into degrees.  Further,

21  Respondent overstates the cited cases.  Citing *Santabello, supra*, the

22  court in *Robinson v Hadden* (10th Cir. 1983) 723 F.2d 59, 63, qualified

23  their holding, stating: "the Commission may consider evidences of

24  offenses by a prisoner which were charged in dismissed counts unless

25  such consideration would violate a plea agreement or a representation

26  made by the Government."  (See *United States v. Anderson* (1992) 970

27

28  that conclusion and such a finding would be within their discretion.

6

C-11

1  F.2d 602, 608.)  Recharacterizing a second degree murder as the

2  original charge of first degree murder is a clear violation of the

3  plea agreement.

4      More analogous than Respondent's federal cases, is California's

5  "*Harvey*" line of cases.  In *Harvey* the California "Supreme Court held

6  that as to a count dismissed pursuant to an agreement to plead guilty

7  to other counts, 'it would be improper and unfair to permit the

8  sentencing court to consider any of the facts underlying the dismissed

9  count for purposes of aggravating or enhancing defendant's sentence.

10  Count three was dismissed in consideration of defendant's agreement to

11  plead guilty to counts one and two.  Implicit in such a plea bargain,

12  we think, is the understanding (in the absence of any contrary

13  agreement) that defendant will suffer no adverse sentencing

14  consequences by reason of the facts underlying, and solely pertaining

15  to, the dismissed count.'"  (*People v. Barasa* (2002) 103 Cal.App.4th

16  287, 291, quoting *People v. Harvey* (1979) 25 Cal.3d 754, 758.)

17      For twenty five years it has been held "improper and unfair" to

18  circumvent a plea by using the material the People have bargained away

19  against the defendant.  The California Supreme Court found this

20  principle "implicit."  The United States Supreme Court has also

21  recognized it.  (See *Brown v. Poole, supra,* citing *INS v. St.Cyr,*

22  *supra,* noting that courts can infer "based on general analysis of what

23  would motivate defendants to accept plea agreements that particular

24  defendant[s] 'almost certainly'" had particular expectations.)  The

25  parallel to the instant situation is unmistakable.  It is "implicit"

26  in a plea bargain reducing the charge of first degree murder to second

27  degree that the indeterminate sentence will not, in actual fact, be

28

7

C -12

1  based on a reinterpretation of the crime as first degree murder.  It
2  would be "improper and unfair" to eliminate all benefit from the plea
3  bargain under the guise and expedient of quasi-judicial[6] action by
4  political appointees.  (See also *People v. Draut* (1999) 73 Cal.App.4th
5  577, 580, citing *People v. Beck* (1993) 17 Cal.App.4th 209, 215,
6  explaining *Harvey*: "implicit in a plea bargain is the understanding
7  that defendant will suffer no adverse sentencing consequences by
8  reason of the facts underlying, and solely pertaining to, the
9  dismissed count.")

10     While an exception to the *Harvey* rule exists, the reason for it
11  is inapplicable in this context.  "*Harvey* declares an equitable rule
12  applicable to negotiated pleas.  The [state] cannot with one hand give
13  a benefit and with the other take it away.  [But] [f]acts surrounding
14  a dismissed charge which are 'transactionally related' to defendant's
15  admitted offense may be considered in the disposition of the latter."
16  (*People v. Klaess* (1982) 129 Cal.App.3d 820, 823.)  Although it is
17  true in all murder cases that the facts considered by the Board would
18  be 'transactionally related' to the crime a petitioner admits by his
19  plea, it is just as certain that such an exception would inevitably
20  swallow the rule.  The fundamental, and controlling, equitable
21  principle would be entirely eliminated.  In this sense the analogy to
22  this exception falters beyond recognition of its underlying precept --
23  "implicit" in any plea bargain is that the state "cannot with one hand
24  give a benefit and with the other take it away."

25     The Board will lament that precluding them from being able to use
26  every possible fact against an inmate impinges on their duty to

27
───────────────────────────────
28  [6] It is "a quasi-judicial function [to] decide to grant or deny parole."  *Hornung*

C-13

1  examine the crime and the criminal.  The Board cannot avoid the fact
2  that their power in this regard exists by virtue of their position
3  within the executive branch.  Aspects of their power may therefore be
4  relinquished by a co-equal division of the executive branch.  In such
5  an instance the inmate is passed to a board with jurisdictional
6  qualifications and limitations.  In this case, the trial judge noted
7  "difficulties with the evidence," during a month long trial, which
8  included about forty witnesses, and which necessitated the negotiated
9  plea after a hung jury.  The local District Attorney decided that a
10 second degree conviction was better than another trial and possibly no
11 conviction at all.  The Parole Board may not distort the rule of law
12 and avoid the significance of the case's history.
13      There is no surprise or injustice being worked on the Board by
14 enforcing the terms of plea bargains because not all plea bargains
15 will necessarily impose such limitations.  If the District Attorney in
16 the first instance feels the crime is "exceptionally callous" or
17 "especially egregious" then there should be no plea bargain.  If the
18 crime amounts to first degree murder or is otherwise out of the
19 ordinary, the District Attorney should simply refuse a disposition.
20 Defendants would then be left with the option of pleading to the
21 charges and hoping that an early demonstration of remorse, and
22 acceptance of responsibility, would carry some weight with the Board
23 decades later.  When, however, the crime is set as second degree
24 murder, the Board's jurisdiction is circumscribed once the plea is
25 entered.
26      In a last ditch effort to avoid honoring the terms of plea
27 _____
28 v. Superior Court (2000) 81 Cal.App.4th 1095, 1099.

C-14

1  bargains, Respondent argues that the District Attorney can never take

2  actions binding the Board. Respondent suggests that if there has been

3  a violation of a plea the remedy is on the defendant to set it aside.

4  Setting aside a plea, after defendants have honored their side of the

5  bargain, is an unrealistic remedy. In this case, the plea was entered

6  because of difficulties with the charges and evidence, and those

7  problems would be exacerbated now that 19 years have passed.

8      Furthermore, it cannot be overlooked that Respondent's position

9  was recently rejected.

10          The state also urges that the prosecutor had no right to
           offer Brown the deal that she maintains she reasonably
11          understood and accepted, and therefore it is void. This
           may be a problem for the state, but not for Brown. See
12          United States v. Anderson (9th Cir. 1992) 970 F.2d 602,
           607 ("A plea induced by an unfulfillable promise is no
13          less subject to challenge than one induced by a valid
           general promise which the government simply fails to
14          fulfill."). Brown had no reason to know that the
           prosecutor's promises were improper. "Santobello itself
15          rejected the relevance of prosecutorial culpability: 'It
           is now conceded that the promise to abstain from a
16          recommendation was made, and at this stage the
           prosecution is not in a good position to argue that its
17          inadvertent breach of agreement is immaterial. . . . That
           the breach of agreement was inadvert does not lessen
18          its impact.'" Mabry v. Johnson (1984) 467 U.S. 504, 511,
           81 L. Ed. 2d 437.
19               (Brown v. Poole, supra, at p. 1161.)

20      The Board's decision to deny Petitioner parole was based "first

21  and foremost [on] the commitment offense itself," (RT 22,) and

22  because this violates Petitioner's plea bargain, this matter must be

23  remanded to the Board for a new hearing conducted in accordance with

24  the principles of due process noted above.

25      This Court will note that other aspects of the Board's decision

26  in this case also violated due process. For example, the Board

27  'found' Petitioner to have had an "unstable social history." The

28

C-15

1  Board was "referring to his admitted problems with alcohol at the
2  time of the commitment offense." (RT 23.) However only "unstable or
3  tumultuous relationships **with others**" is a "circumstance tending to
4  show unsuitability." (Title 15, § 2402(c)(3).) Petitioner's
5  problems with alcohol 19 years ago, which appear to have been
6  resolved, are no evidence of current unsuitability. Also, the Board
7  seems to have relied on Petitioner's "minor record of arrests" (RT
8  23) when only a "previous record of violence" is a "circumstance
9  tending to show unsuitability." (Title 15, § 2402(c)(2).) It was
10  also a violation of due process to punish Petitioner for not having
11  letters of support. Title 15, § 2402(d)(7) provides that if the
12  inmate either has "marketable skills" or realistic "plans" then
13  either one is a "circumstance tending to show suitability." (Title
14  15, § 2402(d).) Since Petitioner had "completed Vocational Data
15  Processing back in '93" (RT 25) he has met this disjunctive
16  criterion.

17  Finally, the Board stated Petitioner had "not sufficiently
18  participated in beneficial self help and therapy programming." (RT
19  23.) "Prisoner needs therapy and participation in self help
20  programming in order to face, discuss, understand and cope with
21  stress in a nondestructive manner. Until progress is made, the
22  prisoner continues to be unpredictable[9] and a threat to others." (RT
23  24.) The Board concluded by directing "if available, for the inmate
24  to participate in any and all self-help and therapy programming that

25  _____
      [9]    The Board's use of the word "unpredictable" is also troubling.
26  "Unpredictable" is the designation used by CDC officials when they do not have
    enough expertise or familiarity with an inmate to give a prediction. It does not
    affirmatively denote dangerousness. In this case the experts, the Correctional
27  Counselor and the Clinical Psychiatrist, were able to give professional
    predictions. To the extent the Board was not able to come to its own conclusion,
28

                                    11

1 becomes available." (PT 25.) It is evident that the Board imposed
2 this requirement of more therapy without any evidence that any more
3 therapy would ever be made available. It has been proven in
4 petitions similar to this one that the CDC does not fund therapy
5 unless there is a diagnosed need. In this case the Correctional
6 Counselor estimated that Petitioner "would pose a low degree of threat
7 to the public if released," (RT 12-13,) and the Clinical Psychiatrist
8 concluded, "if released to the community, he appears to present a
9 lower than average risk of committing similar crimes compared to other
10 inmates given his conduct within the prison setting, his family, his
11 social support and his tenacity to remain out of gang involvement" (RT
12 14-15). Neither CDC expert recommended further therapy, accordingly,
13 it is doubtful Petitioner would ever be given any more therapy or
14 programming in this regard. The Board thus puts Petitioner in an
15 impossible position by requiring proof of programming that will never
16 be provided.

17      Most courts which have considered Parole Board actions, have
18 noted their numerous and egregious abuses of discretion. (See *Biggs*
19 *v. Terhune* (2003) 334 F.3d 910 (nearly half of the Board's findings
20 were without evidentiary support); *McQuillion v. Duncan* (2002) 306
21 F.3d 895, (Board thoroughly abused its discretion because not a single
22 point was supported by some evidence); *In re Caswell* (2001) 92
23 Cal.App.4th 1017, 1030, (Board finding appeared to be "makeweight
24 rationalization" for what seemed to be a "predetermined conclusion in
25 search of justification,"); *In re Ramirez* (2001) 94 Cal.App.4th 549,
26 571, (court noted "The Board's readiness to make a finding so at odds
27

it can not use its own failings against Petitioner.
28

12

1  with the record supports Ramirez's claim that his parole hearing was

2  a sham,"); *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 427 (Board

3  statements appeared to be "a post hoc rationalization for a decision

4  already made.")  The Board's 'finding' regarding a need for therapy,

5  which is probably not available, and which was made without any

6  evidence and contrary to the conclusions of the staff experts

7  (Correctional Counselor and Clinical Psychiatrist,) when coupled with

8  Petitioner's near perfect disciplinary record (zero classification

9  score and only one 115 over a decade old,) appears to be yet another

10 unfortunate example of the Board's serious misapplication of

11 elementary principles of adjudication and due process.

12      As noted above the petition for a writ of habeas corpus is

13 granted and the matter is remanded to the Parole Board with

14 directions to conduct new proceedings in accordance with due process

15 as outlined above.  The Board is precluded from relying on any of the

16 purported reasons as outlined above.  The Board shall, within ten

17 days, set a date for a new hearing which shall be held within 45

18 days.

19      The above resolution of this petition makes it unnecessary for

20 this Court to examine the proof of Governor Davis' allegedly corrupt

21 and biased parole policy and its influence and impact on Parole Board

22 actions.  This Court, however, will retain jurisdiction over the

23 issue and will proceed to decide the question if Petitioner is not

24 granted a parole date after the proceedings contemplated by this

25 order.  If, after (re)hearing/ (re)consideration, Petitioner is not

26 given a parole date, he may immediately file a renewed habeas

27 petition in this Court.  Petitioner will be excused from pursuing his

28

C-18

1   administrative remedies which have been shown in other Petitions to
2   be illusory and the cause of unreasonable delays.  In the case of
3   Weider #114291, wherein this issue was extensively litigated and
4   Respondent submitted evidence by way of affidavit, Respondent did not
5   allege that a new hearing or any meaningful relief had ever been
6   provided by way of an administrative remedy.  Petitioner Honesto's
7   case is further proof of the ineffectiveness of the administrative
8   remedies given the numerous and egregious violations of due process
9   by the panel that were not remedied by the Board's appeals unit.

10

11

12   DATED:  _Apr 13_, 2004    _James C. Emerson_
13                            JAMES C. EMERSON
                              JUDGE OF THE SUPERIOR COURT
14

15   cc:   Petitioner (at CSATF/SP Corcoran)
16         Petitioner's Attorney (Allen H. Schwartz)
           Attorney General (Anya Binsacca)
17

18

19

20

21

22

23

24

25

26

27

28

C-19

EXHIBIT

E

**GRACE HONESTO**
909 Linda Vista
San Jose, CA  95127

September 9, 1998

<u>Via Certified- Receipt</u>

**PERSONAL & CONFIDENTIAL**
Mr. Glenn Mueller, Warden
Folsom State Correctional Facility
P.O. Box 71
Represa, CA  95671

RE: **Pedro J. Honesto / Ad-Seg #D55459 Bldg. 3-8-2-10**

Dear Mr. Mueller:

I have been instructed from State Officials to direct this letter to your attention for <u>immediate</u> assistance regarding the protection of my son, **Pedro Honesto, #D55459** Bldg. 3-8-2-10, who is presently in custody at your facility.

My concern is especially directed at and from the recent occurrence of disorder at this facility between racial group activity. If you review my son's "jacket", it will reflect that Pedro was placed in third-tier, maximum custody status and observation at the Santa Clara County Department of Corrections from the result of an assault and stabbing. This attack against Pedro was due to his brother employed as a Correctional Officer in Santa Clara County.

I am providing you with additional information of my employment history which is another basis for my concern. Until 1997, I was the Assistant to the Executive Administration for Director Inham for the Department of Corrections of Santa Clara County. Prior to this, I worked for the Women's Residential Center, Santa Clara County. During this period, for approximately (18) eighteen months, I was also a member of the Federal Grand Jury [#80-7] under the direction of Honorable Judge Robert Aguilar for this district/county.

Under this particular Grand Jury, our emphasis was "Interstate Transportation of Drugs and Prostitution". Most matters were directed at various organizations involving smuggling of drugs and prostitution throughout this district. Many individuals were sentenced to prisons throughout California and remain in custody.

Other members of our family have affiliation with the Department of Corrections (i.e. my other son (Pedro's brother), has been an officer for 14 years with the Santa Clara County Department of Corrections. His present status would be considered very high profile due to his activity such as Platoon Commander for the Emergency Response

...er to Warden G. Mueller, Folsom Correctional Facility
September 9, 1998
Page 2

Team; he has also taught at the Academy; my daughter (Pedro's sister), was employed
with the Santa Clara County Department of Corrections; My grandson (Pedro's nephew)
is a Guard/Correctional Officer with the Department of Corrections, State of California at
Soledad). Pedro was recently transferred from Soledad because of State Policy, wherein
an inmate and correctional officer cannot be at the same institution.

       My son has used his time in a very positive, constructive manner while
incarcerated. He received his GED, proceeded to achieve and acquire his Associated Arts
[AA] degree from an Orange County college, as well as receive various Certificates
specializing in Computer Technology and attendance/participation of AA
classes/meetings. Pedro also was an Administrative Assistant to the Warden at California
Men's Colony (CMC). He has no 315's [discipline problems] on his "jacket", and had no
felony prior convictions prior to this matter.

       I have researched this matter with Pedro's knowledge and assistance, and request
your assistance and guidance on Pedro's behalf, to relocating my son to either "Mule
Creek State Prison - B Facility" or "California Men's Colony (CMC) - East Facility".

       We, my family and I, know and believe, as well as Pedro, that he is in danger and
jeopardy and his life is threatened. This is why I have outlined our family's employment,
to plead with you for this transfer for the safety and life of my son. I make every effort to
visit my son, whenever and wherever possible. I understand rules and regulations,
however I also am well informed of the various organizations that exist within the penal
system. It is for these reasons, which are a reality, to restrict and above all prevent my
son's life being "taken out" by someone or individuals who are incarcerated at this
particular institution and affiliated with the organizations mentioned above.

       We believe this to be an extremely urgent matter and implore your intervention and
assistance to this very delicate, but very serious situation pertaining to life of my son,
which is at stake. Your assistance and cooperation is greatly appreciate. I await your
reply.

                                        Sincerely yours,

                                        Grace M Honesto

                                        GRACE HONESTO

GH/lg

cc:    C.A. Terhune, Director of Dept. of Corrections, California
       Hon. Bill Lockyer, State Senator
       Susan T. Kwan, Esq.
       Hon. Robert Aguilar (Ret.)
       Hon. Zoe Lofgren
       Ms. Kathy Napoli-Chavez

May 10, 2001

TO:      OFFICE OF THE INSPECTOR GENERAL

ATT:     INTAKE

FROM:    GRACE HONESTO / INMATES MOTHER

SUBJECT:  INMATE IN CORCORAN PRISON

C/O GRACE HONESTO
909 LINDA VISTA STREET
SAN JOSE CA. 95127
(408) 926-2235

INMATE NAME:      PETER J. HONESTO
CDC NUMBER :      D55459
INMATE ADDRESS:   CSATF/SP,FACILITY D GYM/DORM 205
                  CORCORAN, CALIFORNIA. 93212-5242

A few weeks ago while visiting my son Peter Honesto at the Corcoran state prison I noticed
a posting with an 800 number, where you offer assistance in cases of abuse or retaliation
for the public, as well as for the inmate.
I called your office and I was advised to send this complaint to (INTAKE).

I am enclosing copies of all the records I have in my possession. As you can see there
is quite a bit of information, it is beyond my understanding how all this things have come to pass,
its almost as if we were living in the dark ages. I understand that my son committed a serious crime,
but, somehow I always thought that the extent of a persons punishment was to be locked up.

I will tell you a little bit about myself, then maybe you will understand how I feel.
After my son went to prison I decided that in order to live with myself I would have to
either go to prison or work in the prison system, so I got a job at the Women's Residential
center of Santa Clara county department of corrections, I also worked as assistant to the
executive administrator, for the director, of the department of corrections in Santa Clara County,
it was there that I was able to see that if you commit a crime, one must be prepared to pay
the consequences. What are the consequences?
is it not our society who should bare the responsibility for the health and well being and safety
of all individuals incarcerated, after you read all these petitions, you too will be amazed
as to how far the color of authority can take some individuals.

I worked for the department long enough to see that the only interests some of the
guards had was to arrive at work, do as little as possible and get in as much overtime
as possible.  you will see in this complaint that my son has done everything possible
to stay away for gang affiliation , but, as you can see, the wardens, sergeants and the
guards want nothing more than to continue the process of forcing my son to live among
the northemers and the southerners, no matter how much his life may be in danger, you see, if
my son were to join the gangs and show his loyalty to the gangs, which means that my son would
show his loyalty by taking someone out, wouldn't that be a great, its called job security for everyone
beginning with the chain of command. You will read in this complaint how they there at the prison
continue to retaliate against my son because all he wants is to be kept away for the gangs.

My son has always been a model prisoner, while incarcerated, he received his GED,
an Associates in Arts Degree and he also completed nine years of AA classes,
A Vocational Computer Programming Certificate, not to mention him being a level #1 Inmate
with 0 points.
does this sound like a person that would jeopardize his chances of ever getting out of prison by joining,
a gang? I don't think so. The only one (115) he has received is one because he couldn't report to a
job. A job which required he wear prison shoes. If my son had been sent to classification, which is a
requirement, they would have read his chrono, which has him wearing street shoes
(for medical reasons) since his incarceration.

Last of all, why is Bill Lockyer, the attorney generals office defending these criminals
that are responsible for the continuous criminal acts against my son. Who will defend
my son? I pay tax dollars for of the needs of our society, but, to see how it is wasted
on people that abuse our system. I feel that these so called defendants should
pay for their own legal defense, What the attorney generals office is doing is validating
their actions as being acceptable.

In ending a pray that you read all these complaints and I hope that there is something
you can do for my son. I have this feeling that a guard will take it upon himself, again
in the color of authority, to force my son in a cell with an inmate that may take his life,
I am so very frightened. If I had known that your office existed, I would have sent you all
these documents a long time ago. Please help my son. Thank you so much in advance
for all the attention that you give to this very delicate matter.
Also please rest assured that if something is not done immediately to stop all
the retaliation against my son, which is happening right now, ( today) I will take this to
the media and any one else that is willing to help me.

Respectfully,

Grace M Honesto

Grace Honesto


CC: ATTORNEY GENERAL BILL LOCKYER

LIEUTENANT GOVERNOR CRUZ BUSTAMONTE

INMATE PETER J. HONESTO


ENCLOSURES

Mrs. Grace Honesto
909 Linda Vista Street
San Jose CA  95127

22 April 2002


Garry South, Esquire
COMMITEE TO RE-ELECT GRAY DAVIS
% Jennifer Whiting
  Campaign Secretary
Post Office Box 67190
Los Angeles CA  90067

> re:  HONESTO v ADAMS
>      Case No. 98W 0141L
>      Kings County Superior Court

Mr. South:

The purpose of this letter is to advise you that an Application
for a Writ of Habeas Corpus was filed on 11 April 2002, claiming
Governor Gray Davis has (1) abused the Doctrine of Separation of
Powers; (2) unlawfully changed my son's prison term; (3) fostered
an unconstitutional "no-parole" policy; (4) violated my son's
plea agreement with California State; and (5) deliberately acted
to discriminate against a disabled person, within the meaning of
the Americans with Disabilities Act.

I am a voting California taxpayer whose son is in State prison
for Second-Degree Murder.  The fact that he is only guilty of the
offense of Voluntary Manslaughter, notwithstanding, Gray Davis's
"no-parole" policy <u>unlawfully</u> prevents my son's release from prison,
even though he has served 17 years, and his in-prison record is
described by prison staff as <u>exemplary.</u>

We are asking you to intervene, before the details of this case
become public knowledge.  Your intervention would mutually benefit
Gray Davis, your campaign's goals, and our family.

Our next step is to contact the media, because Davis's "no-parole"
policy is not only a violation of my son's Constitutional right
to be free, pursuant to the First Amendment, as triggered by the
California State Legislature's criteria for release on parole, but
also, Davis's policy has already been censured by both a State
Superior Court Judge, and a California Appellate Court Judge.  As
your staff will note, when reading the enclosed Application,
Judge Miriam Vogel seems to think Gray Davis either misunderstands
the limits of his authority, or he simply believes the law does
not apply to the Governor of California.

Exhibit T-2

**P-68** //⁻¹

The question our family will be presenting to the media, both TV and the newspapers in Sacramento, San Francisco, San Jose and Los Angeles, is: "IF GRAY DAVIS CANNOT UNDERSTAND THE DOCTRINE OF THE SEPARATION OF POWERS, OR (WORSE!), IF GRAY DAVIS BELIEVES HE IS ABOVE THE LAW, IS THIS THE MAN THE AMERICAN VOTERS WANT IN THE NATION'S WHITE HOUSE?"

My son has been viciously attacked and stabbed, and he suffered permanent neurological damage while in prison, simply because he (1) has family members in law enforcement, and (2) refuses to participate in gang activities. If it were not for Gray Davis's "no-parole" policy, my son would have been spared that attack, because of his exemplary prison record, and could have received competent medical treatment.

We shall wait until 1 June 2002 to hear from you. If you do not respond, or if you respond in the negative, we shall (1) provide a copy of this Application to Bill Simon's Campaign Manager; (2) give interviews to the media and provide them copies; (3) submit a civil action against Gray Davis in Federal District Court for claims of violations of the ADA, First Amendment right to liberty and participating in an unlawful civil conspiracy with the Board of Prison Terms, the goal of which was to deprive my son of his well-settled Constitutional rights; and (4) vigorously pursue the Application in the California Court system, with the attendant publicity.

You have the power to prevent the resultant negative publicity, and we believe that preventing negative publicity should be your primary goal, at this juncture.

Our needs are simple: my son's immediate release, for whatever political spin Gray Davis wants to put on it to make himself look favorable in the media, plus a check sufficient to enable my son to pay his future lifelong medical bills.

In exchange, my son will withdraw his Application, and he will agree not to pursue the Federal civil action against Gray Davis.

We believe our son will prevail, both in State Court, as well as in Federal District Court, but the ultimate court battles would be extremely time-consuming. On the other hand, the resultant negative publicity for Gray Davis would be devastating to his re-election campaign, not to mention his White House run!

Waiting to hear from you in the near future, I am

Respectfully yours,

GRACE HONESTO

ENCL   as indicated



Mrs. Grace Honesto
909 Linda Vista Street
San Jose CA  95127

8 May 2002


COMMITTEE TO RE-ELECT GRAY DAVIS
Attn: ‛ Andrea Ness, Esquire
Post Office Box 67190
Los Angeles CA  90067

                re:   HONESTO v ADAMS
                      Case No. 98W 0141L
                      Kings County Superior Court
                      Corcoran Division (Dept. 10)

Ms. Ness:

Please accept this follow-up information, which may be of significance
to those in your legal department who are evaluating this situation
for Mr. South.

In the <u>Fresno Bee</u> on 3 March 2002, at Section B-3, an article entitled
"Court stays murderer's release from prison" clearly demonstrates
Gray Davis's position on releasing those prisoners who have taken a
life.  Davis has obviously adopted a stance that his "no-parole"
policy is absolute, despite <u>any</u> extenuating circumstances.

The article is enclosed, for your convenience in reviewing what
was written.  The problem, for your campaign purposes, is that the
Board of Prison Terms found this prisoner suitable for parole, but
Gray Davis took the extraordinary measure of having the Attorney
General's office persuade the Supreme Court to stop the release,
and overruled the Board, calling the prisoner, "a person with
little regard for human life."

Gray Davis's stance flies in the face of logic, inasmuch as this
particular prisoner (1) meets the criteria established by the State
Legislature, which makes it a <u>right;</u> (2) was found suitable for
release by the Board of Prison Terms; (3) has an exemplary prison
record; (4) suffers from AIDS; (5) suffers from cancer; (6) has
heart disease; (7) suffers from progressive dementia; and (8) has
served more than 17 years for an offense for which prisoners have
been released at 10 years, or less, prior to the Wilson/Davis tenures.

Because of Gray Davis's "no-parole" policy, tens of millions of
dollars are being spent to keep prisoners who are otherwise eligible
for release imprisoned, when those millions could be diverted to
educating the California taxpayer's children.

Exhibit 

HONESTO
8 May 2002
Page 2

Although Gray Davis has consistently touted himself as the "Education Governor," he is more and more being perceived as the "Incarceration Governor" by California taxpayers.

The various articles I have cited in my letters are found in the California newspapers, a number of pro-prisoner publications, in politically-oriented publications, and even in nationally-circulated magazines. The latest issue of <u>Playboy</u> contains an extremely negative letter about Governor Gray Davis in the Editorial Column.

My belief is that Bill Simon's staff simply not yet stumbled upon these negative articles, but they will certainly make good use of the information, once they are directed to it!

On a final note, I respectfully point out what your legal staff may have already determined, if they understand civil law. Once the Rosenkrantz situation is resolved, against Gray Davis, the flood gates will open, and the Attorney General's office will be hard-pressed to defend against the enormous amount of habeas petitions from all those prisoners who are affected by the decision, let alone petitions from those prisoners who will attempt to stretch their circumstances to fit the Supreme Court's ruling.

Although I am not a politician, I <u>do</u> understand civil law, and my unsolicited advice to Mr. Garry South is to <u>quickly</u> advise Gray Davis to approve Rosenkrantz's release, forestalling the adverse court ruling, and taking credit for a vote-getting decision!

Mr. South can then turn his attention to resolving my son's dilemma, thus preventing another flood of habeas petitions, once prisoners read the facts of my son's case in the law journals.

Hoping to hear favorably from you, in the near future, I remain

Respectfully yours,



Mrs. Grace Honesto

Exhibit 

STATE OF CALIFORNIA

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

FILE COPY

D-GYM

Location: Institution/Parole Region  Log No.  DEPARTMENT OF CORRECTIONS

1. CSATE/SP SATF D-01-04154   Category  8

2. _____  2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

NAME: Pedro Honesto   NUMBER: D-55459   ASSIGNMENT: Bldg. Porter   UNIT/ROOM NUMBER: Gym 205M

A. Describe Problem: I submitted the required CDC-7362 and request form when the medical form was not answered. I suffer from a numbness on the left side of my face, and periodic sharp pain in the head. I have been complaining about this injury since an assault I suffered at Folsom Prison, to my head in the summer of 1998. And at one point here at CSATE/SP, in the Summer/Fall of 1999, while in Ad. Seg. I received medication for the pain but only for a short period of time; the numbness again began when I wrote this and the pain is soon to follow.

If you need more space, attach one additional sheet.

B. Action Requested: To see a specialist

Inmate/Parolee Signature: Peter Honesto   Date Submitted: 8-26-2001

C. INFORMAL LEVEL (Date Received: 9-4-01)
Staff Response: Please return to 2/W and request to see where you have been placed on the MD line

Staff Signature: Rodman   Date Returned to Inmate: 9-4-01

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

Dissatisfied. This response is disingenuous, at best. I am seeking prompt, and reasonable medical care for what appears to be a degenerative and/or disabling injury which has spread further throughout my body since the original injury in 1998. The repeated requests I have ignored, so what purpose would be served to "see where [I] have been placed on the MD line?"

Signature: Peter Honesto   Date Submitted: 09-06-01
Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim   CDC Appeal Number:

STAFF APPEALS
SW
SEP 2 0 2001

CSAT APPEALS
RECD AUG 27 2001
SEP 2 5 2001

CSATF APPEALS

OCT 2 5 2001

First Level    ☒ Granted    ☐ P. Granted    ☐ Denied    ☐ Other: _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: 9-25-01    Due Date: 11-7-01

Interviewed by: Interviewed Pt. Reviewed the chart &
Examined the Pt.
Pt. reffered to Neurologist & labs are done.
will Flu.
Pt. will be worked up for his chronic ongoing
medical Problem.

Staff Signature: Dr Vijaya Katyula    Title: mD    Date Completed: 10/23/01

Division Head Approved:
Signature: _____    Title: HCM(A)    Returned
Date to Inmate: 10-24-01

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of
receipt of response.

_____

_____

_____

_____

Signature: _____    Date Submitted: _____

Second Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: _____    Due Date: _____
☐ See Attached Letter

_____

Signature: _____    Date Completed: _____

Warden/Superintendent Signature: _____    Date Returned to Inmate: _____

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of
response.

_____

_____

_____

_____

_____

Signature: _____    Date Submitted: _____

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION:  ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____
☐ See Attached Letter
CDC 602 (12/87)    Date: _____

12/03/02  18:13  Adventist Health->            Adventist Health-> ontist Health        Page 882

# Adventist Health
## San Joaquin Community Hospital
2615 Eye Street Bakersfield, CA 93303

CC:    Corcoran II SATF

DATE OF CONSULTATION:        **12/03/2002**

REFERRING PHYSICIAN:
CONSULTING PHYSICIAN:        Gregorio Pineda, M.D.    *[325]

## HISTORY OF PRESENT ILLNESS:
This is a 40-year-old male who is seen in follow-up for a left cerebellar pontine angle syndrome secondary to trauma. The patient had an injury during a cell fight with laceration to the left side of his face, cheek and lower jaw in 1999. In October 2000 the patient had a CAT scan of the brain, of the posterior fossa with thin cuts and contrast, showing no mass lesion. At that time the patient was examined and found to have a hearing loss on the left side.

Over the past year the patient has shown no progression; hearing is still poor, but better when there is little or minimal background noise. He complains of numbness to the left face intermittently. He denies any change in speech or coordination. He denies any headaches.

PAST ILLNESSES: He is complaining of left flank and urinary problems, under the care of urology.

## PAST SURGICAL HISTORY:
Surgery to the eye, multiple lasers to remove metallic slivers. There is a persistent metallic sliver in the eye, hence the MRI scan could not be performed.

EXAMINATION at this time reveals a well-developed and well-nourished male who is easily examined, very somber outlook. The calvarium reveals facial trauma. TMs are normal. There are no perforations. The neck is supple. There are no head or neck masses. Lungs are clear to auscultation. Heart – Regular sinus rhythm without murmurs. Abdomen – No organomegaly. Extremities – No abnormalities. Neurological – The patient is appropriate and alert, but somewhat somber. EOMs are full. There is no nystagmus. Fundi are well-seen and appear benign. Pupils are equal and reactive. Disks are sharp. No papilledema. Motor and sensory over V1, V2 and V3 are all within normal limits. Weber lateralizes very slightly to the right. Tongue is in the midline. Uvula moves well. Speech is clear and distinct. Motor examination – No weakness, paralysis or drift. Rapid alternating movements are normal. Reflexes are symmetrical, 1+. Toes are downgoing. Sensory examination is normal. Coordination is normal.

IMPRESSION: Left cerebellar pontine angle syndrome secondary to trauma; no evidence of progression.

## RECOMMENDATIONS
1    Mild analgesics p.r.n.
2    No further neurological follow-up necessary. This will be permanent and stationary.

---

## CONSULTATION/HISTORY &
## PHYSICAL EXAMINATION.

Kaiser
San Joaquin Community Hospital

Patient:  HONESTO, PEDRO
MRN:    512-22-0

Admission Date  12/03/2002
PINEDA, GREGORIO, M D

O PRAD
Page 1 of 2

STATE OF CALIFORNIA
**INMATE/PAROLEE DISABILITY VERIFICATION (I/P DV)**
CDC 1845 Provisional (Rev. 01/01)                                    DEPARTMENT OF CORRECTIONS

CHECK ALL OF THE BOXES APPLICABLE

| INMATES NAME | CDC NUMBER | INSTITUTION | HOUSING ASSIGNMENT | DATE FORM INITIATED |
|---|---|---|---|---|
| Honesto, Pedro | D55459 | SATF | GYM - 231 M | 9/13/02 |

*Section A - E to be completed by a physician only*

## SECTION A: REASON FOR INITIATION OF FORM

[X] Inmate voluntarily self-identified to staff

[X] Observation by staff     [ ] Third party evaluation request

[ ] Medical documentation or Central File information

## SECTION B: CATEGORIES OF DISABILITY

[ ] Blind/Vision Impaired          [ ] Speech Impaired

[X] Deaf/Hearing Impaired          [ ] Other

[ ] Mobility Impaired

## SECTION C: DISABILITIES IMPACTING PLACEMENT

1. [ ] PERMANENT WHEELCHAIR USER -DPW

2. [ ] PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)-DPM
   *Cannot* walk 100 yards or up a flight of stairs without pausing with the use of aids (crutches, prothesis, or walker).

3. [ ] PERMANENTLY DEAF/HEARING IMPAIRED-DPH
   So severe they must rely on written communication, lip reading or signing as their residual hearing, with aids, will not enable them to hear an emergency warning, or effectively communicate.

4. [ ] PERMANENTLY BLIND/VISION IMPAIRED -DPV
   *Not* correctable to central vision acuity of less than 20/200 with corrective lenses.

5. [ ] PERMANENT INDISCERNIBLE/NO SPEECH-DPS
   No effective written communication.

6. [ ] OTHER IMPACTING PLACEMENT (See Comments below)-DPO

## SECTION D: DISABILITIES NOT IMPACTING PLACEMENT

A. [ ] PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)-DNM
   Walks 100 yards and up a flight of stairs without pause
   [ ] *without* aids  [ ] *with* aids (crutches, prothesis, or walker)

B. [ ] PERMANENT NONAMBULATORY MOBILITY IMPAIRMENT
   (e.g., arm or hand prostheses, or missing digit(s))

C. [X] PERMANENTLY HEARING IMPAIRED-DNH
   With residual hearing at a functional level *with* hearing aid(s).

D. [ ] PERMANENTLY BLIND/VISION IMPAIRED-DNV
   *Correctable* to central vision acuity less than 20/200 with corrective lenses.

E. [ ] PERMANENT INDISCERNIBLE/NO SPEECH-DNS
   Communicates *effectively* in writing.

## SECTION E: Additional Medical Information

List assistance needed with daily living activities: (*i.e., eating, bathing, dressing, etc.*)

Left ear only

Per 128C(s) dated:
Has the following documented health care needs:
[ ] In-patient   [ ] Sun Sensitive   [ ] Out-patient
[ ] Heat Risk/Alert   [ ] Cannot be exposed to particulates in the air
Refer to 128C(s) dated:

[ ] DISABILITY NOT VERIFIED (*Explain in comments section*)

[X] VERIFIED DISABILITY IN:
   [ ] SECTION C     [X] SECTION D

DOCUMENTED MENTAL HEALTH NEEDS
[ ] CCCMS   [ ] EOP   [ ] MHCB   [ ] DMH
Refer to 128C(s) dated:

SECTIONS A through E COMPLETED BY:

| Physician's Name (Print) | Physician's Signature | Date Signed |
|---|---|---|
| H Dunn | | |

## SECTION F: ADDITIONAL PLACEMENT FACTORS AND INFORMATION
*For completion by correctional counseling staff*

[ ] Uses American Sign Language (A.S.L.)
[ ] Uses Signing Exact English (S.E.E.)
[ ] Communicates in writing   [ ] Reads lips
[ ] Reads braille   [ ] Requires large print

[ ] NO ADDITIONAL INFORMATION AVAILABLE

SECTION F COMPLETED BY:
| NAME | TITLE | DATE SIGNED |
|---|---|---|
| | | |

COMMENTS

C--LL COPY

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
INMATE APPEALS BRANCH
P O BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date:    **FEB 2 0 2002**

In re:    Honesto, D-55459
California Substance Abuse Treatment Facility and
    State Prison at Corcoran
P.O. Box 7100
Corcoran, CA 93212

IAB CASE NUMBER:    0105561
LOCAL LOG NO.:    SATF 01-4154

This matter was reviewed on behalf of the Director of the California Department of
Corrections (CDC) by Appeals Examiner W. Hutto, Facility Captain.

## ISSUE

Whether or not staff acted appropriately on the appellant's request.

## ARGUMENTS

### I

It is the appellant's position that he has numbness on the left side of his face and periodic
sharp pain in his head. He states that he did not understand the response at the First Level
of Review. The appellant states that he is aware that he has an appointment with a
neurologist. In section "H" of the appeal the appellant indicates that he has no problem
understanding the responses, however, the responses are never straightforward. He states
he was referred for a consult with a neurologist in August 2001. The appellant contends
that a neurologist still has not seen him.

The appellant requests on appeal to see a neurologist and to be informed of the date the
appointment will be scheduled.

### II

It is staff's position that on November 28, 2001, the utilization nurse confirmed that the
appellant's appointment with a neurologist was scheduled. The anticipated neurology
consultation is expected to be within 30-90 days. The institution states that the appellant
will be notified of his appointment time. The appeal was partially granted in that the
appellant has been scheduled for a consultation with a neurologist.

## FINDINGS

The rules governing this issue are:

0105561

HONESTO, D-55459
CASE NO. 0105561
PAGE 2

## California Code of Regulations, Title 15, Section (CCR) 3350. Provision of Medical Care and Definitions.

(a) The department shall only provide medical services for inmates which are based on medical necessity and supported by outcome data as effective medical care. In the absence of available outcome data for a specific case, treatment will be based on the judgment of the physician that the treatment is considered effective for the purpose intended and is supported by diagnostic information and consultations with appropriate specialists. Treatments for conditions which might otherwise be excluded may be allowed pursuant to section 3350.1(d).

(b) For the purposes of this article, the following definitions apply:

(1) Medically Necessary means health care services that are determined by the attending physician to be reasonable and necessary to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data as being effective medical care.

(2) Outcome Study means the definition, collection and analysis of comparable data, based on variations in treatment, concerning patient health assessment for purposes of improving outcomes and identifying cost-effective alternatives.

(3) Outcome Data mean statistics such as diagnoses, procedures, discharge status, length of hospital stay, morbidity and mortality of patients, that are collected and evaluated using science-based methodologies and expert clinical judgment for purposes of outcome studies.

(4) Severe pain means a degree of discomfort that significantly disables the patient from reasonable independent function.

(5) Significant illness and disability means any medical condition that causes or may cause if left untreated a severe limitation of function or ability to perform the daily activities of life or that may cause premature death.

## CCR 3354. Health Care Responsibilities and Limitations.

(a) Authorized Staff. Only facility-employed health care staff, contractors paid to perform health services for the facility, or persons employed as health care consultants shall be permitted, within the scope of their licensure to diagnose illness or, prescribe medication and health care treatment for inmates. No other personnel or inmates may do so.

(c) Private Consultants. Health care personnel not employed by the department are not authorized to order treatment for an inmate. Such persons may offer opinions and recommendations for consideration by department health care staff as follows: An inmate or an inmate's responsible guardian or relative, or an attorney or other interested person wanting the inmate examined by a private physician, shall submit a written request to the institution head. The institution head shall, after consulting with the facility's chief medical officer grant the request unless convinced that specific case factors warrant denial. The fact of and reasons for such denial, and notice of the right to appeal the decision in writing to the director, shall be d- un- ʷ-ted and given to the inmate or the pers- requesting the ʷ-ɔɩɖe heꜞth care service. Costs of such private consultations or examination- ʃhall be paid by the inmate or the person requesting the service.

(e) Medical Sick Call. Each department facility confining inmates shall schedule times and locations for providing routine medical attention to general population inmates. A medical doctor, registered nurse, or

HONESTO, D-55459
CASE NO. 0105561
PAGE 3

medical technical assistant shall make daily visits to each nongeneral population housing unit to provide medical attention to inmates unable to use the sick call services provided for general population inmates. Staff conducting sick call shall screen medical problems appearing to require further medical attention and shall evaluate requests for appointments with other medical staff. A facility physician shall personally visit each specialized housing unit at least once each week.

All submitted documentation and supporting arguments of the parties have been considered. The documentation and arguments presented are persuasive that the appellant has failed to support his appeal issue with sufficient evidence or facts to warrant a modification of the Second Level response.

A case conference with Dr. Salama, Chief Physician and Surgeon, and a review of the appellant's Unit Health Record was conducted. The UHR indicated that a neurologist evaluated the appellant in November 2000. A computerized axial tomography scan of the appellant's brain was completed and showed negative results. Dr. Salama indicated that a magnetic resonance imaging was not completed because the appellant has silver fragments in his eye, which poses a risk of injury to the appellant. The neurologist again saw the appellant on December 6, 2001, and the appellant was identified with cerebro pontine angular syndrome, which is possibly posttraumatic. The neurologist read the brain scan and noted that there was no tumor visible. The neurologist recommended that the appellant be seen a neurologist in one year and be provided with pain medication. Dr. Salama states that the appellant is receiving the recommended treatment as identified by the neurologist.

In this particular matter, the medical records and professional staff familiar with the appellant's medical history refute the appellant's contention that he has not received adequate medical care.

## DECISION

The appellant's request was appropriately granted in part.

The appeal is denied.

## ORDER

No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDC.

LINDA L. RIANDA, Chief
Inmate Appeals Branch

cc:    Warden, SATF
       Appeals Coordinator, SATF

C-FILE COPY

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

*CSATF APPEALS*
*JAN 1 4 2003*
*D*

Date:   DEC 3 0 2002

In re:   Honesto, D-55459
California Substance Abuse Treatment Facility and
    State Prison at Corcoran
P.O. Box 7100
Corcoran, CA 93212-7100

IAB Case No.: 0204385          Local Log No.: SATF 02-00694

This matter was reviewed on behalf of the Director of the California Department of Corrections (CDC) by Appeals Examiner T. Surges, Staff Services Manager I. All submitted documentation and supporting arguments of the parties have been considered.

I   APPELLANT'S ARGUMENT: It is the appellant's position that he is not receiving the pain medications that were prescribed by an outside specialist. The appellant requests to see a neurologist and to receive pain medication.

II   SECOND LEVEL'S ARGUMENT: It is staff's position that the appellant was seen by Dr. Pineda, a neurologist, on December 6, 2001. Dr Pineda recommended that the appellant be seen for a follow-up appointment in one year, not six months as the appellant alleges. Staff report that Ultram, a pain medication, was dispensed on May 28, 2002. Staff further note that the Medical Administration Record indicates the appellant was a no-show for pill line on several occasions; therefore, the Ultram was discontinued on July 3, 2002.

III   DIRECTOR'S LEVEL DECISION: Appeal is denied.

A.   FINDINGS: The institution has provided the appellant with a thorough response. The appellant was examined on December 6, 2001, by a neurologist. It is noted that the neurologist prescribed pain medication for the appellant and recommended that he be seen for a follow-up visit in one year. The Department shall only provide medical services for inmates that are based on medical necessity and supported by outcome data as effective medical care. The appellant may submit a Health Care Request Form, CDC 7632, if his condition requires additional medical care. While the appellant may not agree with medical staff's determination of his medical needs, he is not permitted to prescribe his health care treatment.

B.   BASIS FOR THE DECISION:
California Code of Regulations, Title 15, Section: 3350, 3354

C.   ORDER: No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDC.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:   Warden, SATF
      Health Care Manager, SATF
      Appeals Coordinator, SATF
      Medical Appeals Analyst, SATF

Department of Corrections

## ·Memorandum

Date:    October 21, 2002

To:    IM Honesto, D-55459

RE:    SATF-D-02-04800

FIRST LEVEL APPEAL DECISION:    PARTIALLY GRANTED

INTERVIEWED BY:    M. Wright-Pearson, SRN II, Oct 9, 2002

APPEAL ISSUE:    You state that you were dissatisfied with the response at the informal level. You state that the response does not explain why staff are continuously discriminating against you when a medical doctor has determined that you are permanently hearing impaired in your left ear. You state that the CDC 1845 has not been revised acknowledging the impairment as a disability therein showing the ADA Coordinator has elected to further discriminate against you with a specious response that fails to acknowledge a doctor's disability verification.

APPEAL RESPONSE:    Your appeal has been given careful consideration and a review of your medical record has been made. On October 9, 2002, I interview you in Facility D, medical clinic. At that time, I informed you that the CDC 1845 was not clear, and there was not medical documentation in your unit health record indicating that you were deaf in your left ear. I informed you that you were scheduled for an audiogram at the CTC on 17 October 2002. Unfortunately, the clinic was cancelled due to death of a staff member. Your appointment has been rescheduled for the first week in November, 2002. I also informed you that you were scheduled to be seen at the CTC for the ENT clinic on October 28, 2002. After all testing has been completed, you will be provided any aids and identifying vests required, if needed. You will receive an updated CDC 1845 and any pertinent chronos, if needed.

DECISION:  You have been provided with a thorough response. Therefore, based on the above, your appeal is being PARTIALLY GRANTED at the First Level of Appeal.

M. SHIRLEEN WRIGHT-PEARSON, SRN II
Director of Nursing Services
California Substance Abuse Treatment Facility and State Prison at Corcoran

JOHN D. KLARICH, M.D.
CMO/Health Care Manager(A)
California Substance Abuse Treatment Facility and State Prison at Corcoran

cc:  Appeal File
     Central File

# DEPARTMENT OF CORRECTIONS
## CSATF- SP CORCORAN

### *FIRST* LEVEL OF REVIEW
S U P P L E M E N T A L   P A G E

**APPEAL LOG #:**   SATF-D-02-00694
**INMATE:**   HONESTO, P.
**CDC #:**   D55459

## DESCRIPTION OF PROBLEM:

It is the appellant's position on appeal that he is experiencing pain due to a head injury.

## ACTION REQUESTED:

The appellant requests on appeal that he see a doctor and receive pain medication.

## APPEAL RESPONSE:

The appellant was interviewed by Dr. Medina on 05-23-02.

The appellant's medical file has been reviewed and his appeal has been given careful consideration. The appellant was evaluated by Dr. Medina on 05-23-02. Dr. Medina ordered Ultram for pain relief and also, ordered a referral for the appellant to see a urologist. The appellant shall be ducated for this appointment in the Correctional Treatment Center (CTC) specialty clinic in the chronological order in which his name appears on the waiting list and depending on availability of the urology specialist and transportation.

Regarding the appellant's allegations of deliberate indifference to his medical condition, the institution endeavors to provide medical treatment commensurate with the community health care standards. It is appreciated that the appellant is interested in seeing a specialist as soon as possible, however, he must realize that the institution is providing health care services for approximately 6,500 inmates and each inmate should have equal access to these services. Inmates with an emergency, serious or life-threatening illnesses and those with disabling pain, of course, receive priority treatment.

You have been provided with a thorough response. Therefore, based on the above, your appeal is being ***GRANTED IN PART*** at the First Level of Review.

If dissatisfied, the appellant is advised that he may submit his appeal at the Second Level for review.

V. J. KATUKOTA , M.D.    Date   6 5 02
Medical
California Substance Abuse Treatment Facility and State Prison, Corcoran

# DEPARTMENT OF CORRECTIONS
## CSATF- SP CORCORAN

### *SECOND LEVEL OF REVIEW*
### S U P P L E M E N T A L   P A G E

| | |
|---|---|
| APPEAL LOG #: | SATF-D-02-00694 |
| INMATE: | HONESTO, P. |
| CDC #: | D55459 |

**APPEAL DECISION:    PARTIALLY GRANTED**

## DESCRIPTION OF PROBLEM:

It is the appellant's position on appeal that he is dissatisfied with the First Level Response to his appeal. The appellant complains he has not seen the neurologist though he has been waiting six (6) months. The appellant further states he also waited for pain medication to be issued.

## ACTION REQUESTED:

The appellant requests on appeal that he be seen by a neurologist and that he be issued pain medication.

## APPEAL RESPONSE:

The appellant was interviewed at the First Level of Review by J. Medina, M.D. on 05-23-02.

The appellant's medical file has been reviewed and his appeal has been given careful consideration. A review of the appellant's Unit Health Record reveals that the appellant was seen by the neurologist, Dr. Pineda, on 12-06-01. Dr. Pineda's recommendation was that the appellant should be seen for a follow-up appointment in one (1) year, *not six (6) months as the appellant alleges*. Pain medication, Ultram, was dispensed on 05-28-02. However, a review of the Medication Administration Record (MAR) indicates the appellant was a no-show for pill line on several occasions, therefore, Ultram was discontinued on 07-03-02.

You have been provided with a thorough response. Therefore, based on the above, your appeal is being *GRANTED IN PART* at the Second Level of Review.

If dissatisfied, the appellant is advised that he may submit his appeal at the Director's Level for review.

Edgar Castellanos                                     9-10-02

F. SALAMA, M.D.                                        Date
Chief Medical Officer                    CSATF APPEALS
California Substance Abuse Treatment Facility and State Prison, Corcoran
SEP 1 8 2002

| INMATE | HONESTO, PEDRO | CDC# | D55459 | HOUSING | E2 160U |
|---|---|---|---|---|---|

This inmate has PERMANENT HEARING IMPAIRMENT (DNH). His residual hearing is CORRECTABLE to functional level with hearing aid(s). Without his hearing aid(s) he cannot hear emergency warnings. The possibility exists that his hearing aid(s) could malfunction. Therefore, he should wear a YELLOW VEST to identify his disability if and when his hearing aid(s) is not functional. THIS DISABILITY DOES NOT IMPACT PLACEMENT.   PREFERRED METHOD OF EFFECTIVE COMMUNICATION WHEN HEARING AIDS NOT FUNCTIONING:  Reads lips/Written notes.

CC: Health Record
    C-file
    Inmate Assignment
    CCI/CCII
    Housing Officer
    Inmate

Signature:  S. Suryadevara, M.D. CMO (A)

Arrival Date: 10/12/07

| DATE:    10/24/07 | HEALTH SERVICES CHRONO | SATF CDC-128-C |
|---|---|---|

INMATE: **HONESTO, PEDRO**     CDC#: **D55459**     HOUSING: **FA-B3-264L**

This inmate has a PERMANENT HEARING IMPAIRMENT (DNH). His residual hearing is CORRECTABLE to a functional level with hearing aid(s). Without his hearing aid(s) he cannot hear emergency warnings. The possibility exists that his hearing aid(s) could malfunction. Therefore, he should wear a YELLOW VEST to identify his disability if and when his hearing aid(s) is not functional. THIS DISABILITY DOES NOT IMPACT PLACEMENT.

CC  Health Record
C-File
Inmate Assignment
CCI/CCII
Housing Officer
Inmate

Signature: K. Kachare, M.D.

Arrival Date: 10/14/1998

Date  02/27/06     *HEALTH SERVICES CHRONO*     SATF CDC-128-C

**EXHIBIT**

F

### DECLARATION/AFFIDAVIT

On 3-26-87, my jury trial to charges of First Degree Murder and Special Circumstances ended in a deadlocked jury trial, due to evidence problems with the Peoples case, at which time Deputy District Attorney Tom Farris representing the State of California, (State & Prison Officials), offered to stipulate to fixing the punishment in the Second Degree, dismissing First Degree Murder and Special Circumstances, (aggravating facts of the crime), as an inducement for me to change my plea, waiving all my rights attendant to a retrial and the States burden of proof, for the benefit of less punishment.  I accepted the plea through trial counsel Frances Cavagnaro  with the reasonable understanding I would not suffer any adverse effects of and pertaining to the dismissed counts, and aggravating facts of the crime, that were not found/proven by a jury 'dismissed'; in exchange for the significant benefit of less punishment by application of good-time conduct credits, providing I positively program due to the dismissed counts, charges, and aggravating facts of the crime, because of evidence problems with the Peoples case in trial.

At the time of the plea change defense counsel advised me the State is bound to the terms of the plea dismissing counts, charges, and aggravating facts of the crime, due to the plea contract.

After the plea bargain/contract hearing Probation Officer E. Kammelarr interviewed me on order by Superior Court Judge J. Komar, without counsel present and without advising me of my right to counsel, at which time I informed the probation officer I did not want to go into the details of the offense or any other facts without counsel present, and that, counsel advised me the punishment was fixed in the Second Degree, due to the plea contract.  Despite these facts E. Kammelarr continued to interview me for a long time without counsel present and documented I became ambivalent to answer any questions, when ignoring my request for counsel, at which time E. Kammelarr continued to interrogate me and induced

1.

a statement from me under duress without waiving my right to counsel and without being advised of my right to counsel, rendering/authoring a probation report detailing my induced statement and aggravating facts of the crime she knew were dismissed due to the term/punishment being fixed/stipulated in the Second Degree as part of the plea contract, for the benefit of less punishment, and she knew the aggravating facts of the crime and First Degree Murder were not found/proven by a jury;   And she knew her report and my induced statement under duress without counsel would be used/applied during stages of the criminal proceedings, and that P. Silva and G. Vick Probation Report Supervisors approved and authorized the probation report interview without counsel present, knowing I had the right to counsel at the interview, and they knew the probation report, my induced statement under duress without counsel and without being advised of my right to counsel would be used/applied when they approved/authorized it as part of the record, adversely prejudicing me where the facts demonstrate the punishment was fixed/stipulated in the Second Degree by the Prosecutor prior to the probation report interview and the rendered report, as outlined in this Complaint.

After I was incarcerated in the California Department of Corrections, Superior Court Judge J. Komar and Deputy District Attorney T. Farris, knowingly used/applied the probation report and my induced statement under duress without counsel present and without being advised of my right to counsel during the probation report interview to instruct State and Prison Officials (Parole Board Member's), to disregard the plea fixed/stipulated in the Second Degree, and to treat the committed offense as a punishment for First Degree by application of the dismissed/stipulated away counts, charges, aggravating facts of the crime that they knew were not found/proven by a jury, and my induced statement to knowingly deny me the benefit of my plea contract for less punishment, and knowingly acting without jurisdiction and after I went to State Prison without counsel present with acts of malicious and/or dishonest, corrupt intent, and in bad faith to

2.

arbitrarily or capriciously discriminate/retaliate against me committing a species of fraud after I pleaded to a crime and because I would not talk about the details of the crime or any other facts at the time of the plea and sentencing at the advise of counsel due to the plea contract, resulting in me being inflicted with violations protected by Equal Protection, and the Due Process Clause of the 14th Amendment to the United States Constitution; And Jurisdictional Violations where the facts demonstrate I did not have counsel present at all stages of the criminal proceedings and on order by Superior Court Judge J. Komar, when interviewed for a probation report, as outlined in this Complaint.

Subsequent to the above stated facts Trial Counsel advised me I had no grounds to appeal.

At my Initial Parole Hearing Dec.1994 Parole Board Member's T. Giaquinto; C. Bentley; R. Beekman; Governor P. Wilson, and subsequent hearings Feb.1997, Parole Board Member T. Giaquinto, Governor P. Wilson; Jan.2001, Parole Board Member S. Lawin; Governor G. Davis; Warden D. Adams; March 2004, Parole Board Member's K. Risen; F. Vasquez; Governor A. Schwartzenegger; Warden's D. Adams; K. Clark and Director of Corrections J. Tilton, knowingly aggravated facts of the crime that they knew were not found/proven by a jury, detailing and applying facts documented in K. Kammelarrs' probation report, my induced statement, knowing I was under duress, without counsel present and without being advised of my right to counsel at the probation report interview, and they knew the aggravating facts, counts, and charges of the crime were dismissed/stipulated away as part of the plea inducement for the benefit of less punishment because of evidence problems with the Peoples case in trial; And choose to knowingly act with malicious and/or dishonest, corrupt intent, and in bad faith to arbitrarily or capriciously discriminate/retaliate against me committing a species of fraud with punishment in breach/violation of the plea contract, and because I did not talk about the details of the offense or any other facts at the time of the plea or sentencing;

3.

the infliction of violations to Plaintiffs' right protected by the U.S. Constitution; And discriminated/retaliated for and/or after I complained about my health, safety/welfare and liberty, knowing there was an excessive risk to my life when they applied a blanket rule/policy (**Cal. Code of Regs.2402**), that automatically excludes parole for individuals who's crime had a particular type of aggravating factor and to prejudice/discriminate against me when they applied/considered a submitted probation report by E. Kammelarr, P. Silva, and G. Vick, detailing dismissed counts, charges, and aggravating facts of the crime, and my induced statement, therein knowingly choosing to violate my clearly established Constitutional Rights to Equal Protection, protected by the 14th Amendment and the Due Process Clause of the United States Constitution, as outlined in this Complaint.

While my case was pending on Habeas Corpus, Nov.2003, Santa Clara County Conflicts appointed Allen Schwartz, attorney at law, who was deficient/ineffective failing to claim and present facts required on Habeas Corpus for release from unlawful restraint. And on 6-1-06, Santa Clara County Conflicts again appointed A. Schwartz, who again failed to present evidence required on Habeas Corpus and filed to detail submitted evidence demonstrating I was inflicted with **Stolen Justice** in Santa Clara County, See **Ex.G**, an extensive investigation showing how Courts, Prosecutors', and lawyers violate Defendant's Constitutional Rights.  On 8-24-07, A. Schwartz informed the Santa Clara County Superior Court on the record of my Complaints to the State Bar about his performance, which included a United States District Court Order **Ex.C**, demonstrating A. Schwartz again knowingly discriminated/retaliated against me because I filed a Complaint against him; failing to present the claim/fact J. Komar; T. Farris; E. Kammelarr; P. Silva; G. Vick; J. Tilton; D. Adams; K. Clark; T. Giaquinto; C. Bentley; R. Beekman; S. Lawin; K. Risen; F. Vasquez; P. Wilson; G. Davis; A. Schwartzenegger; B. Lockyer; E. Brown; J. Blonien; Santa Clara County Conflicts and doe's applied the

4.

aggravating facts of the crime that were not found/proven by a jury dismissed as part of the plea contract to breach/violate the binding contract invalidating the plea contract and to discriminate/retaliate against me because I pleaded to a crime for the benefit of less punishment and because I would not talk about the details of the offense at the time of the plea and sentencing; A. Schwartz also failed to present the claim and facts that my induced statement to the probation officer under duress without counsel present and without being advised of my right to counsel was applied to prejudice/discriminate against me, knowing I did not waive my right to counsel and knowing I had the right to counsel at all stages of the criminal proceedings. Despite these facts the Superior Court failed to remove A. Schwartz from the case, and on Final Order **Ex.H**, failed to address the issues, when documenting the Trial Courts use of my statement to the probation officer under duress without counsel present and without being advised of the right to counsel, and where the facts demonstrate I did not waive my right to counsel at the time of the interview; The Superior Court knowingly inflicted me with a gross miscarriage of justice (**Stolen Justice**), failing to remove A. Schwartz from the case knowing he failed to present the claims enumerated above and failed to present the claim I was inflicted with a species of fraud, and where the facts demonstrate a blanket rule/policy (**Cal.Code of Regs.2402**), was applied to me by State and Prison Officials in violation of my clearly established Constitutional Rights protected by the United States Constitution, as outlined in this Complaint.

On 8-25-06, Deputy Attorney General J. Blonien admitted J. Komar; T. Farris; State Officials, Parole Board Member's; Prison Officials, D. Adams, K. CLark, and J. Tilton, knowingly aggravated facts of the crime that were dismissed/stipulated away treating the crime/committed offense "as a First Degree case", to keep and house me in prison; And that, J. Blonien knew about the discrimination/retaliation and had the power and authority as Deputy Attorney General to stop the abuse and mistreatment, but elected to act corruptly with

officials Attorney General's B. Lockyer and E. Brown, to knowingly instruct State and Prison Officials to continue the abuse and mistreatment with acts of malicious and/or dishonest, corrupt intent, and in bad faith to arbitrarily or capriciously discriminate and/or retaliate against me, as outlined in this Complaint.

The rules and laws expose the fact the Briggs Initiative Proposition 7 of 1978, **Cal. Penal Code, 3041(a)(b)**, and **Cal.Code of Regs.2402**, authored the intent to keep high profile criminals in prison under prior law and my current law, in prison by aggravating facts of the crime that were not found/proven by a jury, inflicting a more severe punishment than authorized by law, therein authorizing the Parole Board, State Governor's and Prison Officials to foster/implement a blanket rule/policy that denies/excludes parole for individuals who's crime had a particular type of aggravating factor, regardless of any Equal Protection, Due Process, Sixth Amendment, Ex Post Facto or plea contract, where the law in application is uncertain and/or removes reformation of the offender, rehabilitation goals.

The facts of my case demonstrates at many levels of Government, under color of State Law and in violation of my right to counsel and to be advised of my right to counsel; "Defendant'" damaged me because I pleaded to a crime and did not talk about the details of the crime or facts at the time of the plea or sentencing at the advise of counsel, violating my civil rights denying me the benefit of my plea contract for less punishment; Despite these facts State and Prison Officials applied the probation report aggravating facts of the crime not found/proven by a jury, my induced statement to the probation officer without counsel, to treat my crime as a First Degree case, in breach/violation of my plea contract, and the infliction of a species of fraud.

I Peter Honesto, pro se Plaintiff declare under penalty of perjury that the foregoing is correct and true, and as to allegations made on information and

belief, I also believe them to be true.

Peter Honesto, pro se Plaintiff

Dated: 6-17-08

EXHIBIT

G

# The Mercury News

MercuryNews.com

## About the review

**By the Mercury News**

Article Launched: 01/22/2006 04:06:29 PM PST

The Mercury News obtained the appellate record for 727 criminal jury trial appeals. Those cases encompass virtually every appeal of a Santa Clara County criminal jury trial decided by the 6th District Court of Appeal from mid-1998 to mid-2003.

WHY ANALYZE APPEALS?

Each criminal appeal — and nearly every guilty verdict is appealed — contains allegations of improper behavior by a prosecutor, defense attorney or judge. It is up to the appellate court to assess these allegations. By analyzing the record of this process, the Mercury News took a comprehensive look at the conduct of trials in Santa Clara County.

WHY REVIEW ONLY JURY TRIALS?

Santa Clara County resolves 12,000 felony cases a year, but only about 300 end up as jury trials. Most of the rest are plea bargains. Still, jury trials define the system. They represent the most hotly contested cases; even cases that do not go to trial are handled, in large part, based on assessments of how they would fare before a jury.

AN UNPRECEDENTED REVIEW:

Because of its comprehensive nature, the analysis focused on a set of rarely examined cases: those that generate unpublished opinions from the appellate court. Appeals courts often label opinions "not to be published" —

meaning they should not be cited as a legal authority — because the analysis does not break new legal ground.

Academic and journalistic studies of criminal trials tend to ignore unpublished opinions because they are difficult to acquire and review. But in so doing, these studies omit the bulk of the courts' work. In California, more than 95 percent of appellate court decisions are unpublished. The Mercury News review is the first to include the full range of criminal cases and issues that confront a local justice system.

ANALYZING THE CASES

The Mercury News began assessing the conduct of the 727 criminal trials through a process of elimination. Hundreds of allegations made in the appeals were discounted, some because the issue was minor, others because the claim appeared to be suspect. The newspaper then reviewed cases with officials in the Santa Clara County District Attorney's Office, and with trial and appellate attorneys, which led to the dismissal of additional cases before arriving at a list of 261 that contained questionable conduct.

EXPERT REVIEW:

The Mercury News' process involved reviewing the appellate court's own findings in each of the cases. But the paper did not restrict itself to the court's findings for two reasons: In some cases, the court for technical reasons failed to reach a final ruling on troubling conduct; in other cases, the paper's analysis raised serious questions about the appellate court's own review and judgment.

To vet its conclusions, the Mercury News enlisted several recognized experts in criminal justice

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News

MercuryNews.com

nationwide.

Bennett L. Gershman, professor at Pace University School of Law in New York. Gershman was an assistant district attorney in New York and has served as a special state prosecutor investigating judicial corruption. He has written manuals on prosecutorial misconduct and on judicial error.

Alvin Goldstein, retired Marin County Superior Court judge and former state prosecutor in New York. Goldstein was chosen by the Justice Department to assist in establishing a judicial system in Iraq.

Laurie L. Levenson, professor at Loyola Law School in Los Angeles. Levenson, a former federal prosecutor, teaches criminal procedure and legal ethics. She has written a book on state criminal procedure.

John T. Racanelli, retired presiding justice of the 1st District Court of Appeal, and previously the presiding judge of Santa Clara County Superior Court.

David A. Sklansky, professor at Boalt Hall School of Law, University of California-Berkeley. Sklansky is a former federal prosecutor who has written a legal casebook on evidence.

Edmund B. Spaeth Jr., retired president judge of the Pennsylvania Superior Court, the appellate court in that state. Spaeth also served as a trial court judge, and more recently taught ethics and evidence at the University of Pennsylvania Law School.

In addition, Arlin Adams, retired member of the 3rd U.S. Circuit Court of Appeals and a former special federal prosecutor, responded to questions about the judiciary.

ADDITIONAL CASES:

In hundreds of interviews, defense lawyers, prosecutors and judges discussed their perspective. Their guidance led the paper to review hundreds more cases that were outside the study period. Those cases provided additional insight into the impact of questionable conduct.

STATISTICAL STUDIES:

To gauge the extent to which the 6th District is the final word on criminal appeals, the Mercury News identified and examined instances in which the appellate court's decisions were later reversed or significantly modified by the California Supreme Court or the federal courts. To provide context, the Mercury News also conducted a computer analysis of criminal appeals across the state.

THE REPORTING STAFF

The lead reporter for the project was Fredric N. Tulsky, who has spent five years at the Mercury News and 33 years in journalism. Tulsky has a law degree from Temple University. He is a Pulitzer Prize winner.

Tulsky collaborated in the early phase of the project with former staff writer Noam Levey.

Also contributing to the project were:

Griff Palmer, data analyst;

Leigh Poitinger, research librarian;

Mike Zapler, staff writer;

Julie Patel, staff writer;

Doug Griswold, graphic artist;

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By  Format Dynamics

# The Mercury News

MercuryNews.com

**FIRST OF FIVE PARTS**

# PART ONE: Review of more than 700 appeals finds problems throughout the justice system

### Investigation turns up justice system problems

By Fredric N. Tulsky, Mercury News

Article Launched: 01/22/2006 02:38:31 PM PST

The Santa Clara County criminal justice system failed Miguel Sermeno.

Sermeno was arrested on felony hit-and-run charges after walking the half-block from his house to the scene of an accident. An overzealous deputy district attorney ignored evidence that pointed to a more likely suspect, instead winning a wrongful conviction.

The system failed Bobby Herrera.

Herrera pleaded guilty to assault for a shooting he did not commit, buckling to pressure from an incompetent lawyer who bled his family for thousands of dollars but never investigated the case. Even after the key witness admitted she falsely accused him, indifferent state appellate court justices let his five-year prison sentence stand without explanation.

The system failed Frederick Brown. Brown was sentenced to 26 years to life for possessing stolen property, after he hauled away a truck that had been stripped of parts as it sat idly near his home for a year. The trial judge refused to instruct the jury on a key point of law: Brown was not guilty if he believed the truck was abandoned.

The three cases are among hundreds examined in an unprecedented three-year Mercury News investigation of the Santa Clara County criminal justice system that shows a disturbing truth:

A dramatic number of cases were infected with errors by prosecutors, defense attorneys and judges, and those errors were routinely tolerated. In dozens of cases, the errors robbed defendants of their right to a fair trial. And in a small number of the very worst cases, they led people to be wrongly convicted.

The study reveals ``a basic truth about how the criminal justice system operates,'' said Laurie Levenson, a former federal prosecutor who teaches criminal law and ethics at Loyola Law School in Los Angeles. Levenson was one of seven experts in criminal procedures and ethics who reviewed the Mercury News findings. ``A lot of sausage gets pushed through that machine. Errors that help the prosecution are common. The uneven nature of criminal justice is a serious concern.''

The Mercury News began its investigation in late 2002, as concerns emerged about the quality of justice in a series of high-profile cases. To test how the system worked more broadly, the newspaper reviewed the records of five years of criminal jury trial appeals decided by the California 6th District Court of Appeal -- 727 cases in all. In addition, the newspaper uncovered about 200 cases of questionable conduct that were not part of the study period, by reviewing files and interviewing lawyers.

The result is an unparalleled look at the extent,

---

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News
MercuryNews.com

nature and impact of errors in a criminal justice system.

The review established that in 261 of the appellate cases reviewed -- more than one in every three of the total -- the criminal trial had been marred by questionable conduct that worked against the defendant. In only about one in 20 cases did the defendant win meaningful relief -- either a new trial or a significantly reduced sentence -- from higher courts.

The problems occurred at every phase of a trial, and in every part of the system.

• **Prosecutors.** In nearly 100 cases, the prosecution engaged in questionable conduct that bolstered its effort to win convictions, the examination revealed. Some Santa Clara County prosecutors withheld evidence that could have helped defendants, some defied judge's orders and some misled juries during closing arguments.

But they did not act in a vacuum. In an adversary system in which defense attorneys and judges are responsible for guarding against prosecutors' excesses, the newspaper study found, those checks on the system too often fall short.

• **Defense attorneys.** In 100 cases, defense attorneys acted in ways that harmed their clients. In nearly 50 cases, the attorneys failed to take the most basic of measures, from properly investigating their case to presenting the evidence they gathered. Defense attorneys failed in dozens more cases to object as prosecutors or judges engaged in questionable conduct, in effect excusing the mistakes.

• <u>Trial judges.</u> In more than 150 cases, judges made missteps or questionable rulings that favored the prosecution. Violating legal precedents, trial

judges allowed evidence that unfairly tainted defendants and prohibited evidence that might have supported their defense. Repeatedly, judges failed to properly instruct jurors on legal principles, instead offering direction that made a guilty verdict more likely.

• **The appellate court.** The 6th District Court of Appeal, the primary court of review for Santa Clara County cases, upheld verdicts in more than 100 cases <u>even as it acknowledged errors had occurred.</u> The appellate court simply concluded those errors made no difference in the outcome of the case. Sometimes those conclusions were appropriate, but a review of the appellate record and consultations with experts established that in more than 50 cases <u>the court misstated facts, twisted logic and devised questionable rationales to dismiss the error.</u>

In nearly all the cases, the 6th District designates its opinions as ``not to be published'' -- a distinction that means they are not to be cited as legal authority in subsequent cases, and thus have little relevance beyond the parties to a case. The Mercury News found that higher courts are extremely unlikely to review unpublished opinions, making the 6th District the final word on most criminal trials in Santa Clara County.

The unpublished designation also has served to shield the cases from outside review. Past academic and journalistic studies of criminal justice, here and elsewhere, have examined published opinions, even though they represent a tiny proportion of court decisions. The Mercury News review is unprecedented in its comprehensive analysis of criminal decisions, published and unpublished alike.

State court statistics show the 6th District over time has published a smaller portion of its criminal cases -- 2 percent -- than any other appellate district in

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By Format Dynamics

# The Mercury News

MercuryNews.com

Although the court's language in the Villarreal case was unusually sharp, its conclusion was typical. In a system in which errors can lead to disastrous consequences, the ultimate check on most questionable conduct -- the 6th District Court of Appeal -- routinely excuses it.

The 6th District, which covers Santa Clara, Santa Cruz, Monterey and San Benito counties, was carved more than two decades ago out of the 1st District Court of Appeal, which oversees the rest of the Bay Area. It has long been regarded as the most conservative appellate court overseeing an urban area in California -- a reputation stemming in part from the role of law-and-order Gov. George Deukmejian, a former attorney general, in appointing its first eight justices.

California does not routinely release detailed statistics on how its appellate courts handle cases, and the available statistics are difficult to compare because court practices vary. But a Mercury News computer analysis of 20 years' worth of appellate decisions shows that the 6th District upholds convictions in 97 percent of the cases it hears.

To reach that level, the Mercury News determined, the court often went to great lengths to minimize or explain away the errors that were alleged in many of those cases.

For example, the review found 30 cases in which the appellate court misstated the facts or the law in ways that bolstered the decision to affirm the conviction. In one case, the court contended two defendants on trial for assault did not challenge the assertion that they had attacked the victim, when the trial record clearly showed they denied the attack.

The mistakes occurred exclusively in unpublished decisions -- suggesting, to experts such as UC-

Berkeley law Professor Stephen Barnett, that judges take less care with those cases. But the impact of not publishing may go beyond mere sloppiness.

Arlin Adams, a former federal appellate judge and special prosecutor, said he has ``long been concerned'' that judges give unpublished opinions short shrift. ``Writing an opinion for publication often forces the writer to analyze more carefully alleged errors,'' he said.

A Mercury News review documented just how powerful the unpublished designation can be in protecting a case from further scrutiny. By examining the opinions of the California Supreme Court over a 15-year period, the newspaper established that the state's highest court rarely reviews appeals in unpublished cases, given that the appellate court's decisions in those cases have no legal authority; during the past decade, the court has reversed only about two unpublished opinions of the more than 3,000 defense appeals it receives annually from all six appellate districts.

**A rare reversal**
* **Justices acknowledge a damaging misstep**

The case of Darcius Butler is the exception in which the 6th District concluded a single prosecution error was sufficient to order a new trial. In reaching that decision, the court acknowledged a crucial issue about the system: Small errors can lead to the wrongful convictions of people against whom there is not strong evidence of guilt.

A jury concluded Butler was the black man with braids who burst into a San Jose home in 2001 and terrorized Lisa Stuffel and her two children. Police initially came to suspect him after a witness identified Thomas Butler as a member of the robbery team and speculated that a robber she could not identify might have been his brother.

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By    Format Dynamics

# The Mercury News

MercuryNews.com

which later drew a rebuke from the appellate court for showing ``appalling disrespect'' to the judge, failed to persuade Hastings to change his ruling.

But Sonya Daniels' difficulties in presenting her defense were just beginning. After both she and her husband were convicted of second-degree murder, Leininger introduced her parents to another attorney, Brenda Malloy, who Leininger contended would be a good choice for the appeal. She would turn out to be a better choice for Leininger than for Sonya Daniels.

Malloy told her it would cost $25,000 for the appeal, and months later, according to court records, the first $10,000 was countersigned and deposited in Leininger's account.

Malloy filed an appellate brief on Sonya Daniels' behalf that was thoroughly lacking in legal research, offering only the barest indication of past court decisions that would normally be the heart of any appeal. The attorney general, in a rare step, argued that the appeal's discussion of the battered-woman issue was not coherent enough to warrant a response.

Then, on July 21, 2001 – the day that the case was scheduled for oral argument before a panel of justices – Malloy failed to show up altogether, and the argument went ahead without Sonya Daniels being represented.

Malloy was out of the country at the time, and was being investigated by the State Bar of California concerning allegations of shoddy representation of other Santa Clara County defendants. She eventually gave up the practice of law, state records show, after the state bar disciplined her as a result of its investigation.

Reached in Ireland, Malloy twice hung up when a reporter asked about the Daniels case. Leininger did not return phone calls.

Sonya Daniels found a new attorney days after the oral argument, but the 6th District would not permit her to file a new brief.

Seven weeks later, the appellate court issued its opinion, one that stands out even for a court that has routinely dismissed appeals. Even as it sharply criticized the work of Leininger and ridiculed the appeal of Malloy, the three-justice panel rejected the idea that better legal work might have made a difference.

The court said it would consider the question of whether Hastings improperly restricted Daniels' defense even though Malloy's brief was below ``the standards of competent appellate counsel,'' because at least she had ``presented some discernible arguments.'

But it rejected other issues Malloy sought to raise, saying her woeful submission did not merit consideration on those issues.

The court went on to endorse Hastings' ruling barring the battered-woman defense, and to affirm the convictions of Brian and Sonya Daniels. Sonya Daniels appealed without success to the California Supreme Court and has now turned to federal court.

The 6th District rulings ``completely distorted the process,'' said Janice Lagerlof, who now represents Sonya Daniels. ``Instead of hearing the issues properly argued, they made up what the arguments should have been, and then answered those arguments. Sonya Daniels was kept from defending herself at trial, and then 6th District denied her the chance to present her case on

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By [f] Format Dynamics

# The Mercury News

MercuryNews.com

appeal."

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.

Format Dynamics®

Print Powered By    Format Dynamics

#

# The Mercury News
MercuryNews.com

**THIRD OF FIVE PARTS**

# PART THREE: The high cost of a bad defense

**Shoddy, inept representation routinely infects cases, a review finds -- and the damage to a defendant often lingers far beyond trial.**

By Fredric N. Tulsky, Mercury News

Article Launched: 01/24/2006 04:50:47 PM PST

At first, after he was wrongfully accused of assault, Bobby Herrera believed he would find a lawyer who could prove his innocence. But in the last emotional minutes before he walked into court, attorney John Pyle was pressuring him to plead guilty.

Pyle already had collected more than $10,000 from Herrera's family. But he hadn't bothered to interview witnesses who could testify that Herrera didn't shoot a guest at his girlfriend's high school graduation party. Nor did Pyle pursue information that Herrera's primary accuser had gone back on her story to friends.

Instead, in the courthouse hallway that day in April 1998, Pyle offered this assessment: Herrera would get no more than a year in jail if he pleaded guilty. If he went to trial, he risked 25 years in prison. And a trial would mean thousands more in legal fees.

Herrera, 19, couldn't bear the thought of costing his parents -- his father was a forklift operator, his mother a home health care provider -- more money they did not have. ``I had no choice but to plead,'' he recalled recently.

But Pyle had misled him horribly. Herrera received a five-year prison sentence. And the family ultimately would pay tens of thousands more in an agonizing legal journey to free Herrera, a journey hindered by more ineffective lawyering and an unsympathetic appellate court.

Herrera's saga -- which was detailed in court records and interviews with participants -- is one of more than 100 uncovered by the Mercury News in which the quest for justice was undermined by poor representation. The paper's analysis, based on a review of 727 criminal appeals, hundreds of interviews and scores of additional cases, provides an unprecedented look at the scope of this problem.

The review showed how attorneys' failures contribute to a system that repeatedly favors the prosecution. Often, the errors were so appalling that they would seem unthinkable even to first-year law students: failing to interview witnesses, gather crucial evidence or know basic criminal law. Experts who reviewed the Mercury News' findings emphasized that another set of problems was just as critical: Attorneys repeatedly failed to respond aggressively to prosecutorial misconduct, a breakdown of the adversarial process that invites violations of defendants' rights.

In the worst cases, as in Herrera's, the attorneys' failures were so fundamental that they left doubts about the guilt of convicted defendants.

Compounding the problem, the review found that the errors plagued defendants far beyond trial. Appellate justices routinely declined to consider allegations of misconduct by prosecutors or errors by judges when attorneys had failed to challenge the behavior at trial.

The newspaper review found the problems began at

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By ▓ FormatDynamics

# The Mercury News

MercuryNews.com

attorney -- mounted a strong effort in the appellate courts.

The 6th District did not even bother to ask prosecutors for input before rejecting the appeal. But the state Supreme Court did, and prosecutors did not contest that Herrera's claim had merit. After the court ordered a new hearing, the district attorney's office dropped the case rather than pursue it again.

Finally free, Herrera had spent more than 11 months in prison and more than $30,000 of his family's money. Among other problems, he had defaulted on his student loans while locked up. But he since has married his girlfriend, and they have a daughter.

``I try to go on with my life, to handle it,' ' Herrera said of the experience. ``It is behind me now."

Only a small percentage of defendants suffer the sort of injustice that plagued Herrera. But his case illustrates much about how the normal workings of the justice system can go awry.

Overwhelmingly, defendants charged with felonies plead guilty rather than stand trial -- more than 95 percent of convictions statewide occur before trial. Most often that is because the evidence of their guilt is overwhelming, and their best chance at a reduced sentence is a plea deal. But judges, prosecutors and defense attorneys have another powerful incentive to bargain: The system would quickly break down if a significant number of defendants demanded jury trials, which are enormously time-consuming.

This pressure can become dangerous when amplified by private attorneys who also have a strong financial incentive to avoid trial.

In such instances, the Mercury News found, some attorneys may give clients erroneous legal advice, deny them the benefits of an investigation, demand more money -- anything to get the case over with.

Said appellate lawyer Kresser: ``There are lawyers who will do everything they can to keep from having to go into a courtroom and try a case."

**Avoiding trial**
* **S.J. lawyer sanctioned for forsaking clients**

One attorney with a history of dodging the courtroom -- to the detriment of his clients -- is San Jose lawyer Rudy Guzzetta. Court records from the 1998 appeal of a San Jose sexual assault case describe a pattern of pressure to plead.

In 1992, Guzzetta persuaded Maria Soto to plead guilty to second-degree murder in the beating death of her 3-year-old daughter, telling her she might get out in less than 15 years if she did, but risked life in prison if she didn't. She got the maximum sentence for the crime, 15 years to life, even after taking his advice.

But Soto won a new trial in 1997, after an appellate panel concluded that Guzzetta had failed to develop evidence implicating Soto's boyfriend, who had a history of beating the child and had been a witness against her. The court also saw a possible explanation for Guzzetta's failure: He was paid by the boyfriend's family to represent Soto, a blatant conflict of interest.

The San Mateo County District Attorney's Office retried Soto, but the jury deadlocked. Soto pleaded no contest to child endangerment and was deported to Mexico.

``She lost everything," said John Halley, her attorney in the second trial. ``She lost her

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



Format**Dynamics**®

# The Mercury News

MercuryNews.com

especially concerned that waiver may be overused.

In an interview, Rushing said he does not consider it the ``noble thing we signed on for'' to find technical reasons to avoid deciding error. He labeled that technique ``gotcha'' jurisprudence.

## High threshhold
• Court stretches to excuse bad counsel

The court's handling of waiver rulings is only a small piece of a larger phenomenon, the Mercury News found: Defendants who blame their convictions on incompetent attorneys rarely find sympathy from the 6th District Court of Appeal.

In part, the court's resistance reflects the mandates of law. A long line of California court rulings has set a high standard to challenge an attorney's representation. The defendant must demonstrate the errors were so severe that a jury probably would have reached a different verdict without them. Even then, a court will not grant relief if it determines the attorney had a tactical reason for the conduct -- perhaps, for instance, the attorney did not object to a prosecutor's fleeting mention of a defendant's criminal history so as not to call attention to it.

In just a handful of cases in the Mercury News review did the court find an attorney's representation so poor that it met this threshhold. Monty Lopez's experience with his lawyer was one. Lopez had been convicted of a felony for resisting officers who came to his house to quiet a disturbance. In the trial, Lopez's attorney sat by while the prosecutor undermined the credibility of defense witnesses with questions about their own past arrests and convictions. Deputy Public Defender Alfred Spielmann, a relatively inexperienced attorney, also failed to object to the introduction of statements that Lopez uttered after he invoked his right to an attorney.

The court said no reasonable attorney would have made those errors. Assistant Public Defender Nancy Brewer said the case spurred her office to provide additional training for its attorneys in countering prosecutors' tactics.

Defendants who fail to overturn their convictions on direct appeal have a second avenue of attack -- the habeas corpus petition, which allows the introduction of evidence not heard at trial. Often these petitions are used to present evidence of an attorney's behavior, such as failure to meet with a client or failure to investigate the case.

The 6th District typically is hostile to these challenges. For every petition it grants, the 6th District rejects more than five others in two words -- petition denied -- without offering an explanation or even asking prosecutors for feedback, the newspaper review found. Even in cases in which the court responds favorably, the defendant generally ends up no better off.

The court orders a new trial in just one in every four of the small pool of cases in which it grants relief. In the remainder, appellate justices send the case back to the Superior Court for a hearing on the new evidence; a sampling of those hearings shows the defendant won relief less than one-third of the time.

``The courts have a bias toward finality,' ' said David Sklansky, a former federal prosecutor and a faculty member at the University of California-Berkeley's Boalt Hall School of Law, who reviewed the Mercury News' findings. ``They are not eager to reopen cases and overturn convictions because of attacks on the work of defense counsel.''

Advertisement

 

A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.

FormatDynamics®

# The Mercury News

MercuryNews.com

The Mercury News review bore this out. Often, the court goes to significant and even surprising lengths to avoid finding fault.

Justices rejected Christopher Taylor's appeal, even though his attorney, Robert Mitchell, was suspended from practicing law throughout Taylor's bank robbery trial for failure to pay child support.

Just because Mitchell could not legally represent Taylor did not mean that his representation was inadequate, the court said.

Nor was the 6th District concerned by the performance of Herman Cowan, who represented Barry Parham during his trial and conviction for possessing cocaine for sale.

From the start of jury selection — when Cowan said he had a family emergency — through the verdict, Cowan was late one day after another. Cowan was even tardy for a hearing on whether he should be held in contempt for his repeated tardiness. On several occasions, a frustrated Judge Gregory Ward told the jury that Cowan was the reason for delays to the trial.

Finally Cowan offered Ward an explanation for his repeated failures to appear: The attorney, who already had a history of discipline for misconduct, said he was battling alcoholism. On appeal, Parham contended these absences, and Ward's courtroom expressions of impatience, unfairly turned the jury against him.

But the 6th District Court of Appeal found Cowan's representation to be sufficient -- and said his irregular schedule may have been tactical. Perhaps, the appellate panel said, Cowan had waited to sober up before coming to court ``in order that he could function at the level of a reasonably

competent advocate when he did appear.''

Both Mitchell and Cowan eventually were disbarred for a pattern of misconduct -- and the disbarment order for Cowan even cited the Parham case. Nevertheless, Parham served his full sentence, and Taylor remains in prison.

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



Format:Dynamics®

# The Mercury News

MercuryNews.com

**FOURTH OF FIVE PARTS**

# PART FOUR: How judges favor the prosecution

**IN A FOURTH OF ALL JURY CASES, A REVIEW FINDS, MEMBERS OF THE BENCH APPLY THEIR TREMENDOUS POWERS IN WAYS THAT HURT DEFENDANTS**

By Fredric N. Tulsky, Mercury News

Article Launched: 01/25/2006 05:35:45 PM PST

The first sign that the proceedings seemed biased against her client came when Judge Edward Lee began questioning a witness, attorney Elissa Eckman would later recall.

But that hardly prepared her for what happened near the end of the Santa Clara County robbery trial. Lee left his seat on the bench, took a water bottle to the podium and gave the jury his own closing analysis of the evidence. In his remarks, Lee offered reasons to doubt the witness testimony supporting Eckman's client, expanding on issues raised during his questioning.

``I never saw anything like it,'' Eckman recently said of the trial of Carlos Guerrero. ``It was like having two prosecutors in the room giving closing arguments. Only, one of them was the judge.''

A Mercury News review of five years of criminal jury trial appeals establishes a pattern of judicial conduct that favored prosecutors, with incidents occurring at nearly every step of the proceedings.

Santa Clara County judges made missteps or questionable rulings in nearly one of every four of the cases.

The impact of their behavior can be crucial: Judges exert tremendous powers as the arbiters of the courtroom – determining what evidence to admit at trial, guiding the jury with their instructions, and setting boundaries for the prosecution and defense as thorny issues unexpectedly arise. Often judges use those powers firmly and fairly. But when they fail to do so, their actions may skew the course of the trial.

• **Rulings on evidence.** In more than 50 of the 727 cases reviewed by the Mercury News, judges allowed prosecutors to introduce questionable – and often improper – evidence. In nearly 50 other cases, defense attorneys were restricted from introducing their own evidence, rulings that often raised concerns from appellate justices or independent experts. For example, in one manslaughter trial, the judge permitted the jury to hear the portion of a defendant's statement to police in which he confessed to striking the victim with a board, but not the portion in which he explained that it happened in a frenzy, after he was stabbed, and that he had not intended to kill the man.

• **Jury instructions.** In 48 cases, judges failed to give the jury appropriate guidance on the law – in ways that either bolstered the prosecution's view of the case or undermined the defense's contentions. As he directed jurors in a gang slaying case, a judge refused to tell them they should convict the defendant of manslaughter, not murder, if they found he acted ``in the heat of passion' ' when he opened fire on rival gang members an hour after someone shot his brother.

• **Judicial partisanship.** In 10 cases, including Guerrero's, judges made explicit remarks or

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



Format**Dynamics**

# The Mercury News

MercuryNews.com

There is political pressure: Nearly 20 years later, the election that ousted California Chief Justice Rose Bird and two associate justices remains a powerful reminder of the risks of being perceived as lenient on crime, at the trial as well as appellate levels. ``I believe there is some pressure, perhaps subtle, on judges in affirming convictions of defendants who appear dangerous to society," Arlin Adams, a former federal special prosecutor and retired member of the 3rd U.S. Circuit Court of Appeals, wrote in an e-mail. ``This pressure seems to be greater on judges who are elected, and thus must face voters in the future." In California, judges at all levels must stand before voters.

Judge Edward Lee is a former police officer who went to law school and served as a deputy district attorney before becoming a judge in 1991. In 1998, he presided over the case of Guerrero.

The case involved allegations of a parking-lot robbery: The victim's hat and coat were taken, but by the time of the trial, the victim was nowhere to be found. A police officer testified that the victim had accused Guerrero and two others of striking him and stealing the items. But the two gang members who were with Guerrero that night testified that was not true.

In his remarks to the jury, Lee offered guidance on how to sort through the contradictions. He called the gang members ``convicted felons," labeling one a ``convicted perjurer," and asked jurors to consider whether they could be ``minimizing the culpability or responsibility of somebody else, the other defendant in the car with them that night?" He also reminded them that the police officer had quoted Guerrero making incriminating statements at the time of the crime — testimony that Lee called ``extraordinary' ' if true.

Despite Lee's comments, the jury ended up deadlocked, causing a mistrial. But Eckman later challenged Lee's conduct in the case, contending he demonstrated bias.

Then, two years later, attorney Thomas Orvis sought to have Lee disqualified in a case by arguing that the judge had established a pattern of bias in other cases including Guerrero's. Lee, he said, ``has a habit and custom of acting as a surrogate district attorney."

An outside judge, in the Guerrero case, and the 6th District, in response to Orvis' complaint, rejected the concerns. Both noted that California judges have wide latitude to decide how to control the proceedings, and are permitted to make fair comments or ask questions to assist the jury.

Lee said he has done nothing wrong. The judge said he has long tried to ensure that juries are ``understanding and paying attention," including offering his instructions to the jury from the courtroom podium instead of behind the bench. On occasion, he said, he also had gone to the podium to summarize his views of the evidence.

But, Lee said, he has been careful to be evenhanded. ``The judge has the duty to make sure the trial is fair," he said. ``That is the primary thing." Nevertheless, he said, in recent years he has not offered jurors his own summation, nor has he engaged in questioning witnesses.

Several veteran judges said such conduct invites trouble, even if it is permitted under California law. Commenting to a jury on the evidence ``is always a dangerous thing to do," said Danner, Santa Clara County's presiding judge, who said he had never done so.

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News

MercuryNews.com

the first time.

But Mullin engaged in acts during the trial that caused the court even greater concern. He was "extraordinarily liberal" in permitting evidence of Parker's past bad conduct, allowing testimony from the complainant's older sister that Parker had raped her -- though refusing to let the jury learn that Parker had been acquitted of that charge. Mullin also blocked a defense expert who would have cast doubt on whether Parker was a pedophile. That, the court concluded, was an error significant enough to overturn the conviction a second time.

In the case of Jorge Vargas, the court's conflict with Mullin lasted multiple rounds and nearly five years. As Vargas waited in prison, the justices twice sent the case back to Mullin with concerns about the length of Vargas' sentence before, the third time around, modifying the sentence on their own.

Vargas allegedly drove a car of gang members in 1994; as they passed a rival gang, a passenger in the car fired a shotgun blast at the rivals, striking one in the neck. Although there was little evidence Vargas knew of the shooter's intent, Mullin gave him a life sentence for attempted premeditated murder and a series of concurrent sentences for a variety of charges that included 14 counts of firing a weapon out of a car, one for each person in the path of the blast. But the appellate court found that Mullin committed several errors, including sentencing Vargas for the crime of attempted premeditated murder when the district attorney had not even charged premeditation.

Mullin cut the sentence to 15 years. But the appellate court said the judge had not ordered the required evaluation of Vargas from the county probation department -- apparently unaware that Vargas, who had no significant prior record, was

eligible for probation.

The third time, Mullin offered a detailed explanation of why he was denying probation as he sentenced Vargas to 14 years in prison. In its third opinion, the appellate court questioned whether probation was the appropriate sentence but said the decision was within Mullin's discretion.

But the appellate court concluded that this time Mullin had wrongly decided to change the sentences for several of the counts of discharging the firearm from concurrent to consecutive. Only one shot was fired, the court noted, and that did not justify consecutive sentences. The appellate court chose not to give Mullin a fourth opportunity. It sentenced Vargas itself to 10 years and eight months -- and he was released soon after because of the time he already had spent in prison.

Mullin also failed to respond to telephone calls and a written request for comment.

**Instructing jurors**
• **In key phase, mistakes may lead to convictions**

The last thing that jurors hear before their deliberations are the judge's instructions on how to apply the law to the case. These instructions, while sometimes technical in nature, are often vital in determining whether the defendant is convicted, and for what crime.

The process is highly regimented. California has adopted a series of standard jury instructions to cover the gamut of crimes. At the close of a case, the judge decides which instructions apply, after both the prosecutor and defense attorney advocate for the instructions they favor.

But repeatedly, the Mercury News review showed, judges err in this phase of the trial. At times the

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By  ▯ Format Dynamics™

# The Mercury News
MercuryNews.com

**LAST OF FIVE PARTS**

# PART FIVE: Last chance, little help

**A REVIEW FINDS THE 6TH DISTRICT COURT OF APPEAL OFTEN MINIMIZES IMPACT OF MISCONDUCT, GOING TO GREAT LENGTHS TO PRESERVE GUILTY VERDICTS**

By Fredric N. Tulsky / Data analysis by Griff Palmer, Mercury News

Article Launched: 01/26/2006 05:53:44 PM PST

The justices of the 6th District Court of Appeal agreed that Timothy Parle suffered from one bad ruling after another during his trial on charges he murdered his wife. But as in so many cases the court reviews, they did not consider the errors bad enough to do anything about them.

The issue at trial was not whether Parle killed his wife but why. In the prosecution's telling, Parle methodically plotted the death of a woman he had fought with for years. To the defense, the slaying was the impetuous act of a mentally ill man, when Parle -- confronted by a woman he feared meant him harm -- snapped.

Judge Rene Navarro made five problematic rulings about what evidence to admit and what to keep out, the 6th District concluded -- all of which helped the prosecution and hindered the defense. No matter, the appellate panel ruled, in an opinion written by Justice Patricia Bamattre-Manoukian. The trial was fair enough. Parle's first-degree murder conviction was upheld.

It is a pattern that has been repeated over and over, a Mercury News analysis of Santa Clara County criminal jury trials shows. Prosecutors, trial judges and defense lawyers engage in questionable conduct that hurts defendants' cases. And the appellate court regularly affirms the convictions nevertheless.

An unprecedented review of five years of appeals -- 727 in all -- established that the court often goes to great lengths to preserve guilty verdicts. By examining the court's reasoning in each case, the Mercury News found that it routinely avoids commenting on troubling courtroom behavior, explains the problems away or says they do not matter.

The court does condemn some errors -- and a sampling of recent cases suggests it may be viewing courtroom conduct more critically under a new presiding justice. But the underlying pattern of rejecting appeals has continued -- a pattern than is especially critical because the 6th District is almost always the last word in a Santa Clara County criminal case.

But something different happened in Parle's case in July, a rare and significant development: U.S. District Judge William Alsup stepped in and rejected the state appellate panel's characterization of the problems as harmless; in fact, he said, some of the judge's erroneous rulings were ``devastating'' to Parle's case. Alsup ruled that Parle's constitutional rights had been violated. He ordered the conviction overturned.

Alsup's ruling, which has been appealed by the state attorney general, not only offers Parle a new trial. In effect, it also takes issue with the way the 6th District Court of Appeal often does business.

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics

# The Mercury News

MercuryNews.com

``Is this the way we should be trying cases?'
' Bennett Gershman, a Pace University School of
Law professor who has studied prosecutorial and
judicial conduct, asked after examining the Mercury
News' findings. He called the appellate
court's approach ``careless and casual.'
'

``When you see errors occurring repeatedly, you
expect to see courts using strong language to
condemn, and publishing those opinions, even
reversing to send a message," he said.
`` But it appears this court is permitting errors to
occur with impunity."

The 6th District -- which encompasses Santa Clara,
Santa Cruz, Monterey and San Benito counties --
reverses only 3 percent of the convictions it
considers, according to a Mercury News analysis.
And it seldom offers strong guidance short of
reversal: Not only is the court's commentary on
trial misconduct often muted, but it also has limited
the impact of its findings in the past decade by
approving just 2 percent of its opinions for
publication -- a legal designation that permits the
opinions to be cited as a precedent in future cases.
That publication rate is the lowest of any appellate
court in California, and lower than most courts in
any state.

Aside from the publication numbers, it is difficult to
compare the 6th District to other appellate districts
in California. The state does not keep detailed
statistics on individual appellate courts, and no
other district has been the subject of a study as
detailed as the Mercury News' review of the
6th.

But Gerald Uelmen, a law professor at Santa Clara
University who has closely studied the state
appellate courts, said 6th District clearly is falling
short.

``That's where the buck stops,"
Uelmen said. ``The Sixth is more tolerant of errors.
We see more forceful opinion with regard to errors,
especially with regard to prosecutorial misconduct,
from the First and Second districts,"
which oversee the rest of the Bay Area and the Los
Angeles area, respectively.

The 6th District's stance on criminal appeals
can be traced, in part, to the timing of its creation --
carved by the Legislature in 1982 out of the 1st
District Court of Appeal, which covers the rest of the
Bay Area and the North Coast.

The 6th District's first eight justices were
appointed by Gov. George Deukmejian, a former
prosecutor who had campaigned for governor on a
promise to name tough judges. Its longtime
presiding justice, Christopher Cottle, was one of its
most conservative members. He retired in 2002 and
has been replaced by Conrad Rushing, a former
presiding judge of Santa Clara County who became
the first 6th District justice appointed by a
Democratic governor.

Rushing came to the court with support from police
and, like his colleagues, tends to uphold
convictions. But Rushing has initiated a number of
reforms to longstanding court practices that
inhibited appeals, such as its routine denial of
requests for funding for expert witnesses. Still,
changing the course of a court is no simple task,
and the 6th District remains strongly conservative in
its approach to criminal cases.

**Faulty reasoning**
• **Dubious rationales to preserve convictions**

The Mercury News found little reason to question
the 6th District's decisions in the
overwhelming number of appeals the paper
reviewed. That included hundreds of cases in which

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News
MercuryNews.com

the court rejected defendants' claims of error. It also included the small number of cases in which the court was troubled enough by the errors to grant some relief.

But that left nearly 250 incidents of questionable conduct to which the court employed methods that minimized or dismissed the concerns.

In more than 100 instances, as in the case of Parle, the justices found that errors occurred at trial but determined those errors to be harmless.

On nearly 140 occasions, the court engaged in techniques that allowed it to avoid finding error: Sometimes it said there was no need for a determination because the error, if it occurred, would have been harmless; other times, the court concluded that the defense waived the right to challenge the error by failing to object at trial.

While such analyses can be valid, outside experts who reviewed the Mercury News' findings said that, in some cases, the court went too far.

But those approaches are far from the only ones the court employed in its effort to uphold convictions, the Mercury News found.

Sometimes it engaged in faulty legal reasoning.

In one case, a defendant convicted in a barroom assault sought a new trial because a witness had come forward with a sworn statement supporting his claim of self-defense. The appellate court refused the new trial request, noting that the same witness had invoked his Fifth Amendment right to remain silent at the first trial. There was no guarantee, the justices said, that he would not do so again. But there was a guarantee, the defense noted to no avail: Once a witness issues a declaration, he cannot legally refuse to testify.

Sometimes the court justified conduct by attorneys that appeared unjustifiable.

In one domestic-abuse case, the defense attorney failed to offer evidence that would have suggested his client's wife had aggressive tendencies of her own: She had broken the jaw of a subsequent husband. No problem, said the court. That evidence might have hurt the defendant, by indicating that he must have been really threatening if he scared so tough a woman.

And in a second domestic-violence case, the defendant's attorney permitted the jury to learn that he was on parole -- a fact typically considered prejudicial to defendants. But maybe, the court suggested, the defense attorney hoped to make the point that a parolee would be especially careful to avoid doing anything that would send him back to prison.

And sometimes the court even prevented defendants from offering evidence to support their claims.

One such case was that of Sean O'Neal, convicted of assaulting a San Jose man by smashing his face with a hammer when the man opened his front door early one morning.

The main issue at trial was whether the victim was correct in his identification of O'Neal, who had been friends with the victim's son years earlier. Prosecutors offered one clue reinforcing the identification: The victim's windows had been broken twice in the three days before the assault. The identity of the culprit was unknown, but the windows of O'Neal's father's home also had been broken days earlier.

When the case first went to trial, the judge barred evidence of the broken windows, as there was no indication that O'Neal was responsible for

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News

MercuryNews.com

crimes committed in the heat of passion. The jury convicted Nguyen of murder and attempted murder.

To Rushing, this was a severe error. ``Although this scenario presents a classic example of provocation and heat of passion, the trial court never instructed the jury'' on the possibility of weighing lesser charges. That failure, he wrote, violated Nguyen's constitutional rights.

But Rushing was a minority of one. In the majority decision, author Bamattre-Manoukian acknowledged that seeing one's brother shot may provoke someone to act rashly. But she noted that there was no evidence that Nguyen remained emotionally distressed by the time of his crime an hour later.

At any rate, the majority concluded it was reasonably probable that the jury would have convicted Nguyen of murder even if Mullin had offered the manslaughter option. The error was harmless, the justices ruled, as they affirmed his sentence of six life terms in prison.

## Quiet on errors
- **Justices fail to act as a check**

Higher courts and legal experts long have worried over the message that is sent when errors are deemed harmless. One concern is that prosecutors who value winning above all else will take away the message that they can continue their behavior without penalty.

Fifty years ago, the state Supreme Court wrestled with an issue that was considered harmless but was recurring at an alarming rate: Prosecutors suggesting that a defendant's failure to testify is evidence of guilt. ``Regrettably, we must recognize and deal with the fact that such conduct will not be discontinued as long as it is merely

rebuked,'' the court wrote, as it overturned a conviction based on the error.

Chief Assistant District Attorney Karyn Sinunu insists that court criticisms of prosecutorial conduct are taken seriously and that the office will counsel trial prosecutors whose conduct draws criticism, regardless of whether a conviction is overturned.

Several outside experts said that courts can take steps, short of overturning a conviction, to help ensure their concerns are heeded: They can express disapproval of the error in sharp language, and they can publish the decision, drawing more attention to their guidance.

The 6th District tends to avoid both steps.

The Mercury News examined the court's opinions in several series of cases in which prosecutorial errors recurred — such as the nine instances in which prosecutors described overcoming reasonable doubt as nothing more significant than the doubt a person overcomes when making a ``left turn,'' or ``going through a green light,'' or ``getting on an elevator,'' or ``getting on an airplane.'' In each instance, the appellate panel noted that the allusion was trivializing reasonable doubt -- a practice that improperly encourages jurors to disregard their doubts.

But in each instance, the reference was brushed off as harmless — and the conduct was disapproved only in mild language. In one case, for example, an opinion termed an elevator comparison ``improper . . . but not so compelling or inflammatory that it undermined'' the judge's instruction on the standard.

``When you see the same error recurring, the pattern suggests that something more than a mistake

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News

MercuryNews.com

is taking place," said Racanelli, now retired from his 1st District post, who found the trivialization of reasonable doubt especially troubling, because the concept of reasonable doubt is crucial to a fair trial. "In that situation, the appellate court has to provide guidance and supervision to the trial court. If it does not, it really is sanctioning the improper conduct."

The most extreme remedy, overturning a conviction, carries its own risks for appellate justices. To overturn a guilty verdict may free a dangerous criminal, a decision that carries more than just risk to society; ever since Chief Justice Rose Bird of the state Supreme Court and two of her colleagues lost retention elections amid a revolt over liberal justice, there is a potential political backlash as well.

In only 18 of the 727 cases reviewed by the Mercury News did the court find the nature of the errors so serious to compel them to reverse in full. That total does not include cases in which the court orders a minor modification, such as a new sentencing hearing.

**Voice of change**
• **Top judge's dissent driving slow shift**

In spring 2002, the 6th District handed down a decision that may be seen as a turning point in Santa Clara County justice, when it affirmed the convictions of Jeffrey Keyes.

Many aspects of the opinion were typical. Confronting Keyes' conviction on charges of murder, robbery, burglary and assault, the appellate panel upheld the jury verdict even though the justices concluded that the case was marred by error. During the trial, the appellate justices agreed, Judge Robert Ahern had devised a novel and, it turned out, illegal method of jury selection, limiting

the attorneys' right to disqualify alternate jurors.

Also typical was the court's dismissal of a second instance of questionable conduct, without even deciding whether it was error: Ahern's ruling permitting the prosecution to read to the jury the testimony of the primary witness against Keyes rather than requiring the witness to testify at trial, where she would have faced significant cross-examination.

Writing the majority opinion, Bamattre-Manoukian ruled that the court need not weigh the effect of either issue, finding that Keyes' lawyer had not objected promptly to the rulings. Because many trial errors can be handled at trial if the attorneys make timely objections, legal doctrine says defendants surrender their right to contest the error if the defense attorney fails to make a proper objection. The error, in legal parlance, is considered waived.

In a typical case, that would have been the end of it. But in Keyes' case, a new justice took issue with the court majority.

Rushing had joined the court months earlier, and already he had dissented twice to register his disapproval with a then-standard jury instruction (the state Supreme Court has since prohibited the instruction). But his dissent in Keyes' case was more remarkable because he publicly challenged two of the 6th District's longstanding practices.

First was the conclusion that the errors had been waived.

"I would be hard pressed to find a case where application of the waiver rule was less justified than the circumstances here," Rushing wrote of the jury selection process.

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

# The Mercury News
MercuryNews.com

As Rushing noted, the prosecutor had passed notes to the defense attorney during jury selection noting Ahern's error, and twice asked if the attorneys could approach the bench. But Ahern refused. So it seemed clear that the defense attorney's objection, coming the Monday after Friday's jury selection, was made at his first opportunity, Rushing concluded. ``It seems plainly wrong and not the law to say that the issue was waived,' ' he wrote.

Rushing said he thought either of Ahern's questionable rulings -- on jury selection or the witness's written testimony -- was sufficient cause to reverse the conviction.

Then his dissent went further still, suggesting that the court's quest for unanimity had diminished the quality of its work. ``By disagreeing with the majority,'' Rushing wrote, he hoped to show that ``vigorous debate can only improve judicial decision-making.''

Since Rushing joined the court, and became its chief a year later, there are significant signs of change; one of those is the percentage of cases in which a panel member dissents. Before 2002, the number of cases involving dissents averaged fewer than three a year; since then, the annual average has risen to seven.

The court also appears to have grown somewhat more willing to reverse cases. The percentage -- which had dipped below 2 percent during the five years before Rushing's appointment -- has climbed by more than half since then. And the proportion of cases sent back to trial courts for adjustments, usually to aspects of the sentence, has more than doubled to over 7 percent.

There are other signs as well. Money is more readily provided to appellate attorneys for expert

witnesses, although some attorneys complain that the money is still so limited that it hinders effective representation.

In many recent instances, the court has exhibited something of a split personality. Since becoming presiding justice, Rushing has seldom put himself on panels with Bamattre-Manoukian: From September 2003 to September 2005, they did not sit together on criminal cases at all, a Mercury News analysis shows. During that period, panels on which Rushing sat were twice as likely to reverse a conviction -- 4 percent of the time -- as were panels on which Bamattre-Manoukian sat, reversing 2 percent of the time.

Similarly, the analysis shows, panels on which Rushing sat published opinions at about twice the rate of panels without him -- a phenomenon that has boosted the 6th District's overall publication rate in the past two years to close to the state average.

In the past several months, for reasons Rushing declined to address, he and Bamattre-Manoukian have begun sitting together on panels again.

**A rare reversal**
- **U.S. judge steps in, but few courts do**

Though a midlevel court — nestled between the county Superior Courts and the California Supreme Court -- the 6th District is the court of last resort for virtually all Santa Clara County defendants.

Defendants may seek review of their cases from the state Supreme Court, but it accepts for consideration fewer than 100 of the 3,000 petitions filed in criminal cases each year. Because the high court puts its emphasis on cases in which it can help resolve uncertainties in state law, unpublished cases, which have no value as precedent, are a low

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

**EXHIBIT
H**

1

2

3                                                    (ENDORSED)
                                              F I L E D
4
                                              SEP 2 5 2007
5
                                                  KIRI TORRE
                                        Chief Executive Officer/Clerk
                                     Superior Court of CA County of Santa Clara
6                                    BY_____
                                                          DEPUTY
7

8              SUPERIOR COURT OF CALIFORNIA

9                 COUNTY OF SANTA CLARA

10

11   _____

12   In re                        )    No.: 98079
                                  )
13       PETER HONESTO,           )
                                  )    ORDER
14   On Habeas Corpus             )
                                  )
15   _____

16       The petition in this case is predicated upon the claim that

17   Peter Honesto (hereafter "Petitioner") entered into a plea bargain

18   that was not knowingly or intelligently made.  He testified at the

19   evidentiary hearing that his attorney advised him he would only serve

20   17 years in prison if he 'behaved and programmed and didn't cause the

21   Dept. of Corrections any problems."  He now asks this Court to set

22   aside the plea, claiming that he has not received any substantive

23   benefit from that plea bargain.  He argues: "Petitioner who insisted

24   on a trial once to a charge of first-degree murder, resulting in a

25   mistrial after the jury deadlocked in a nearly even split due to

26   evidence problems with the People's case, therein never intended to

27   freely give the state everything he had thus far successfully fought

28

                                  1

1  'not to worry about the judge saying '15-life,' because if he
2  'programmed well' he would get out.  He also testified that, after
3  his mother joined the conversation and told him not to accept the
4  plea bargain, the attorney wrote down his calculations on paper and
5  told him it would be about ten years after including credits.  Mrs.
6  Honesto testified, however, that the attorney only promised that
7  Petitioner *could* be paroled at his first hearing and that she heard
8  no mention of any particular number of years.

9      A review of the sentencing transcript is also instructive.  The
10 Court there stated:

11     "Of course, the *sentence is indeterminate* with a *minimum period
       of time.*
12
           The ultimate term that the defendant receives after the
13     minimum term with whatever credits the defendant is entitled to
       will be determined by the Community Release Board which will, of
14     course, be looking very carefully at the defendant during his
       period of incarceration.
15
       . . .Nevertheless, it seems to me that it's worth saying to the
16     defendant that the amount of the indeterminate sentence that he
       receives beyond the minimum term that is going to be fixed by
17     law really should be in part determined by two competing factors
       and they really don't compete with each other.
18         One of those is punishment and I'm not sure what adequate
       punishment is for taking the live of a human being, but it's
19     certainly clear to me that in this case fifteen years is not
       sufficient, nor is seventeen years.
20         That ultimate question is going to be determined by the
       release board.
21         The other, it seems to me, very serious factor to be
       considered in fixing a term beyond the minimum is the extent to
22     which a defendant, in this case Mr. Honesto, is rehabilitated.
           Having read the probation report carefully and more than
23     once, and looked at the manner in which Mr. Honesto has
       responded to the offense, I have a very serious doubt that he is
24     ever going to be rehabilitated.

25     . . . I am very hopeful that the Community Release Board will
       [at] each opportunity that it has, review that state of mind of
26     the defendant in determining what the appropriate time for his
       potential release may be, if that time should ever arise.  And
27     frankly, I'm not sure that it will.
           I'm not sure that it should.
28

                                   3

SCHWARTZ-AJLOUNY                    PAGE 02/05

1  against.  It is implausible that Petitioner would enter the plea to
2  second-degree murder only to have his punishment fixed at that
3  contemplated by first-degree murder."   (Petition at page 25.)
4  "Petitioner respectfully points out that basic logic demands
5  (recognizing) that Petitioner would NOT enter a voluntary and knowing
6  plea to a term of 25 years to life, with no promise of release, when
7  Petitioner had just been the recipient of a deadlocked jury."
8  (Petition at page 27.)

9      If Petitioner had been advised by counsel that he would serve
10  only 17 years, he was unquestionably misinformed about a direct
11  consequence of his plea and would be entitled to relief.   Thus, an
12  order to show cause was issued and an evidentiary hearing undertaken
13  to afford Petitioner an opportunity to meet his burden of proof on
14  that claim.  That burden was to show not just the logic and
15  plausibility of his position but also its factual basis.  Petitioner
16  failed to meet that burden of proof.

17      The only evidence presented by Petitioner was his own testimony
18  and that of his mother, Grace Honesto, in addition to the court
19  documents which accompanied the Petition and the traverse.  This
20  court is not convinced, however, given the lapse of time,
21  Petitioner's obvious self interest, and the inconsistencies in the
22  record, that Petitioner was not properly advised of the consequences
23  of his plea, including the fact that the term imposed was anything
24  but a term of life imprisonment with a guarantee of *eligibility* for
25  parole after 17 years.

26      Petitioner testified that his attorney told him he could get out
27  at his first parole hearing without mentioning any specific time, and
28

2

```
 1              . . . For a violation of Penal Code Section 187, murder, fixed
                in the second degree, it is the judgment and sentence of this
 2              court that the defendant be committed to the state prison for a
 3              period of 15 years to life."

 4         Thus, there can be little question that the indeterminate nature

 5    of the sentence and the possibility of spending the remainder of his

 6    life in prison was known to the defendant in 1987.   No substantial,

 7    credible evidence to the contrary has been offered.   This sort of

 8    evidence could have come from the attorney who counseled him to

 9    accept the plea, from the Deputy District Attorney who induced the

10    plea, or even from other attorneys who dealt with similar cases at

11    the time and who could testify to the patterns, practices, and

12    understandings of the bench and bar.  As noted above, evidence from

13    Petitioner alone is of little value given his obvious self interest.

14    The personally stressful circumstances surrounding the events,

15    coupled with the passage of time, further diminish the reliability of

16    evidence presented from Petitioner alone.

17         Because Petitioner has not provided credible, objective evidence

18    in support of his claim his petition is DENIED.

19

20

21

22

23    DATED: Sep 24, 2007              _____
                                        LINDA R. CONDRON
24                                      JUDGE OF THE SUPERIOR COURT

25

26    cc:  Petitioner's Attorney (Allen Schwartz)
           Attorney General (Jessica Blonien)
27         Research
           CJIC
28
```

4

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| In the Matter of<br><br>**PETER HONESTO**<br><br>             Petitioner On Habeas Corpus. | **(ENDORSED)**<br>**F I L E D**<br>SEP 2 5 2007<br><br>KIRI TORRE<br>Chief Executive Officer/Clerk<br>Superior Court of CA County of Santa Clara<br>BY BRET MORROW DEPUTY |
| **PROOF OF SERVICE BY MAIL OF:** | |
| **ORDER OF COURT (Penal Code §871.5)** | **CASE NO.:**<br>**98079** |

### CLERK'S CERTIFICATE OF SERVICE

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF THIS DOCUMENT, *ORDER OF COURT [Penal Code §871.5])*, WAS HAND-DELIVERED INTO THE BELOW-LISTED AGENCY'S INTER-OFFICE PICK-UP BOX, (WHERE APPLICABLE), OR MAILED WITH FIRST CLASS POSTAGE PREPAID IN A SEALED ENVELOPE ADDRESSED AS SHOWN BELOW, AND THESE DOCUMENTS WERE PLACED FOR PICK-UP OR MAILED AT SAN JOSE, CALIFORNIA ON DATE SHOWN BELOW.

DATED:     SEP 2 5 2007                       KIRI TORRE, CHIEF EXECUTIVE OFFICER/CLERK

                                BY:         **BRET MORROW**

                                         Bret Morrow, Deputy Courtroom Clerk

| **Petitioner:**<br>Steven Samble<br><br>c/o<br>Allen Schwartz<br>111 W. St. John Street, Suite 555<br>Santa Clara CA 95113 | **Respondent:**<br>Jessica N. Blonien, Deputy Attorney General<br>OFFICE OF THE ATOTRNEY GENERAL<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco CA 94102-7004 |
|---|---|
| **CJIC:**<br><br>(Placed in inter-department pick-up box) | **RESEARCH:**<br><br>(Placed in inter-department pick-up box) |

Pedro Honesto D-55459
CSATF/SP, E2-162 up
Corcoran, Calif. 93212-5242

Clerk of the United States District Court
for the Northern District of California
450 Golden Gate Avenue
Box 36060
San Francisco, Calif. 94102

Clerk

RECEIVED
JUN 28 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA